## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

| | |
|---|---|
| J.R., an individual,<br><br>        Plaintiff,<br><br>  vs.<br><br>Extended Stay America, Inc. d/b/a Extended Stay America Jacksonville – Southside St. Johns Town Center, Extended Stay America Jacksonville – Deerwood Park, Extended Stay America Jacksonville – Lenoir Avenue South, Extended Stay America Jacksonville – Salisbury Road Southpoint; Wyndham Hotels & Resorts, Inc. d/b/a Knights Inn Jacksonville; Red Lion Hotels Corporation d/b/a Knights Franchise Systems, Inc.; Jai Shree Laxmi, LLC d/b/a Emerson Inn,<br><br>        Defendants. | Case No.:<br><br>COMPLAINT<br><br>DEMAND FOR JURY TRIAL |

## COMPLAINT

COMES NOW the Plaintiff J.R., by and through the undersigned counsel, and respectfully submits her complaint for damages and makes the following averments.

## I.  INTRODUCTION

1.      Human sex trafficking is a pervasive evil that has left an indelible stain on the fabric of society.  This modern-day slavery exists illegally throughout the United

States and is furthered by public lodging establishments, including Defendants' hotels. Trafficking is undoubtedly one of the most wicked and immoral forms of behavior to plague civilized societies.

2.      As sex trafficking has grown to epidemic proportions, it has become widely recognized that our laws must look beyond the individual trafficker and sex buyer to end sex trafficking.  Congress therefore enacted the William Wilberforce Trafficking Victims Protection Reauthorization Act ("TVPRA") of 2008 to expand civil liabilities against anyone who knowingly benefits from the negligent participation in a venture that engages in trafficking crimes.[1]

3.      This case is about Plaintiff, J.R., a survivor of sex trafficking and the unfortunate victim of a scheme that began with criminal traffickers, and was assisted, supported, and facilitated by Defendants and their associates.  Defendants profit from sex trafficking by allowing criminals to brazenly operate in and out of their hotels throughout this country and have done so for years. Defendants permit criminals to parade their misconduct openly on Defendants' hotel premises, as Defendants reap huge profits at the expense of human life, human rights, and human dignity.

4.      Hotels exist to make profits, and sex trafficking increases revenues for any business willing to tolerate this depraved behavior.  Traffickers know that some hotels, like Defendants', rarely, if ever, intervene, even in the face of openly illegal behavior.

---

[1] *See generally*, Human Trafficking - Key Legislation, U.S. DEPARTMENT OF JUSTICE (Sep. 28, 2022), https://www.justice.gov/humantrafficking/key-legislation.

5.     Rather, Defendants' promotion of profits over people in their business ventures welcomes sex trafficking at their properties through ease of access for buyers, the ability to pay in cash (non-traceability), free Wi-Fi, and maintaining anonymity, privacy, and discretion.  Defendants further refuse to educate their staff or implement and enforce anti-trafficking measures and reporting.

6.     Defendants have known for more than a decade that sex trafficking runs rampant at their hotels.  Instead of taking timely and effective measures to thwart this reality, Defendants choose to profit off the exploitation of Plaintiff and others like her. Intent on benefitting from the profit created by rooms rented for this explicit and apparent purpose and acquiring valuable customer data by providing free internet services which attracts traffickers, Defendants repeatedly ignore the open and obvious presence of commercial sex on their properties.

7.     Throughout 2013, Plaintiff was trafficked for commercial sex in Defendants' Jacksonville, Florida hotels.  Plaintiff endured coercion, psychological torment, and verbal abuse coupled with physical and sexual violence as her trafficker sold her at Defendants' properties.

8.     These repeated crimes took place with the actual and/or constructive knowledge of Defendants, which systematically created ways to use trafficking victims as a means to increase their profits, including renting rooms and providing internet for traffickers to advertise commercial sex with J.R. at their hotels.    Defendants implemented permissive policies, procedures, and brand standards rather than taking concrete and effective steps to prevent, spot, or report trafficking at their hotels.

9. Plaintiff is a survivor of sex trafficking at Defendants' hotels. She brings this action for damages under the federal TVPRA civil remedy, 18 U.S.C. § 1595, seeking compensation for the harms and losses she sustained as a result of Defendants' facilitation of these commercial sex transactions at their hotels. Defendants own, operate, and/or manage the hotels wherein Plaintiff suffered. She alleges Defendants enabled, harbored, held, facilitated, and benefitted from participation in business ventures Defendants knew, or should have known, were engaging in commercial sex trafficking, sexual exploitation, and the brutal victimization of J.R., and others, in violation of 18 U.S.C. § 1591(a).

10. Specifically, Plaintiff alleges each Defendant violated federal law by benefitting from direct and indirect participation in business ventures that rented rooms Defendants knew or should have known were used to harbor J.R. for the purpose of sex trafficking and that provided internet services used by traffickers to advertise victims and solicit buyers for commercial sex acts at Defendants' hotels. Defendants and traffickers had, and have, a mutually beneficial relationship, fueled by the sexual exploitation of victims like J.R.

11. As a direct and proximate result of Defendants' consistent participation and refusal to identify, stop, and prevent commercial sex trafficking at their properties, Plaintiff was trafficked for the purpose of commercial sex, sexually exploited, and victimized repeatedly at Defendants' hotels.

12. Thwarting the expansive growth of human trafficking requires the hospitality industry and its component members to be held accountable for their role

in profiting from participation in ventures that a reasonable person or entity knows or should know engages in sexual slavery through both harboring and advertising victims. Civil lawsuits are thus an essential component of a viable plan for combatting sex trafficking in America.

## II. PARTIES

13.    Plaintiff J.R. is an adult, natural person, and citizen of the United States. She is a resident of, and domiciled in, Jacksonville, Florida. Plaintiff is a "victim" of sex trafficking within the meaning of 22 U.S.C. § 7102(17) and 18 U.S.C. §§ 1591(a), 1595(a), and a survivor of a "severe form of trafficking" within the meaning of 22 U.S.C. § 7102(16).[2]

14.    Defendant Extended Stay America, Inc. ("ESA Inc.") is a Delaware corporation with its principal place of business in Charlotte, North Carolina. ESA Inc. is a leading hospitality company with over 760 hotels nationwide.[3] In 2013, at the time of the incidents alleged herein, ESA Inc. directly owned, operated, and offered all public lodging services at its branded hotels,[4] including where Plaintiff was

---

[2] Due to the sensitive and private nature of Plaintiff's claims, Plaintiff will respectfully request this Court permit her to proceed under pseudonym in a forthcoming motion pursuant to Federal Rule of Civil Procedure 26(c) and Local Rule 3.01 to ensure Plaintiff's identity remains confidential throughout all public filings in this lawsuit. Plaintiff seeks not to prejudice Defendants and will reveal her legal name to Defendants for the limited purpose of investigating Plaintiff's claims once the parties have entered into a protective order.

[3] *Our Locations*, EXTENDED STAY AMERICA, https://www.extendedstayamerica.com/hotels/ (last visited Dec. 14, 2022).

[4] ESA Inc. did not begin franchising its hotels until 2017. *See* Tatiana Rokou, *Extended Stay America launches franchise development program*, TRAVEL DAILY NEWS (Jun. 7, 2017, 10:05 AM), https://www.traveldailynews.com/post/extended-stay-america-launches-franchise-development-program; Elliott Mest, *Extended Stay America reveals franchising component*, HOTEL MANAGEMENT (Jun. 5, 2017, 8:22 PM), https://www.hotelmanagement.net/franchising/extended-stay-america-reveals-franchising-component.

trafficked at the Extended Stay America® Jacksonville –Southside St. Johns Town Center located at 10020 Skinner Lake Drive, Jacksonville, Florida 32246 ("ESA® Southside"), the Extended Stay America® Jacksonville – Deerwood Park located at 8801 Perimeter Park Boulevard, Jacksonville, Florida 32216 ("ESA® Deerwood"), the Extended Stay America® Jacksonville – Lenoir Avenue South located at 4699 South Lenoir Avenue, Jacksonville, Florida 32216 ("ESA® Lenoir"), and the Extended Stay America® Jacksonville – Salisbury Road Southpoint located at 4693 Salisbury Road, Jacksonville, Florida 32256 ("ESA® Salisbury") (collectively, the "ESA Inc. hotels"). ESA Inc. can be served by its registered agent, Intertrust Corporate Services Delaware Ltd., at 200 Bellevue Parkway, Suite 210, Wilmington, Delaware 19809.

    a.  Defendant ESA Inc. is subject to the jurisdiction of this Court because it regularly conducts business in the State of Florida, derives substantial revenue from services rendered in Florida (including through the operation of numerous branded hotels), and has caused indivisible injuries to Plaintiff in Florida as alleged herein.

    b.  Whenever reference is made in this Complaint to any act, deed, or conduct of ESA Inc., the allegation is that ESA Inc. engaged in the act, deed, or conduct by or through one or more of its officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of ESA Inc.

15.    Defendant Wyndham Hotels & Resorts, Inc. ("Wyndham") is a Delaware corporation with its principal place of business in Parsippany, New Jersey. Wyndham is one of the largest hospitality companies in the world with nearly 9,000 branded hotels across 95 countries.[5]  Wyndham owns, operates, manages, and/or franchises all public lodging services at its branded hotels.  Wyndham can be served by its registered agent, Corporate Creations Network, Inc., at 801 U.S. Highway 1, North Palm Beach, Florida 33408.

a.  Wyndham Worldwide Corporation ("Wyndham Worldwide") acquired the Knights Inn® brand in 1995.

b.  In 2013, Plaintiff was trafficked for commercial sex at Wyndham Worldwide's branded hotel, the Knights Inn® Jacksonville, located at 460 Lane Avenue South, Jacksonville, Florida 32254.

c.  Wyndham Worldwide, including Knights Franchise Systems, Inc. now owned by Defendant Red Lion, owned and operated the Knights Inn® brand during Plaintiff's trafficking at the Knights Inn® Jacksonville. Wyndham Worldwide, including Knights Franchise Systems, Inc., owned, operated, managed, and/or supervised the Knights Inn® Jacksonville when Plaintiff was trafficked.

d.  Wyndham Worldwide, including Knights Franchise Systems, Inc., controlled and dictated the day-to-day actions and inactions of the

---

[5] *Locations – Discover Wyndham Hotels & Resorts*, WYNDHAM HOTELS & RESORTS, https://www.wyndhamhotels.com/locations (last visited Dec. 14, 2022).

Knights Inn® Jacksonville through highly specific and demanding brand standards, policies, and procedures when Plaintiff was trafficked.

e. Wyndham Worldwide, including Knights Franchise Systems, Inc., employed front desk and housekeeping staff and controlled all aspects of day to day operations, including but not limited to, staff training, uniforms, reservation and marketing systems, credit processing systems, Wi-Fi qualifications, internet service provider contracts, policies, terms, and conditions on internet landing pages, safety and cybersecurity measures, monitoring systems for customer reviews, hotel amenities such as furniture and food and beverage, and other management systems related to the daily operations at the Knights Inn® Jacksonville when Plaintiff was trafficked.

f. In 2013, Wyndham Worldwide, including Knights Franchise Systems, Inc., was the principal in an agency relationship with nearly exclusive control over every element of the daily operations at the Knights Inn® Jacksonville. Wyndham Worldwide is both directly liable for its violations under TVPRA Section 1595 and vicariously liable for the acts and/or omissions of its staff at the Knights Inn® Jacksonville.

g. When Plaintiff was trafficked, the Knights Inn® Jacksonville had apparent agency for Wyndham Worldwide, including Knights Franchise Systems, Inc., so as to establish vicarious liability under Florida law, in addition to its actual agency relationships.

8

h. Wyndham Worldwide, including Knights Franchise Systems, Inc., ratified the actions and inactions of the Knights Inn® Jacksonville.

i. Wyndham Worldwide, including Knights Franchise Systems, Inc. knowingly benefitted financially, both directly and through the acquisition and use of customer data, through its participation in its venture at the Knights Inn® Jacksonville which (1) rented rooms where Plaintiff was harbored and forced to engage in commercial sex, and (2) provided the Wi-Fi Plaintiff's trafficker(s) used to advertise and solicit buyers to purchase commercial sex delivered by Plaintiff at the Knights Inn® Jacksonville. Wyndham Worldwide further benefitted through maintaining its reputation and public image.

j. Defendant Wyndham is the successor entity to Wyndham Worldwide. Defendant Wyndham retains successor liability for the wrongful acts of its predecessor, Wyndham Worldwide Corporation, including Knights Franchise Systems, Inc. now owned by Defendant Red Lion.

k. Defendant Wyndham is subject to the jurisdiction of this Court because it regularly conducts business in the State of Florida, derives substantial revenue from services rendered in Florida (including through the operation of numerous branded hotels), and has caused indivisible injuries to Plaintiff in Florida as alleged herein.

l. Whenever reference is made in this Complaint to any act, deed, or conduct of Wyndham, the allegation is that Wyndham engaged in the

act, deed, or conduct by or through one or more of its officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Wyndham.

16.    Defendant Red Lion Hotels Corporation ("Red Lion") is a Maryland corporation with its principal place of business at 1550 Market Street #350, Denver, Colorado 80202.  Red Lion is one of the largest hospitality companies in the world, operating eight brands in hotels across North America.[6]  Red Lion can be served by its registered agent, CSC-Lawyers Incorporating Service Company, 7 St. Paul Street, Suite 820, Baltimore, Maryland 21202.

  a.  In 2018, Defendant Red Lion[7] acquired the Knights Inn® brand, including Knights Franchise Systems, Inc., from Defendant Wyndham.

  b.  Defendant Red Lion, doing business as Knights Franchise Systems, Inc., is the successor entity to Defendant Wyndham's and Knights Franchise Systems, Inc.'s wrongful conduct.  Defendant Red Lion retains successor liability for the wrongful acts of its predecessors, Defendant Wyndham and Knights Franchise Systems, Inc.

  c.  Defendant Red Lion is subject to the jurisdiction of this Court because it regularly conducts business in the State of Florida, derives substantial revenue from services rendered in Florida (including through the

---

[6] *Our Brands*, RLH BRANDS, https://www.redlion.com/our-brands (last visited Dec. 16, 2022).
[7] Through its wholly owned subsidiary, Red Lion Hotels Franchising, Inc.

operation of numerous branded hotels), and has caused indivisible injuries to Plaintiff in Florida as alleged herein.

17.     Defendant Jai Shree Laxmi, LLC ("JSL") is a limited liability company doing business as the Emerson Inn.  Now, and in 2013 at the time of the incidents alleged herein, JSL directly owned, operated, and offered all public lodging services at the Emerson Inn located at 3558 Philips Highway, Jacksonville, Florida 32207 where Plaintiff was trafficked.  JSL can be served by its registered agent, Prem Patel, at 3558 Philips Highway, Jacksonville, Florida 32207.

   a. Defendant JSL is subject to the jurisdiction of this Court because it regularly conducts business in the State of Florida, derives substantial revenue from services rendered in Florida (including through the operation of numerous branded hotels), and has caused indivisible injuries to Plaintiff in Florida as alleged herein.

   b. Whenever reference is made in this Complaint to any act, deed, or conduct of JSL, the allegation is that JSL engaged in the act, deed, or conduct by or through one or more of its officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of JSL.

## III. JURISDICTION AND VENUE

18.     This Honorable Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution, laws, or treaties of the

United States, including the TVPRA and its authorization amendments under 18 U.S.C., Chapter 77, and specifically section 1595. This Court also has supplemental jurisdiction over Plaintiff's claims that do not arise under federal law because each claim is "so related to claims in the action within [this Court's] original jurisdiction that they form part of the same controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).

19.    Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District, and because one or more Defendants reside in this District and Division.

## IV. SEX TRAFFICKING

20.    Under federal law, severe sex trafficking of an adult is defined by the use of force, fraud, or coercion to compel commercial sex acts. 22 U.S.C. § 7102(11)(A).

21.    Sex trafficking is a serious public health problem that negatively affects the well-being of individuals, families, and communities.[8]

22.    It is a global crime with enormous profits.[9] Forced sexual exploitation generates an estimated $99 billion per year.[10]

---

[8] *Sex Trafficking*, CENTERS FOR DISEASE CONTROL AND PREVENTION (Feb. 4, 2022), https://www.cdc.gov/violenceprevention/sexualviolence/trafficking.html.

[9] *Human Trafficking is the World's Fastest Growing Crime*, THE ADVISORY BOARD (May 22, 2017, 9:30 AM), https://www.advisory.com/daily-briefing/2017/05/22/human-trafficking.

[10] INT'L LAB. ORG., PROFITS AND POVERTY: THE ECONOMICS OF FORCED LABOR 13 (2014).

23.    Indeed, while sex trafficking makes up only 22% of the world's total forced labor, it is "six times more profitable than all other forms of forced labor, and five times more profitable than forced labor exploitation outside domestic work.[11]

24.    Recent statistics show that traffickers in developed nations like the United States can earn on average $80,000 per sex trafficking victim annually.[12]

25.    However, sex trafficking is preventable. Crucial efforts to stop and deter sex trafficking include training awareness to recognize the signs of trafficking and measures to "end business profits from trafficking-related transactions."[13]

26.    Traffickers could not succeed in this hugely profitable industry alone. Experts agree that trafficking is less underground and traffickers routinely interact and utilize commercial businesses for their criminal endeavors.[14]

27.    This intersection between human trafficking and the private industry is well-recognized. Criminal traffickers must depend on legitimate mainstream business partners to be successful. The private sector's involvement in the sex trafficking trade is undeniable, and companies have long had a responsibility to address their known role in it with active and effective measures.[15]

## V.  SEX TRAFFICKING IN THE HOSPITALITY INDUSTRY

---

[11] *Id.* at 7, 15.

[12] *Id.* at 27.

[13] *Id.* at 13.

[14] *See, e.g.,* Carmen Niethammer, *Cracking The $150 Billion Business of Human Trafficking,* FORBES (Feb. 2, 2020), https://www.forbes.com/sites/carmenniethammer/2020/02/02/cracking-the-150-billion-business-of-human-trafficking.

[15] *Id.* (quoting Bradley Myles, chief executive officer of Polaris: "Human trafficking is a $150 billion a year global industry and can't be fully addressed without businesses taking active and effective measures to reduce the potential for exploitation within their own systems.").

28.     In particular, hotels are the central piece of infrastructure necessary to the survival of the sex trafficking trade.  News outlets, nonprofits, and other interested stakeholders have confirmed the "obvious nexus" between human trafficking and hotels' crucial role as the venue for selling commercial sex.[16]  The National Human Trafficking Hotline statistics also confirm hotels as the top-reported venue where sex trafficking occurs, surpassing even commercial brothels.[17]

29.     "Contrary to popular misconception, trafficking does not only take place in cheap hotels or motels with sub-par accommodations."[18]  The problem is industry wide.  In the United States, as much as 63% of all trafficking incidents occur at hotels ranging from luxury to economy.[19]

30.     Traffickers use hotels as the hub of their operations based on a variety of factors, including "convenient locations, buyer comfort, price, a hotel's policies, procedures,…infrastructure," and "whether the hotel is prone to law enforcement monitoring…[or is] perceived by traffickers to have distracted and busy staff."[20]

---

[16] Brittany Anthony, *On-Ramps, Intersections, and Exit Routes: A Roadmap for Systems and Industries to Prevent and Disrupt Human Trafficking*, Hotels and Motels, POLARIS 16-23 (Jul. 2018) https://polarisproject.org/wp-content/uploads/2018/08/A-Roadmap-for-Systems-and-Industries-to-Prevent-and-Disrupt-Human-Trafficking-Hotels-and-Motels.pdf; *see also Hotels & Motels Recommendations*, POLARIS, https://polarisproject.org/hotels-motels-recommendations (last visited Dec. 21, 2022); Giovanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.
[17] *National Human Trafficking Hotline Statistics*, THE POLARIS PROJECT (2016), https://polarisproject.org/resources/2016-hotline statistics.
[18] Anthony, *supra* note 16, at 18.
[19] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hospitality Industry*, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015).
[20] Anthony, *supra* note 16, at 18.

31.     Defendants have known this data for decades.  Their complacency in the face of the sex trafficking epidemic makes their hotels, and others like them, *the* venue of choice for sex trafficking.  Traffickers and buyers alike rely on Defendants' refusal to adopt and enforce company-wide anti-trafficking policies, train staff on what to look for and how to respond, and/or establish safe and secure reporting mechanisms for their staff at the point of sale.  Defendants and their hotels thus provide an ease of access for buyers, an ability to pay in cash (non-traceability), and the ability to maintain anonymity, privacy, discretion, and permission which increases the prevalence of sex trafficking at their hotels.[21]

32.     Put simply, Defendants' hotels are a "crucial piece of the infrastructure necessary to facilitate human trafficking" because "hotel chain franchises…offer a good balance of quality and price while giving buyers a sense of anonymity and safety."[22]

33.     Defendants have both the power and responsibility to make sex trafficking difficult for criminals.  Yet, Defendants repeatedly fail to heed the call, enact anti-trafficking measures, or enforce their own policies.  Instead, Defendants continue to facilitate these crimes at their hotels, content to direct their efforts solely to profit and their own bottom line.

---

[21] Hotels Initiative, THE POLARIS PROJECT, https://polarisproject.org/initiatives/hotels (last visited Dec. 28, 2022); *see also* Cavagnaro, *supra* note 16, at 1.
[22] Anthony, *supra* note 16, at 18.

34.    Due to Defendants' commitment to profiting from, rather than preventing, sex trafficking, they refuse to embrace anti-trafficking policies, practices, and training that would have prevented J.R., and other vulnerable persons like her, from being sold, and continuing to be sold, for sex in their hotels throughout the nation and worldwide.

## A.    THE SEX TRAFFICKING OF J.R. AT DEFENDANTS' HOTELS

35.    In or around January of 2013, J.R. was struggling to find stable housing. She was living out of her car and met a man who approached her at a gas station. He offered her a helping hand, but instead, drugged her, stole her identification, cellphone, and car, advertised her, and sold her for commercial sex at Defendants' hotels.

36.    Throughout 2013, J.R. was subjected to repeated instances of rape, physical abuse, verbal abuse, exploitation, psychological torment, kidnaping, and imprisonment at the hotels owned, operated, supervised, and/or branded and franchised by Defendants.

37.    The trafficker commonly used threats and intimidation to coerce J.R. and her co-victims into performing non-consensual sexual acts. The trafficker remained in control over her person, whereabouts, and belongings. He also used drugs, alcohol, the incurrence of debt, threats to her person and family, and other physical and psychological methods to enforce compliance, such as hitting, slapping, choking, beating, humiliation, exhaustion, and isolation.

38.    In addition, the trafficker worked with other gang members to remain in control over their sex trafficking victims, including J.R. These traffickers had firearms

16

and other weapons and made threatening gestures toward J.R. The trafficker told J.R. to do what she was told, or she would be harmed. J.R. was routinely hit, chased, or held at gun point. J.R. also witnessed her co-victims being beaten on numerous occasions; and in one instance, watched the traffickers shave her co-victim's head.

39. The trafficker moved J.R. and her co-victims from one Defendant's hotel to another, staying for days or a week at a time. J.R. was sold for commercial sex numerous times per night with each "sale" to a different buyer.

40. Buyers entering Defendants' hotels were non-paying guests and left shortly after they arrived and procured the sexual services they had purchased.

41. The foot traffic to and from the rooms where J.R. and her co-victims were harbored was constant and obvious to both hotel staff and guests, including guests who complained. During a sale, the trafficker would wait directly outside the hotel room door or in the lobby, or visibly pace around the hotel hallway or parking lot.

42. The trafficker used Defendants' Wi-Fi to post advertisements on Backpage and other internet sites for commercial sex with J.R. at Defendants' hotels, to communicate with potential buyers, and to watch and record J.R.'s sexual acts.

43. The trafficker also had personal relationships with Defendants' hotel staff, including front desk management and housekeeping personnel. Despite J.R. encountering the same hotel staff and exhibiting obvious red flag signs of her trafficking, Defendants' staff repeatedly failed to report J.R.'s abuse to law enforcement or attempt to avert her suffering. Rather, Defendants' staff consistently

17

aided the trafficker in continuing to sell J.R. for commercial sex at Defendants' hotels, profiting therefrom.

44.    The trafficker followed a repetitive process at Defendants' hotels which, alongside several other red flags and direct employee interactions, alerted, or should have alerted, Defendants to J.R.'s trafficking, including but not limited to:

    a.  Paying for rooms in cash or with prepaid vanilla cards with these transactions being conducted with the assistance of Defendants' personnel;

    b.  Paying for extended stays on a day-to-day basis with these transactions being conducted with the assistance of Defendants' personnel;

    c.  Renting rooms which had fewer beds than patrons and an excessive number of people staying in the room with these transactions being conducted with the assistance of Defendants' personnel;

    d.  Requesting special rooms or features, including late check out, rooms in more secluded areas, or rooms by exits, with these transactions being conducted with the assistance of Defendants' personnel;

    e.  Patrons in the trafficker(s)' party were not forthcoming about their full names, addresses, or vehicle information when registering at check-in, with this conduct taking place in the presence of Defendants' personnel;

    f.  The trafficker(s) had control over J.R.'s and her co-victims' identification, money, and belongings while in the presence of Defendants' personnel;

g.  J.R. and her co-victims showed signs of physical abuse, restraint, and confinement, including bruising, drugging, cigarette burns, unkempt hair, and attire inappropriate for the weather or their age, all evident to Defendants' personnel;

h.  J.R. and her co-victims showed signs of fear, anxiety, tension, submission, and/or nervousness with this distress taking place in the presence of Defendants' personnel;

i.  J.R.'s and her co-victims' physical appearance showed signs of malnourishment, poor hygiene, fatigue, sleep deprivation, and untreated illness or injuries, all evident to Defendants' personnel;

j.  J.R. and her co-victims dressed in provocative clothing and shoes, observed by Defendants' personnel;

k.  J.R. and her co-victims lacked freedom of movement or were constantly monitored by the traffickers while in the presence of Defendants' personnel;

l.  J.R. and her co-victims had few or no personal possessions despite renting rooms for an extended stay, with these transactions being conducted with the assistance of Defendants' personnel;

m. J.R. and her co-victims were traveling with men (the traffickers) who appeared to be significantly older, with this conduct taking place in the presence of Defendants' personnel;

n.  The rooms in which J.R. and her co-victims were held had numerous weapons and firearms displayed and visible from the public hallways and entrances of Defendants' hotels and to Defendants' personnel;

o.  The rooms in which J.R. and her co-victims were held had indicia of commercial sex within the room, including excessive sex paraphernalia, an inordinate number of used condoms, empty bottles of lubrication, lingerie, sex toys, and bodily fluids on the sheets and towels, all visible from the public hallways and entrances of Defendants' hotels and to Defendants' personnel;

p.  The rooms in which J.R. and her co-victims were held smelled of bodily fluids and musk, which was notable from the public hallways and entrances of Defendants' hotels and obvious to Defendants' personnel;

q.  The rooms in which J.R. and her co-victims were held had excessive amounts of cash visible from the public hallways and entrances of Defendants' hotels and to Defendants' personnel;

r.  The rooms in which J.R. and her co-victims were held contained multiple computers, cell phones, pagers, credit card swipers, or other technology, which was visible from the public hallways and entrances of Defendants' hotels and to Defendants' personnel;

s.  The rooms in which J.R. and her co-victims were held had excessive amounts of drugs and alcohol which were visible from the public

20

hallways and entrances of Defendants' hotels and to Defendants' personnel;

t.  J.R. and her co-victims displayed apparent signs of illegal drug use both inside and outside of Defendants' hotel rooms, with this conduct taking place in the presence or view of Defendants' personnel;

u.  J.R., her co-victims, and the trafficker(s) made excessive housekeeping requests to Defendants' personnel for extra linens, toiletries, and cleaning supplies in the rooms where J.R. and her co-victims were held;

v.  The "Do Not Disturb" sign was constantly displayed on the rooms where J.R. and her co-victims were held with trash left outside, in full presence and view of Defendants' personnel;

w.  Individuals loitered in the hallways and appeared to monitor the area in the vicinity of the rooms in which J.R. and her co-victims were held, with this conduct taking place in the presence and view of Defendants' personnel;

x.  Active and apparent solicitation of buyers by the trafficker(s), J.R., and her co-victims took place in and around Defendants' hotels, including the lobby and parking lot, with this conduct taking place in the presence and view of Defendants' personnel;

y.  The continuous procession of unregistered buyers at odd hours entering and exiting the rooms where J.R. and her co-victims were held, with this conduct taking place in the presence and view of Defendants' personnel;

z.  Individuals entering and exiting through the side or rear entrances of Defendants' hotels, with this conduct taking place in the presence and view of Defendants personnel;

aa. Vehicles in Defendants' hotel parking lots regularly parked backwards so the license plates were not visible, with this conduct in the presence and view of Defendants' personnel;

bb. Extraordinary violence and loud disturbances in and around Defendants' public hotel areas, as well as from inside the hotel rooms where J.R. and her co-victims were held, with this conduct in the presence and view of Defendants' personnel;

cc. Audible pleas to Defendants' personnel and hotel guests for help from J.R. and her co-victims;

dd. Hotel guest complaints about J.R., her co-victims, and the traffickers to Defendants' personnel;

ee. Direct employee encounters and witness accounts of J.R.'s and her co-victim's trafficking by Defendants' personnel in Defendants' hotel rooms and on the premises;

ff. Use of Defendants' Wi-Fi to post advertisements for commercial sex with J.R. and her co-victims at Defendants' hotels;

gg. Online reviews indicating the prevalence of sex trafficking and criminal activity at Defendants' hotels; and

hh. J.R. and her co-victims being repeatedly taken and returned to Defendants' hotels over a period of time, with this conduct taking place in the presence of the same Defendants' personnel.

45.    In addition to these abundant red flags that specifically alerted, or should have alerted, Defendants to J.R.'s trafficking at each of their hotels in 2013, the following accounts of J.R.'s trafficking occurred at each of the Defendants' hotels:

**The ESA® Southside, ESA® Deerwood, ESA® Lenoir, and ESA® Salisbury hotels owned and operated by Defendant ESA Inc.:**

46.    J.R. was trafficked for commercial sex on numerous occasions throughout 2013 at Defendant ESA Inc.'s hotels in Jacksonville, Florida, including the ESA® Southside, ESA® Deerwood, ESA® Lenoir, and ESA® Salisbury.

47.    J.R.'s trafficker had personal relationships with ESA Inc. staff who allowed him to rent specially requested rooms for trafficking or turned a blind eye to the trafficker's repeated open abuses of J.R.

48.    For instance, at the ESA® Southside, numerous guests complained to ESA Inc. staff about the noise caused by the trafficker and buyers in selling J.R. To J.R.'s dismay, when ESA Inc. staff came to the hotel room door, they provided a mere "warning with a wink." Defendants' personnel alerted the trafficker to the complaint, indicated they knew J.R. and her co-victims were being sold for commercial sex within the room, and then left without rendering aid or inquiring as to J.R.'s or her co-victims' well-being, allowing the trafficker to continue with the criminal endeavor within the

ESA Inc. room, knowing the hotel would continue profiting from the trafficker's use of the room as a result.

49.    A violent altercation later broke out wherein the trafficker and another man viciously beat J.R. to the ground.  The two men punched and kicked J.R.'s face and head while her co-victims screamed within the ESA Inc. room.

50.    J.R. pleaded with the staff at the ESA® Southside for help until one finally agreed to call 911.  J.R. was then transported to a nearby hospital and treated for her injuries.

51.    Despite recognizing them from this previous altercation, the staff at ESA® Southside continued to rent rooms to the trafficker when he later returned again throughout 2013 with J.R.

52.    In addition, J.R.'s trafficker had personal relationships with ESA Inc. housekeeping staff who not only provided him with excessive linens and toiletries, but also at times allowed him to circumvent the check-in process entirely, supplying access to ESA Inc. rooms in which to traffic J.R.

53.    For example, in one instance at the ESA® Deerwood, J.R. witnessed the trafficker bypass the front desk staff and check-in process.  Instead, he walked specifically toward a known ESA Inc. housekeeper within the hotel.  The trafficker spoke with the housekeeper, and the housekeeper opened and furnished the trafficker with an ESA® Deerwood room in which to traffic J.R. for commercial sex.

54.    J.R. also encountered several security guards at ESA Inc.'s hotels when being trafficked.  These security guards repeatedly acknowledged J.R., the trafficker,

and numerous buyers coming to and from the ESA Inc. rooms where J.R. was held. These security guards witnessed the trafficker's violence toward J.R. and her co-victims, the physical deterioration of J.R.'s appearance, J.R.'s provocative dress, and other obvious red flags of sex trafficking yet failed to inquire, intervene, or call law enforcement.

**The Knights Inn® Jacksonville owned, operated, or franchised by Defendant Wyndham and Defendant Red Lion:**

55.    J.R. was trafficked for commercial sex at the Knights Inn® Jacksonville throughout 2013, being held for several nights in a row and returning week after week.

56.    J.R.'s trafficker had personal relationships with the Knights Inn® Jacksonville staff who allowed him to rent specially requested rooms for trafficking or turned a blind eye to the trafficker's repeated abuses of J.R.

57.    In full view of the Knights Inn® Jacksonville office and lobby, the trafficker forced J.R. to solicit buyers from inside and around the hotel. The Knights Inn® Jacksonville staff witnessed J.R. walking throughout the hotel property, constantly coming and going with different buyers at all hours of the day and night.

58.    On one occasion, J.R.'s trafficking caused a huge scene with another guest at the Knights Inn® Jacksonville. The staff appeared and explicitly declared they knew J.R. was being sold for commercial sex. The staff did not inquire as to J.R.'s well-being or call law enforcement. Instead, the same staff allowed the trafficker to continue renting rooms at the Knights Inn® Jacksonville to traffic J.R. throughout 2013, knowing the hotel would reap the profits.

**The Emerson Inn owned and operated by Defendant JSL**

59.    The Emerson Inn is located in a known hotspot for crime and commercial sex trafficking within Jacksonville, Florida.

60.    J.R. was trafficked for commercial sex on numerous occasions throughout 2013 at the Emerson Inn.

61.    J.R. was forced to solicit buyers in and around the Emerson Inn, including from cars in the parking lot in full view of the hotel office.

62.    In addition, J.R.'s trafficker was brazenly and unapologetically violent with J.R. and her co-victims at the Emerson Inn. J.R. also suffered numerous physical assaults from buyers at the Emerson Inn.

63.    In one of the first instances J.R.'s trafficker held her at the Emerson Inn for commercial sex, a buyer was spooked during the transaction and took back the money he had paid. The trafficker was so angry that he threw J.R. out of the Emerson Inn room and chased her around the parking lot screaming about how he would harm her and she would make up for the lost sex act. The trafficker caused such a commotion that Emerson Inn staff came outside of the hotel office and watched the disturbing scene. They did not offer assistance to J.R. nor did they call the authorities. Rather, the staff allowed the trafficker to continue renting rooms at the Emerson Inn, knowing the hotel would reap the profits.

64.    On another occasion, the trafficker lifted J.R. by her throat as she gasped for air on the outside grounds of the Emerson Inn. Again, staff witnessed the trafficker

choking J.R. but chose not to offer aid or alert the authorities. They continued renting rooms to the trafficker for the explicit and apparent purpose of sex trafficking J.R.

65.    J.R. endured several similar assaults in and around the Emerson Inn wherein her trafficker or buyers would violently attack her, scream at her, and make clear to any nearby patron or staff that she was being forcibly sold for commercial sex.

## B.    COMBATTING HOTEL SEX TRAFFICKING

66.    Defendants have long known of their role and responsibilities to combat sex trafficking within their hospitality businesses.

67.    Global campaigns took initiative against the human trafficking epidemic and the lack of internal policies concerning human trafficking in the hotel industry as early as 1997 with the United Nations' Blue Heart Campaign and domestically in 2010 with the Department of Homeland Security's Blue Campaign.[23]

68.    Abundant resources have been available to members of the hospitality industry that wish to implement anti-trafficking measures and provide effective trafficking recognition and response training.   Each of the following organizations offer guidance and recommendations for viable programs to address this issue:

a.   Polaris Project, including the National Human Trafficking Hotline and Resource Center;

---

[23] *See* UNITED NATIONS OFFICE ON DRUGS AND CRIME, *https://www.unodc.org/ unodc/en/blueheart/ index.html* (last visited Dec. 20, 2022); *Blue Heart Campaign*, WIKIPEDIA, https://en.wikipedia.org/ wiki/Blue_Heart_Campaign (last visited Dec. 20, 2022); *DHS Blue Campaign Five Year Milestone*, DEPARTMENT OF HOMELAND SECURITY (Jul. 22, 2015), https://www.dhs.gov/blog/2015/07/22/ dhs-blue-campaign-five-year-milestone.

b.  ECPAT-USA;

c.  BEST Alliance – Businesses Ending Slavery & Trafficking;

d.  U.S. Department of Homeland Security: Blue Campaign;

e.  U.S. Department of Health & Human Services: Office on Trafficking in
    Persons, including the Look Beneath the Surface Campaign;

f.  National Center for Missing & Exploited Children;

g.  United Nations Office on Drugs & Crime: Blue Heart Campaign;

h.  United Nations Human Rights Office of the High Commissioner,
    including the Guiding Principles on Business and Human Rights; and

i.  United Nations Global Compact.

69.     For example, to assist hospitality companies in combatting sex trafficking
within their businesses, ECPAT developed and launched The Code of Conduct for the
Protection of Children from Sexual Exploitation in Travel and Tourism ("The Code")
in 1996 and ECPAT-USA in the United States in 2004.[24]

70.     The Code identifies the following six steps companies should take to
prevent child sex trafficking: (1) establish corporate policy and procedures against
sexual exploitation of children; (2) train employees in children's rights, the prevention
of sexual exploitation and how to report suspected cases; (3) include a clause in further
partner contracts stating a common repudiation and zero tolerance policy of sexual
exploitation of children; (4) provide information to travelers on children's rights, the

---

[24] *What is the Code?*, THE CODE, https://thecode.org/about/ (last visited Dec. 20, 2022).

prevention of sexual exploitation of children and how to report suspected cases; (5) support, collaborate and engage stakeholders in the prevention of sexual exploitation of children; and (6) report annually on the company's implementation of Code-related activities.[25]

71.    ECPAT-USA also identified hotel-specific best practices for preventing sex trafficking within the hospitality industry, including but not limited to:

a.  Develop a formal policy against trafficking;

b.  Develop a protocol for response;

c.  Conduct periodic staff training on recognizing and responding to trafficking indicators;

d.  Do not rent by the hour;

e.  Do not permit cash payments;

f.  Block "internet access to popular websites for online sex ads;"

g.  Monitor "online sex ads such as Craigslist and Backpage for your hotel name and pictures of your rooms and guests;"

h.  Change Wi-Fi passwords in rooms and cafes regularly;

i.  Require all visitors to be logged, including guest name, visitor name, arrival time, departure time, and room number;

j.  Actively greet and speak with all visitors arriving at night;

k.  Watch for a trend of visitors to the same room; and

_____

[25] THE CODE, *supra* note 24.

l.   Be aware of rooms with excess condoms, lubricants, and towels and report these indicators to management.[26]

72.     Numerous well-researched toolkits and trainings have also long since identified red flag signs of trafficking that hotel staff should notice, such as:

a.   Patrons show signs of fear, anxiety, tension, submission, nervousness, and/or appear distressed or injured;

b.   Patrons show signs of physical abuse, restraint, and/or confinement;

c.   Patrons exhibit evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way;

d.   Patrons show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

e.   Patrons lack freedom of movement or are constantly monitored;

f.   Patrons avoid eye contact and interaction with others;

g.   Patrons have either no, or no control over, their money or identification;

h.   Patrons in provocative clothing and shoes, dress inappropriately for their age, or have lower quality clothing compared to others in their party;

i.   Patrons have few or no personal items—such as no luggage or other bags;

j.   Patrons are not forthcoming about full names or contact details;

k.   Minor patrons take on adult roles (e.g., pay bills, request services);

---

[26] *ECPAT-USA Anti-Trafficking Hotel Checklist*, ECPAT-USA, https://static1.squarespace.com/static/594970e91b631b3571be12e2/t/5cd329e8a4222f20baf5378b/1557342696892/ECPAT-USA_Anti TraffickingHotelChecklist.pdf (last visited Dec. 28, 2022).

l. A group of girls appears to be traveling with an older female or male;

m. A group of males or females with identical tattoos in similar locations, which may indicate "branding" by a trafficker;

n. Room is paid for with cash or pre-loaded credit card;

o. Room rented has fewer beds than expected patrons;

p. The same person reserves multiple rooms;

q. Patrons enter/exit through side or rear doors instead of the lobby;

r. Constant flow of men into a room at all hours;

s. Patrons leave room infrequently, not at all, or at odd hours;

t. Patrons loiter in hallways or appear to monitor the area;

u. Cars are regularly parked backward hiding the license plate;

v. Excessive use of hotel computers for sexually explicit websites;

w. Pornography entertainment rented in rooms with minors;

x. Patrons request information or access to adult services or sex industry;

y. Patrons solicit male guests; or

z. Patrons ask staff or guests for food or money.[27]

---

[27] DEP'T OF HOMELAND SECURITY, *Blue Campaign Hospitality Toolkit*, https://www.dhs.gov/sites/default/files/ publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf (last visited Dec. 21, 2022), attached as "Exhibit A;" *see also* U.S. DEP'T HEALTH & HUM. SERVS. OFFICE ON TRAFFICKING IN PERSONS, Fact Sheet: Identifying Victims of Human Trafficking, https://www.acf.hhs.gov/archive/otip/fact-sheet/fact-sheet-identifying-victims-human-trafficking (last visited Dec. 20, 2022).

73.    In particular, "hotel housekeeping, maintenance, and room service staff typically have the most access to guest rooms where signs of human trafficking may be apparent," and should therefore be trained on additional red flags, including:

a.  "Do Not Disturb" sign used constantly;

b.  Requested room or housekeeping services (e.g., additional towels, new linens, etc.), but denying staff entry into room;

c.  Refusal of cleaning services for multiple days;

d.  Excessive amounts of cash in a room;

e.  Smell of bodily fluids and musk;

f.  Presence of multiple computers, cell phones, pagers, credit card swipes, or other technology;

g.  Excessive amounts of alcohol or illegal drugs in rooms;

h.  Evidence of pornography;

i.  Excessive amounts of sex paraphernalia in rooms (condoms, lubricant, lotion, etc.); or

j.  Rooms stocked with merchandise, luggage, mail packages, and purses/wallets with different names.[28]

74.    Because "hotel and motel employees are often in the best position to see potential signs of human trafficking,"[29] training hospitality staff to recognize these

---

[28] DEP'T OF HOMELAND SECURITY, *supra* note 27, "Exhibit A."
[29] *Id.*

signs of trafficking and be prepared to act when they observe red flags is a critical component to combatting trafficking within hotels.[30]

75.     Every day, thousands of hotel employees witness manifestations of sex trafficking.  The hospitality industry thus has the greatest reach to prevent, identify, and thwart commercial sexual exploitation where it is most likely to occur.

76.     In one recent study, 75% of survivors reported coming into contact with hotels during their exploitation.  "Unfortunately, 94% also disclosed that they never received any assistance, concern, or identification from hotel staff."[31]

77.     As described in the Office on Trafficking in Persons' Fact Sheet – Identifying Victims of Human Trafficking: "It is important to be vigilant and to 'look beneath the surface' in situations that don't seem quite right. One chance encounter could be a victim's best hope for rescue."[32]

78.     It is widely recognized that effective staff training has a substantial, positive impact on decreasing the prevalence and scope of trafficking within hotels.[33]

---

[30] *Training for Hotel Associates*, ECPAT-USA, https://www.ecpatusa.org/hotel-training (last visited Dec. 20, 2022); *see also* MICHELLE GUELBART & JULIA WEJCHERT, ECPAT-USA, NO VACANCY FOR CHILD SEX TRAFFICKERS IMPACT REPORT: THE EFFICACY OF ECPAT-USA'S WORK TO PREVENT AND DISRUPT THE COMMERCIAL SEXUAL EXPLOITATION OF CHILDREN IN HOTELS (2017).
[31] *Hotels & Motels Recommendations*, POLARIS, https://polarisproject.org/hotels-motels-recommendations (last visited Dec. 21, 2022).
[32] U.S. DEP'T. HEALTH & HUM. SERVS., *supra* note 27.
[33] *See* DEP'T OF HOMELAND SECURITY, *supra* note 27, "Exhibit A"; Emily Roman, Evaluating the Impact of Training Employees to Identify Victims of Human Trafficking (2019) (M.A. thesis, Abilene Christian University) (Digital Commons @ ACU); *Free Online Training*, AMERICAN HOTEL & LODGING ASSOCIATION, https://www.ahla.com/issues/human-trafficking (last visited Dec. 21, 2022); *Training for Hotel Associates*, *supra* note 30.

79.    Training hotel staff to identify the signs of trafficking and sexual exploitation is a crucial legal obligation for the hospitality industry. The presence of trafficking and sexual exploitation in a hotel is frequently an obvious occurrence and, although unutilized, underutilized, or ineffectively utilized, many well-researched red flag trainings and toolkits were published to the hotel industry long before 2013 to help businesses, like Defendants, train their staff and create procedures to address the issue.

80.    Furthermore, aside from their unique position in this epidemic, hospitality businesses have the highest obligation to protect their guests from dangers that are known, or should be known, including trafficking and sexual exploitation, and should be held accountable when they fail to comply.

81.    As aptly stated in a publication by the Cornell University School of Hospitality, "the hospitality industry is undoubtedly involved in the sex trafficking industry…and therefore has an inherent responsibility to deter the crime and can be liable for failing to do so."[34]

82.    Upon information and belief, between at least 2008 and 2013, Defendants ESA Inc., Wyndham, Red Lion, and JSL held meetings among their executives, directors, and managers discussing sex trafficking at their hotels.

83.    Upon information and belief, between at least 2008 and 2013, Defendants ESA Inc., Wyndham, and Red Lion also participated in meetings through their trade organizations, such as the American Hotel Lodging Association (AHLA)

---

[34] Sarkisian, *supra* note 19, at 3-10.

and communicated with organizations like ECPAT and Polaris, regarding trafficking prevention in the hotel industry and at their hotels.

84.   Upon information and belief, between at least 2008 and 2013, Defendants ESA Inc., Wyndham, and Red Lion further exchanged emails by employees related to sex trafficking at their hotels.

85.   Upon information and belief, between at least 2008 and 2013, Defendants ESA Inc., Wyndham, Red Lion, and JSL received and reviewed publicly available information regarding trafficking in hotels.

86.   Upon information and belief, between at least 2008 and 2013, Defendants ESA Inc., Wyndham, Red Lion, and JSL were aware of the domestic and international campaigns and associated resources to combat trafficking in hotels.

87.   Despite the existence and availability of resources, Defendants have refused to implement and enforce the recommended anti-trafficking measures and staff training at their hotels or to commit to doing so.

88.   Even Defendants Wyndham and Red Lion who are signatories to ECPAT's CODE only pay lip service to its goals, while failing to implement its most effective guidance. Their membership is nothing more than a fig leaf, and their commitments are demonstrably false.

89.   Despite publicly committing to employee training, Defendants have consistently failed to act, and training has never occurred in earnest or *en masse*.

According to ECPAT's reports, the actual number of employees trained by hotel industry leaders like Defendants Wyndham, Red Lion, and ESA Inc. is abysmal.[35]

90.    For years, Defendants have flagrantly contravened the spirit of ECPAT by failing to seriously implement its most effective guidance and rejecting universal recommendations on effective anti-trafficking hotel measures and staff training.

91.    Defendants maintain a commitment to profiting from the exploitation of J.R. and others like her.  They choose to preserve their profits made by renting rooms to traffickers and acquiring customer data through free Wi-Fi used to advertise sex trafficking victims.  Defendants further cut costs by not implementing responsible and effective anti-trafficking measures or staff training.

92.    In addition, Defendants ESA Inc., Wyndham, and Red Lion have long engaged in a coordinated campaign to avoid bad publicity while preserving the profits they derive from lodging traffickers, victims, and buyers, which ensures Defendants remain as complacent as their peers in facilitating trafficking at their hotels.

93.    Defendants ESA Inc., Wyndham, and Red Lion hired media professionals to make public claims to their investors and customers addressing the longstanding problem of human trafficking at hotels with no intention of acting on it or changing their permissive business practices.[36]

---

[35] GUELBART & WEJCHERT, *supra* note 30.

[36] For instance, in 2011, the hotel industry trade and lobbying group American Hotel & Lodging Association (AHLA) issued an industry statement condemning human trafficking.  AHLA stated trafficking is state and federal crime which "appl[ies] to all businesses and persons...including lodging establishments.  Moreover, lodging establishments are often subject to licensing requirements which prohibit the knowing use of their premises for illegal or immoral purposes.  All employees are expected to comply and are encouraged to alert the authorities if there is suspected trafficking in their hotel."

94.    To curry favor and a positive public image, Defendants ESA Inc., Wyndham, and Red Lion also used their trade association memberships to advertise policies, practices, and procedures that indicate a unified commitment to fighting human trafficking.[37]    Through these trade associations such as AHLA, Defendants disseminated very specific talking points to provide to the government, law enforcement, the public, and the media.    These talking points amounted to nothing but spin whereby Defendants ESA Inc., Wyndham, and Red Lion tote themselves as heroes for taking a stand but implementing no genuine anti-trafficking efforts within their hotel organizations.

95.    Yet these were more than just advertising campaigns.    They were part of a concerted effort to divert the attention of anti-trafficking stakeholders and lawmakers away from Defendants and make assurances that the hotel industry, and Defendants ESA Inc., Wyndham, and Red Lion, specifically, were meaningfully addressing the industry-wide problem of human trafficking—without the true intention to do so.    By representing to the public and to legislators "the industry's ongoing commitment and work to end human trafficking" Defendants acknowledged and assumed their responsibility to meaningfully address human trafficking at their hotels.[38]

---

[37] *See, e.g.,* NICHOLS, ANDREA J., SEX TRAFFICKING IN THE UNITED STATES: THEORY, RESEARCH, POLICY, AND PRACTICE (Columbia Univ. Press 2016) (citing American Hotel and Lodging Association 2012 "Industry Principles to Combat Human Trafficking").

[38] *See No Room for Trafficking,* AMERICAN HOTEL & LODGING ASSOC., https://www.ahla.com/issues/human-trafficking (last visited Dec. 27, 2022).

**C.    DEFENDANTS' ACTUAL OR CONSTRUCTIVE KNOWLEDGE OF J.R.'S TRAFFICKING THROUGH REPORTS, REVIEWS, AND DATA SYSTEMS**

96.    Defendants not only have access to public police and news reports, but also internal reports generated by guests and employees regarding sex trafficking at their individual hotel locations.

97.    In addition, Defendants have access to public reviews left by guests on online website forums, such as TripAdvisor.com, Yelp.com, and Google.com, wherein guests frequently complain about the obvious prevalence of the commercial sex trade, physical violence by trafficker pimps, drug use, and other signs of human trafficking at their hotels.  For instance, Defendants have long received, and continue receiving, evidence and reports that human trafficking runs rampant at their hotels, including at the Emerson Inn, Knights Inn® Jacksonville, ESA® Southside, ESA® Deerwood, ESA® Lenoir, and ESA® Salisbury where J.R. was trafficked, from:

    a.    Emerson Inn Online Reviews:

        i.    "Had a prostitution ring and drugs going on there."

        ii.    "Prostitutes in parking lot that live in the rooms."

        iii.    "I wouldn't even give this place 1 star nasty room and full of pimps and prostitutes"

        iv.    "It's ok for the price, if they were to get rid of some of the prostitutes and pimps I would rate it 5 stars."

     v.  "Deep screaming from the tenants at night and slot [sic] [o]f cursing could be heard outside my door. In fact I heard a man say 'I will kill you' the hotel [was] full of pimps and prostitute busy all night...."

    vi.  "very little hygiene, a lot of crime I do not recommend it. it's very dangerous"

  b.  <u>Knights Inn® Jacksonville Online Reviews:</u>

     i.  "Horrible prostitutes in and out of hotel"

    ii.  "Do not stay at this hotel. I called to inform the front desk that black guys were trying to pimp out a prostitute at the hotel. The woman at the front desk started threatening me and stated that the hotel was a known drug and hooker hotel and for me to stay the hell away from there. She was irate with me and started accusing me of doing drugs and hookers. These people will rob you. Not a safe place. Will call corporate office to inform them tomorrow."

   iii.  "Trashy place.  The girl by the pool was tweaking so bad, we didnt need a fan...The people next room to me smoked so much weed and kept traffic coming thru all nite. The front desk lady in daytime is Clearly just here for a check. Offers excuse of 'well it is the west side.  She didnt care...hookers walk around here..."

iv.  "Just passing through looking for Pokemon and giving someone a ride.  About the same amount of hookers as there are Pokemon around."

v.  "They had 2 overdoses…Hookers roam and dopeboys hustle.  Do not stay here. I will never go back. Door didnt lock proper. Lady at night looked like a closet doper. Scared me. [thumbs down emoticon] horrid horrid horrid."

vi.  "…No one at the hotel was ever helpful and 'working girls' always around asking for a party…."

vii.  "The owner[s] have drug dealer payin them to let them know when the police r coming…I think it should be close[d] down"

viii.  "…I'm not too happy with Knights Inn they need more security an[d] more lighting…they have a lot of…young women walking around there at night and usually I think you need to take a good look at that they need to beware of what comes and goes out of [their] motels…"

ix.  "Locals stay here. Not exactly safe…Pretty sure you can rent by the hour."

x.  "To[o] much bad traffic if you know what I mean. You can tell illegal stuff is going on"

xi.  "Atmosphere was a lot of criminal activity around the premises all hours of the night...it was hard to sleep because of the smell and the activity that was very busy from 3 in the morning to 5 in the morning..."

xii.  "Saw a pregnant woman get attacked..."

xiii.  "Drug abuse is openly prevalent and a quiet night is unheard of"

c.  <u>ESA® Southside Online Reviews</u>

i.  "The first night, I was approached by two prostitutes in the parking lot after I returned back from the store.  Unsavory-types of people wander around the property all weekend long...I specifically inquired before booking the room if it was a corporate facility, or a franchise one. I was assured it was corporate...I will be following up with their corporate office (ESA Management LLC of Charlotte, NC) to get out of my 30 day stay ASAP."

ii.  "Would recommend a different hotel...I was approached several times by women offering me there [sic] companionships ship for a fee...The staff is untrained and not knowledgeable with company policies."

iii.  "This place would be fine but it's filled with drug dealers and hookers.  The smell of pot is constant."

iv.  "There is [sic] prostitutes out here i heard screams at 3am, i looked out the window it was a woman and some guys and they were arguing about something sounded like a shoot out ready to happen."

v.  "They need to shut this rat hole down. Wanna witness a drug bust? Drug deal? Or drugged up prostitute get slapped up in the dark desolate parking lot before then hearing bangs, as well as her screaming from being gang banged in the room next to you? Come here. You wanna be scared to go out to your car because goons are out there? Come here. …Probably laying in the bed of a murder victim or battered prostitute. I would even get tested for hiv after leaving here …Suspicious men, druggies, sleezy women."

vi.  "there's a lot of drugs trafficking going on in that place of business is not safe Horrible"

vii.  "I travel throughout the United States and travel to other countries…This Extended Stay is by far the worst place that I stayed.  First let me say I do not like to complain but this place deserves it…When [] the sheets came loose I saw blood in different areas all over the mattress cover, a lot of body sweat and sex stains."

viii.  "Shady people standing around on stair wells and area…"

ix.  "This place was terrible and not safe. I didn't get a good night of sleep either of the nights I was there. There were a bunch of shady characters walking around and talking loud all night long."

x.  "First off, when we drove on the property in was like going into a drug zone!"

xi.  "Whoever was in my room also left their drug paraphernalia right on the dresser!!! I told the hotel manager on site about the situation and she tried to cover it up!  I let her take the stuff they left on the dresser and she stalled until I called the corporate office."

xii.  "Drug addict party place. NEVER STAY HERE!!!!!"

xiii.  "I just watched a drug deal go down in the parking lot."

xiv.  Never stay here. Worst nightmare of my life….Drug dealers on site."

d.  ESA® Deerwood Online Reviews:

i.  "Horrible staff…Swat busted a prostitute smoking crack and tried selling sex to an undercover…"

ii.  "The room was dirty there was drug deals at all hours the door was constantly slamming.  Horrible place."

    iii. "Turns out it was a key to a random drug dealers room....because when I opened the door...there were drugs everywhere....and people..."

    iv. "They need to do better with the towels and tracking there [sic] extending stay drug users…"

e.  <u>ESA® Lenoir Online Reviews:</u>

    i. "Definitely drug dealing going on here there's no way the hotel's not aware of it strange people loitering outside day and night."

    ii. "THE wors[t] Hotel. Dirty, blood on the shades, dirty beds. drug trades in front of the hotel..."

    iii. "There was blood on the back of the bathroom door, the entire hotel smells like weed and there's drug deals happening outside the hotel."

    iv. "Place was gross. Found condom wrappers in the bed."

    v. "NIGHTMARE HOTEL. Full of dope boys and drugs… This hotel and management are a joke. Half of the night shift is outback with the dope boys. That hotel is super shady. BEWARE BEWARE BEWARE..."

    vi. "I'm writing this as I wait for the police to arrive to tell the people in the parking lot to shutup! The night shift attendent, after 3 phone calls from me since 1200 (it's now

44

5a) complaining about these inconsiderate folks inside on my floor, and outside, said she cannot do anything and cannot go outside! Guess they can't call the police either!"

f.  ESA® Salisbury Online Reviews:

i.  "Way too many escorts staying here.  Seriously they need to clean them out.  Too many hotels around jax let them stay and then drug dealers come.  Clean up are [sic] hotels Jacksonville plz."

ii.  "high prostitution area"

iii.  "DIRTY…SMELLS BAD AND I THINK I FOUND BLOOD STAINS ON THE MATTRESS… I have never been in a pay [b]y the hour hotel but i would imangine [sic] what that would look like would be our room…I will be calling corperate [sic] asap…"

iv.  "…hands-down the worst hotel I have ever stayed at in my life…very shady characters walking around let alone inside the hotel.  There was only ONE staff member there at a time which they each claimed they were the manager as well as did nothing whatsoever about any complaint…"

98.    Upon information and belief, Defendants regularly review and monitor complaints, criminal activity, police reports, news articles, suspicious disturbances, and online hotel reviews such as the above which provide indicators of human

trafficking at their individual hotels, including at the ESA Inc. hotels, Knights Inn®
Jacksonville, and Emerson Inn.

99.     Upon information and belief, Defendants also require all employees to
report suspicious activity at their hotels to Defendants' corporate executives and
upper-level management.  Had Defendants trained their staff on the red flag signs of
trafficking, their staff would have reported the obvious indications of J.R.'s trafficking
the staff witnessed at their hotels, including at the ESA Inc. hotels, Knights Inn®
Jacksonville, and Emerson Inn.[39]

100.     Moreover, Defendants require their hotels to use centralized data
systems that are owned and operated by Defendants at the corporate level, for
reservations and booking, credit processing, property management, Wi-Fi and
information technology, and incident reporting.  Through these means and centralized
management platforms, Defendants repeatedly collected data on J.R., her trafficker,
and her buyers and had direct access to data such as: room reservation patterns,
identification and payment information, data from websites visited on hotel Wi-Fi,
guest complaints and disturbances during stays, extra requests for towels and linens,
room cleaning requests, and other data associated with J.R. and her trafficker's many
stays at their hotels.

---

[39] Alternatively, despite Defendants' failures to train their employees or implement and enforce anti-
trafficking policies and procedures, staff that witnessed signs of J.R.'s trafficking may still have
reported the criminal conduct to higher corporate management such that Defendants' had actual
knowledge, as well as constructive knowledge, of J.R.'s trafficking at the ESA Inc. hotels, Knights
Inn® Jacksonville, and Emerson Inn.

101.    Similarly, Defendants offer free internet at their hotels through specific providers which is available to guests in rooms as well as throughout publicly accessible networks in their hotel lobbies and common areas.  Defendants collect data on internet usage through these services, including:

    a.    The IP address and other identifying information for all devices that access the internet on Defendants' wireless networks;

    b.    The identity of websites accessed by those devices through the IP addresses of the servers that host those websites; and

    c.    Information about the user accessing the internet through Defendants' wireless networks, including the users' room number, a user-provided name, and other identifying information.

102.    For instance, through such data collection, Defendants knew or should have known of the prevalent use of websites like Backpage.com used by traffickers to post advertisements for commercial sex at their hotels.

103.    Despite the fact Defendants are sufficiently sophisticated to monitor, provide cybersecurity, and prevent illegal activity from occurring at their hotels over their wireless networks, Defendants made no effort to flag or block the use of such website advertisements, or failed to otherwise address or monitor internet usage at their hotels that indicated J.R.'s exploitation and other signs of commercial sex trafficking within their walls.

104.    Prior to, during, and following the incidents described herein, Defendants had actual and/or constructive knowledge of the rampant criminal activity

occurring at their hotels, including the sex trafficking of J.R. and others like her, drug dealing, and general safety concerns observable by staff, guests, via hotel video surveillance, through oral and written complaints, news, reporting, and centralized management, internet, and data systems. Nevertheless, Defendants chose to prioritize profits over people, and elected not to take any reasonable measures to curtail the continued exploitation at their hotels.

### D. DEFENDANTS ARE DIRECTLY LIABLE FOR THEIR ROLE IN PERMITTING AND FACILITATING J.R.'S TRAFFICKING AT THEIR OWNED, OPERATED, AND BRANDED HOTELS

105.    Congress enacted the Victims of Trafficking and Violence Protection Act ("TVPA") in 2000 to combat sex trafficking, prevent violence against women and children, and offer justice for survivors of modern-day slavery.[40]

106.    In each reauthorization since its enactment, Congress has maintained a strong intent to provide adequate protection and recovery for victim survivors of trafficking against "the enormous profitability of this industry."[41]

107.    Specifically, in 2003, over the objection of the Department of Justice, Congress chose to add a civil remedy under section 1595 and broadly define the class of defendants who could be sued in this private right of action. Then again, when

---

[40] TVPA Pub. L. 106–386, October 28, 2000, 114 Stat. 1464 (2000) (codified as amended in Title 22, Chapter 78, and Title 18, Chapter 77, of the U.S. Code); *see also* Markup of H.R. 2620 before House Int'l Affairs Comm., 108th Cong., 1st Sess., at 298 (July 23, 2003) (statement of Rep. Christopher Smith).
[41] *Trafficking In Persons: The Federal Government's Approach to Eradicate This Worldwide Problem: Hearing on H.R. 2620 Before the Subcomm. On Human Rights and Wellness of the H Comm. on Gov't Reform*, 108th Cong. (2004) (statement of Rep. Dan Burton).

Congress passed the William Wilberforce TVPRA in 2008 it amended section 1595 to increase the capacity of survivors to recover against anyone who "knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter."[42]  Congress has thus consistently expanded the TVPRA in an effort to deter sex trafficking worldwide and provide a broad remedy for survivors against actors like Defendants.[43]

108.    Defendants have been on notice of repeated incidences of sex trafficking occurring at the hotels they own, operate, supervise, and brand for decades. Defendants have further known that the hotel industry is the epicenter of the sex trafficking trade.  Yet each Defendant failed, and persists in failing, to fulfill its statutory responsibility to combat such criminality, or to refuse its benefits.

109.    Defendants participated in commercial hotel operating business ventures at their directly owned, operated, and branded hotels, including the ESA® Southside, ESA® Deerwood, ESA® Lenoir, ESA® Salisbury, Knight's Inn® Jacksonville, and Emerson Inn where J.R. was trafficked.  There was an ongoing business relationship between Defendants, their hotels, and their staff which was aligned with Defendants' common hotel operating enterprises.

---

[42] William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457, 122 Stat. 5044.
[43] *See Roe v. Howard*, 917 F.3d 229, 242 (4th Cir. 2019) ("Viewed as a whole, the TVPA represents a far-reaching congressional effort to combat transnational human trafficking on numerous fronts, including by expanding the civil claims and remedies available to its victims.").

110.    In 2013, the ESA® Southside, ESA® Deerwood, ESA® Lenoir, and ESA® Salisbury were alter egos, representatives, agents, or co-conspirators of Defendant ESA Inc., their owner and parent corporation.  ESA Inc. had the right to exercise control over all business operations, management, supervision, administration, and procedures at the ESA® Southside, ESA® Deerwood, ESA® Lenoir, and ESA® Salisbury (the "ESA Inc. hotels").

111.    In 2013, ESA Inc. was a single and joint employer with a high degree of interrelated, intermingled, and unified operations at the ESA Inc. hotels.  ESA Inc. shared common policies, practices, and procedures—or lack thereof—with the ESA Inc. hotels.  As an integrated enterprise and/or joint employer, ESA Inc. and the ESA Inc. hotels are separately and jointly responsible for compliance with all applicable laws, and jointly and severally liable for any damages caused by employees.

112.    In 2013, the Emerson Inn was an alter ego, representative, agent, or co-conspirator of Defendant JSL, its owner and parent corporation.  Defendant JSL had the right to exercise control over all business operations, management, supervision, administration, and procedures at the Emerson Inn.

113.    In 2013, Defendant JSL was a single and joint employer with a high degree of interrelated, intermingled, and unified operations at the Emerson Inn. Defendant JSL shared common policies, practices, and procedures—or lack thereof— with the Emerson Inn.  As an integrated enterprise and/or joint employer, Defendant JSL and the Emerson Inn are separately and jointly responsible for compliance with

all applicable laws, and jointly and severally liable for any damages caused by employees.

114.    In 2013, the Knights Inn® Jacksonville was an alter ego, representative, agent, or co-conspirator of Defendant Wyndham, including Knights Franchise Systems, Inc. now owned by Defendant Red Lion, its owner and parent corporation. Defendant Wyndham had the right to exercise control over all business operations, management, supervision, administration, and procedures at the Knights Inn® Jacksonville.

115.    In 2013, Defendant Wyndham was a single and joint employer with a high degree of interrelated, intermingled, and unified operations at the Knights Inn® Jacksonville.    Defendant Wyndham shared common policies, practices, and procedures—or lack thereof—with the Knights Inn® Jacksonville.  As an integrated enterprise and/or joint employer, Defendant Wyndham and the Knights Inn® Jacksonville are separately and jointly responsible for compliance with all applicable laws, and jointly and severally liable for any damages caused by employees.

116.    Defendant Red Lion retains successor liabilities for Defendant Wyndham, Knights Franchise Systems, Inc. and the Knights Inn® Jacksonville.

**Defendants Knowingly Benefitted from Participation in the Commercial Business Ventures at Their Hotels**

117.    Defendants knowingly benefitted from their business ventures through economic and non-economic means, including but not limited to, the profits reaped through room rentals, data collection, and maintenance of their public image.

118.   Defendants knowingly benefitted from the steady stream of income earned by renting rooms to J.R.'s trafficker and buyers.

119.   Defendants were the primary facilitators in the venture of renting rooms at their hotels.   Defendants engaged in marketing to attract participants, including J.R.'s trafficker and buyers, to the venture.   Defendants controlled and fixed the price of room rentals at their hotels.   Defendants controlled room booking and payment processing for renting at their hotels.   Defendants required their hotels to use software operated and controlled by Defendants for room booking and reservations, credit processing for payments for room rentals, and property management.   Defendants also took primary responsibility for customer retention and rewards programs at their hotels.   Thus, every time J.R.'s trafficker rented a room at Defendants' hotels, Defendants knowingly benefitted from their participation in the reservation, payment information, and guest reservation data that was processed, collected, and retained through Defendants' software and management platforms.

120.   Defendants also knowingly benefitted from acquiring valuable customer data when they provided free Wi-Fi to patrons at their hotels, including J.R.'s trafficker and buyers.   Defendants profited from data collected each and every time J.R.'s trafficker and buyers used Defendants' Wi-Fi to advertise and solicit J.R. for commercial sex at Defendants' hotels.

121.   Defendants controlled policies and procedures relating to Wi-Fi, information technology, and the collection of guest web browsing data at their hotels. Defendants required their hotels to use specific Wi-Fi service providers and to store

52

their guest data on Defendants' centralized data platforms.  Defendants had direct access to guest data through their centralized data management platforms.  Defendants then used this valuable guest data for marketing purposes and also retained data to sell to third parties.

122.   Defendants knowingly benefitted from allowing the ongoing use of its Wi-Fi to access websites like Backpage, and other notorious pages used for the advertisement of commercial sex, knowing that if they cut-off access to such pages, they would lose traffickers' and buyers' regular and profitable patronage.

123.   In addition, Defendants knowingly benefitted from their ongoing reputation for privacy, discretion, and lack of policies and training hindering commercial sex at their hotels which continues to attract traffickers and buyers.

124.   Defendants further knowingly benefitted from maintaining and enhancing their hotel brand goodwill by denying to the general public any problem of sex trafficking at their hotels while pretending to take unified efforts to combat it.

125.   Defendants knowingly benefitted through strategic cost-saving measures, including refusing to mandate or monitor employee training on sex trafficking, declining to analyze or address data they received regarding criminal activity, safety, and other indicia of trafficking issues occurring at their hotels (while using the same data to enhance marketing and other profit driven purposes), and choosing not to implement adequate security measures or employ qualified staff.

126.   Defendants were direct participants in the commercial business ventures at their hotels.  Defendants and their hotels were aligned in a common enterprise

involving risk and potential profit. There was a continuous business relationship between Defendants and their hotels.

### Defendants' Business Ventures Violated the TVPRA by Harboring and Advertising Sex Trafficking at Their Hotels

127. Through their business ventures, Defendants harbored J.R., J.R.'s trafficker, and J.R.'s buyers in their hotel rooms, thus facilitating J.R.'s trafficking.

128. Defendants' business ventures rented and provided rooms to J.R.'s trafficker in which J.R. was harbored and forced to engage in commercial sex acts to numerous buyers entering Defendants' hotels for this explicit and apparent purpose.

129. Defendants' business ventures also advertised J.R. for commercial sex at their hotels using the Wi-Fi services provided by Defendants.

130. Defendants had the opportunity to inhibit J.R.'s trafficker and buyers, but instead chose to continue implementing permissive business practices which failed to take reasonable measures to stop sex trafficking from occurring at their hotels.

131. Defendants failed to take any steps to stop harboring or advertising J.R. at their hotels, including alerting authorities, implementing reasonable security measures, training their staff to improve awareness of sex trafficking red flags, monitoring internet usage over their networks, or declining to provide free Wi-Fi or access to websites like Backpage that are tied to the trafficking industry.

132. These failures were deliberate choices made by Defendants to conduct business ventures that facilitated, rather than prevented, sex trafficking in their hotels and in contradiction to all available anti-trafficking guidance for businesses.

**Defendants Knew or Should Have Known of J.R.'s Trafficking at Their Hotels**

133.    Defendants had actual or constructive knowledge of J.R.'s trafficking.

134.    A reasonably diligent company, armed with the knowledge and data available to Defendants, would have recognized the issue of sex trafficking at their hotels and implemented policies, procedures, and training that, if followed, would have identified J.R.'s trafficking at their hotels.

135.    Defendants knew or should have known that the business ventures they compel in their hotels necessarily permit and facilitate sex trafficking, and J.R. was harmed, by design, from those strategic business decisions.

136.    Defendants knew or should have known of J.R.'s trafficking at their hotels because they have been on notice of the pervasive issue and centrality of their hotels as sex trafficking havens for decades and failed to implement anti-trafficking measures.

137.    Defendants knew or should have known of J.R.'s trafficking at their hotels through the numerous national and international efforts to combat sex trafficking within the hospitality industry, including the proliferation of well-researched and widespread anti-trafficking toolkits and trainings.

138.    Defendants knew or should have known of J.R.'s trafficking because they knew sex trafficking and prostitution are associated, that both carry a high risk of physical and sexual violence, substance abuse, and other illegal and dangerous conduct, and that pimps and traffickers use force, fraud, and coercion to compel commercial sex acts.

139.   Defendants knew or should have known of J.R.'s trafficking because they knew their hotels were in areas known for crime and the sex trade, and that their hotels were therefore susceptible to sex trafficking, from the numerous guest reviews, reports, and other police news they received and reviewed concerning these issues at their specific hotels.

140.   Defendants knew or should have known of J.R.'s trafficking because hotel employees observed the obvious red flags of trafficking at their hotels.  These sex trafficking signs were so open and obvious that numerous hotel guests complained to Defendants and publicly warned others in online reviews about the dangers of Defendants' hotels.[44]

141.   Defendants knowingly enabled the trafficking of J.R. and other victims at their hotels by refusing to train their employees to identify, address, and or report obvious signs of sex trafficking, and by refusing to implement a brand-wide zero tolerance policy for sex trafficking on their properties.  Defendants knew or should have known of J.R.'s trafficking had Defendants done so.

142.   Defendants knew or should have known of J.R.'s trafficking through their centralized control over their hotel operating systems, including reservations, internet, reports, and reviews concerning their hotels which alerted or should have alerted Defendants to the ongoing criminal activity.

---

[44] *See* Section V.C. Defendants' Actual or Constructive Knowledge of J.R.'s Trafficking Through Reports, Reviews, and Data Systems, ¶¶ 97.a (Emerson Inn), b. (Knights Inn® Jacksonville), c. (ESA® Southside), d. (ESA® Deerwood), e. (ESA® Lenoir), f. (ESA® Salisbury).

143.   In addition, each time J.R.'s trafficker or buyers connected to Defendants' Wi-Fi to post or view advertisements of commercial sex with J.R., Defendants knowingly collected and retained their web browsing and personal data on Defendants' data management platforms which alerted or should have alerted Defendants to J.R.'s trafficking at their hotels.

144.   Defendants knew or should have known of J.R.'s trafficking at their hotels through their centralized control over, and monitoring of, their hotels, the decades of research and resources provided to Defendants to combat this known problem, and their purported anti-trafficking measures which their hotels would have used to report J.R.'s trafficking to Defendants had any such measures actually been effectively trained, implemented, or enforced.

145.   Defendants could and should have implemented and enforced anti-trafficking policies, procedures, and training to address the known sex trafficking at their hotels which would have protected J.R., and others like her, from being repeatedly exploited, including by:

     a.  Mandating employee training addressing trafficking within hotels;

     b.  Distributing material to assist employees in identifying trafficking;

     c.  Developing a process for escalating suspected trafficking within the organization;

     d.  Providing checklists, protocols, and information on trafficking;

     e.  Mandating new hire orientation on human rights and corporate responsibility;

    f.   Mandating periodic continued employee education on hotel trafficking through webinars, seminars, conferences, and online portals; and

    g.   Tracking performance indicators and key metrics on trafficking prevention at their hotels; and

    h.   Closing hotels which continue to allow rampant sex trafficking and refuse to enforce the corporate anti-trafficking policies and procedures.

146.   Despite having actual and/or constructive knowledge of the extensive commercial sex trafficking occurring at the hotels Defendants ESA Inc., JSL, and Wyndham owned and operated daily, these defendants maintained their deficiencies, repeatedly failing to stop or adequately address J.R.'s trafficking at the ESA® Southside, ESA® Deerwood, ESA® Lenoir, ESA® Salisbury, Emerson Inn, and Knight's Inn® Jacksonville.

147.   Had Defendants not harbored known and suspected human traffickers, buyers, and victims in exchange for financial gain, J.R.'s trafficker could not have successfully arranged for her to be continually sold for sex at Defendants' hotels.

148.   Had Defendants not allowed J.R. to be advertised across their networks in exchange for financial gain, J.R.'s trafficker could not have successfully arranged for her to be continually sold for sex at Defendants' hotels.

149.   Had Defendants not had business models which permitted, facilitated, and encouraged ongoing human trafficking at their hotels, Plaintiff would not have been trafficked at Defendants' hotels throughout 2013. The open and obvious signs of J.R.'s sex trafficking would and should have resulted in J.R.'s trafficking being

reported, prevention of further room rentals to her trafficker, and an end to J.R.'s exploitation at Defendants' hotels.

### E. DEFENDANTS WYNDHAM AND RED LION ARE VICARIOUSLY LIABLE FOR J.R.'S TRAFFICKING AT THE KNIGHTS INN® JACKSONVILLE

150.    In addition to, and apart from, each Defendants' direct liability under the TVPRA, Defendants Wyndham and Red Lion are also vicariously liable for the actions and inactions of the Knights Inn® Jacksonville that facilitated J.R.'s trafficking.

151.    In 2013, Wyndham Worldwide, including Knights Franchise Systems, Inc., exercised systemic control over the Knights Inn® Jacksonville. The Knights Inn® Jacksonville was thus an agent of Wyndham Worldwide when J.R. was trafficked.

152.    To any extent the Knights Inn® Jacksonville was franchised, rather than directly owned and operated, by Wyndham Worldwide, including Knights Franchise Systems, Inc., Defendants Wyndham and Red Lion are vicariously liable and retain successor liability for Wyndham Worldwide and the Knights Inn® Jacksonville.[45]

153.    Under a typical franchise agreement, the corporate Brand lends its name and likeness to third party owners, while the hotel building and operations are run by a franchisee or third-party management company under the Brand's exacting control. In return, the Brand exchanges the high risk that is inherent in owning an asset like a hotel for the low risk associated with owning a franchise contract, while still controlling the Brand's image, policies, and profits from putting heads in their beds.

---

[45] *See* Section II. Parties, *supra* ¶¶ 15 (Wyndham), 16 (Red Lion).

154.    The average consumer does not see this relationship. The Brand gives the franchisee property the Brand's identity.  The Brand provides signage within and in front of the hotel property that assures customers that when checking into that branded hotel they can expect that Brand's specific standards.   This notion is reinforced throughout the branded hotel as the Brand is emblazoned on everything from the pens on the bedside tables to the staff uniforms at the front desk.

155.    In addition to Brand recognition and controlling consumer expectations, the Brand provides a marketing organization as well as hotel listings in the Global Distribution System (GDS) and other online travel agency databases.  The Brand also supplies the branded hotel with its Brand-wide central room reservation system, 1-800 phone number, payment and revenue management tools, world-class loyalty programs and customer support, corporate website, advertising, and media channels.   In addition, the Brand requires the use of specified vendors and suppliers of goods and services at the hotel, and mandates the branded hotel carry Wi-Fi internet service which allows the Brand to access, monitor, and harvest guest data.

156.    Furthermore, for the privilege of carrying the Brand's name and reputation, the Brand requires the branded hotel to abide by the Brand's corporate policies, procedures, reporting, and staff training requirements.  Rather than paying the cost to develop their own, the branded hotel receives predetermined operating standards from the Brand.  The Brand directs, communicates, and publishes these protocols through the Brand's property systems with back-end management by the Brand.

157.   The Brand is considered a joint employer of the employees at its branded hotels.   As a standard practice in the hospitality industry, the Brand exercises significant control over the employment decisions at its branded hotels.   The Brand promulgates policies, procedures, and standards governing the hiring, training, retention, and advancement of employees at its branded hotel and sets its rates of pay.

158.   The Brand thus exercises significant control over the branded hotel's day-to-day operations.   Marketing, room reservations, hotel operating management systems, vendors, protocols, and internet at the branded hotel are all mandated and controlled by the corporate Brand.[46]

159.   Through these mechanisms, the Brand sees reservation trends and gathers valuable customer data from guests at the branded hotel, including names, payment information, reservation history, browsing data, service inquiries, utilization of facilities, other details associated with the hotel stay for promotional, customer service, and guest safety reasons.[47]

160.   In return, the branded hotel typically pays around 10% of its total revenue back to the Brand and is required to maintain the hotel property in accordance with the Brand's standards as laid out in its franchise agreement.

161.   Per the contract, franchise agreement, or direct ownership, supervision, and operation by the Brand, the Brand may enforce these standards through periodic

---

[46] Ellen Meyer, *The Origins and Growth of Franchising in the Hotel Industry*, LODGING MAGAZINE (Apr. 10, 2018), https://lodgingmagazine.com/the-origins-and-growth-of-franchising-in-the-hotel-industry
[47] *See, e.g., Privacy Policy*, SONESTA RED LION, https://franchise.sonesta.com/es/node/946.

inspections.  The Brand may terminate the agreement if the branded hotel is found to be inadequate; however, the Brand rarely takes this action because it would lose the associated franchise fees.  The right of the Brand to enforce these standards is also their responsibility.

162.   To the extent Wyndham Worldwide served as a corporate Brand and franchised the Knights Inn® brand to the Knights Inn® Jacksonville in 2013, Wyndham Worldwide and the Knights Inn® Jacksonville exhibited a significant degree of interrelated, intermingled, and unified operation, which demonstrated an agency relationship between them.

163.   This agency relationship was created through Wyndham Worldwide's Brand exercise of an ongoing and systemic right of control over the Knights Inn® Jacksonville's hotel operations beyond that which is necessary to maintain Brand standards, including the means and methods of how the Knights Inn® Jacksonville conducted daily business through the following actions:

    a.  hosting online bookings on the Brand's domain;

    b.  regulating the rates for room rentals;

    c.  fixing additional hotel prices, such as for fees, incidentals, and food;

    d.  sharing profits;

    e.  requiring the use of the Brand's property management systems;

    f.  requiring the use of the Brand's payment processing systems;

    g.  requiring the use of only specific and Brand approved hotel vendors;

    h.  requiring the use of the Brand's customer rewards program;

i.   mandating free Wi-Fi access at the hotel;

j.   requiring the use of the Brand's internet services and providers, including filtering, cybersecurity measures, and advertising, which allows the Brand to access, monitor, and harvest guest internet data;

k.   requiring installation of the Brand's data transport systems which share data with the Brand;

l.   mandating insurance coverage and other property requirements;

m.  mandating other standardized or strict rules of hotel operation;

n.   controlling customer review and response platforms;

o.   requiring the branded hotel to gather and generate data reports, including reservation, payment, and occupancy information for the Brand;

p.   requiring the branded hotel to keep audit reports and other records of hotel operations to be delivered to the Brand;

q.   setting employee wages;

r.   making employment decisions, including hiring, firing, and promotions;

s.   providing standardized training methods, education, and orientation materials for branded hotel employees, including but not limited to, webinars, seminars, conferences, and online portals;

t.   advertising for the branded hotel, including new property openings and employment;

u.   providing standardized marketing services and requirements;

v. providing the software, hardware, and platforms used by branded hotels in daily operations or to report suspicious activity;

w. providing IT support for the Brand's required systems;

x. dictating the building and maintenance of the branded hotel structure in the Brand's specified manner;

y. requiring modifications and updates to the branded hotel structure upon the Brand's request;

z. prohibiting substantial changes to the branded hotel without the Brand's express permission;

aa. conducting regular inspections and auditing hotel operations for compliance with contract terms and the Brand's rules and regulations;

bb. developing and requiring the use of uniform Brand operating policies, procedures, and standards, including policies relating to security and guest safety, human rights, ethics, corporate governance, legal compliance, and risk management issues; and

cc. other actions that deprive the branded hotels of independence.

164. Upon information and belief, Wyndham Worldwide tracked, managed, and controlled the data regarding guest information, including physical location of guests via internet enabled devices, internet activity, inventory information, and indicia of J.R.'s trafficking at the Knights Inn® Jacksonville, including check-in, hospitality requests, internet activity and advertising posts on Backpage.com and other

adult pages which solicited commercial sex listing the address and her location at the Knights Inn® Jacksonville.

165.   In addition, Wyndham Worldwide created an apparent agency relationship with the Knights Inn® Jacksonville by holding it out to the public as possessing authority to act on Wyndham Worldwide's behalf.[48]

166.   J.R.'s traffickers and buyers relied on Wyndham Worldwide's Brand standards and failure to implement or enforce anti-trafficking measures when they chose to harbor and advertise J.R. for commercial sex at the Knights Inn® Jacksonville.

167.   As alleged herein, employees at the Knights Inn® Jacksonville observed obvious signs of J.R.'s trafficking and had either actual or constructive knowledge of her exploitation.   Yet under Wyndham Worldwide's hotel operating policies, procedures, and Brand standards, these employees failed to address J.R.'s victimization due to a lack of training, enforcement, or effectiveness.

168.   As the primary in an agency relationship with Knights Inn® Jacksonville, Wyndham Worldwide assumed and breached its duties in the following ways:

    a.   Failing (altogether or adequately) to mandate employee training addressing trafficking within hotels;

    b.   Failing (altogether or adequately) to distribute material to assist employees in identifying trafficking;

---

[48] *See, e.g.*, Section V.C. ¶ 97.b.ii (online review warning against staying at the Knights Inn® Jacksonville and indicating they would "call corporate office to inform them tomorrow"); *see also* Section V.C. ¶ 97.c.i ("I will be following up with their corporate office…").

   c.  Failing (altogether or adequately) to develop a process for escalating suspected trafficking within the organization;

   d.  Failing (altogether or adequately) to provide checklists, protocols, and information on trafficking;

   e.  Failing (altogether or adequately) to mandate new hire orientation on human rights and corporate responsibility;

   f.  Failing (altogether or adequately) to mandate periodic continued employee education on hotel trafficking through webinars, seminars, conferences, and online portals;

   g.  Failing (altogether or adequately) to track performance indicators and key metrics on trafficking prevention at their branded hotels; and

   h.  Failing (altogether or adequately) to enforce anti-trafficking policies and procedures or end brand franchise agreements with hotels which allowed sex trafficking on the property.

169.  Defendants Wyndham and Red Lion are vicariously liable for the knowing benefits the Knights Inn® Jacksonville received in franchising the hotel to Wyndham Worldwide, including but not limited to, the Knights Inn® brand's name, likeness, operating standards, and centralized management systems, and similarly liable for Wyndham Worldwide's knowing benefit of significant franchise fees and continuous royalties on gross revenues generated at the Knights Inn® Jacksonville.

170.  Defendants Wyndham and Red Lion are vicariously liable for the Knights Inn® Jacksonville's participation in a commercial hotel operating business

venture with Wyndham Worldwide which repeatedly harbored J.R., her trafficker, and buyers in their rented rooms for commercial sex and advertised J.R. using its internet services for the same explicit purpose.

171.    Employees at the Knights Inn® Jacksonville knew or should have known of J.R.'s trafficking through the obvious interactions and red flag signs she, her co-victims, trafficker, and buyers repeatedly exhibited over numerous and extended stays.

172.    Employees at the Knights Inn® Jacksonville knew or should have known J.R.'s trafficker's purpose for being present at the hotel was to force to J.R. into commercial sex acts, yet rented him rooms and continued to permit their presence.

173.    Employees at the Knights Inn® Jacksonville knew or should have known J.R.'s buyers were present at the hotel solely for commercial sex, yet continued to permit their presence and repeated entry to the rooms where J.R. was held.

174.    Employees at the Knights Inn® Jacksonville failed to report the crimes and shielded J.R.'s trafficker and buyers from interruption by law enforcement.

175.    Employees at the Knights Inn® Jacksonville failed to help or in any way address the suffering of J.R. and her co-victims from repeated sex trafficking.

176.    Employees at the Knights Inn® Jacksonville continued to supply the trafficker and buyers with hotel services, including additional housekeeping.

177.    Had the Knights Inn® Jacksonville or Wyndham Wordwide enacted and enforced effective anti-trafficking measures at their hotel, J.R.'s continued trafficking would not have been possible.  They would not have profited from her pain.

# VI.  CAUSES OF ACTION

## COUNT ONE – 18 U.S.C. § 1595 ("TVPRA") (Against all Defendants)

178.    J.R. incorporates each foregoing allegation as if fully set forth herein.

179.    J.R. is a victim of sex trafficking within the meaning of 18 U.S.C. § 1591(a) and is therefore entitled to bring a civil action under 18 U.S.C. § 1595.

180.    Defendants' acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. § 1595.  Specifically, Defendants had a statutory obligation not to benefit from a venture that it knew, or should have known, to engage in violations of 18 U.S.C. § 1591(a).  At all relevant times, Defendants breached this duty by their participation in, and facilitation of, the trafficking of J.R. for the purposes of commercial sex induced by force, fraud, or coercion, by their acts, omissions, and commissions.

181.    Defendants benefitted as a result of their acts, omissions, and/or commissions by renting rooms and acquiring customer data, by keeping operating costs low without implementing staff training and other effective anti-trafficking measures, and by maintaining their public image and the loyalty of the segment of their customer base that seeks to participate in the sex trade.  Defendants had actual or constructive knowledge of J.R.'s trafficking but failed to implement or enforce anti-trafficking measures that would have helped her, and others like her.  The actions, omissions, and/or commissions alleged in this pleading were the but-for and proximate cause of J.R.'s injuries and damages.

68

182.    J.R. has suffered substantial physical and psychological injuries as the result of being trafficked at Defendants' hotels, including the ESA® Southside, ESA® Deerwood, ESA® Lenoir, ESA® Salisbury, Knight's Inn® Jacksonville, and Emerson Inn, in violation of 18 U.S.C. § 1591(a).

## PRAYER FOR RELIEF

WHEREFORE Plaintiff requests that the jury selected to hear this case render a verdict in her favor on all counts alleged, and against each and every named Defendant, separately and severally, and that it award damages to her in an amount which will adequately compensate her for the injuries and damages she sustained due to the Defendants' conduct outlined as follows:

a.    All available compensatory damages for the described losses with respect to each cause of action;

b.    Past and future medical expenses, as well as the costs associated with past and future life care;

c.    Past and future lost wages and loss of earning capacity;

d.    Past and future emotional distress;

e.    Consequential and/or special damages;

f.    All available noneconomic damages, including without limitation pain, suffering, and loss of enjoyment of life;

g.    Disgorgement of profits obtained through unjust enrichment;

h.    Restitution;

i.    Punitive damages with respect to each cause of action;

j.      Reasonable and recoverable attorneys' fees;

k.      Costs of this action; and

l.      Pre-judgment and all other interest recoverable.

On the foregoing basis, Plaintiff also requests a jury be selected to hear this case and render a verdict for Plaintiff, and against Defendants, and that it award damages to Plaintiff in an amount which adequately reflects the enormity of the Defendants' wrongs, and which will effectively prevent other similarly caused acts.    Further, Plaintiff requests the Court enter judgment consistent with the jury's verdict and prays for any other damages and equitable relief the Court or jury deems appropriate under the circumstances.

**THE PLAINTIFF DEMANDS A TRIAL BY JURY**

Date: January __18__, 2023                    **RESPECTFULLY SUBMITTED**,

                                              */s/ Doug H. Clifton*
                                              Doug H. Clifton (Fla. Bar No. 49850)
                                              EDWARDS & RAGATZ, PA
                                              4401 Salisbury Rd., Ste. 200
                                              Jacksonville, FL 32216
                                              T: 904-399-1609
                                              F: 904-399-1615
                                              E: DHC@edwardsragatz.com

                                              Meghan E. McCormick (Fla. Bar No.888745)
                                              Amanda J.G. Walbrun (*Pro Hac Vice Pending*)
                                              BOUCHER LLP
                                              555 Montgomery St., Ste. 1205
                                              San Francisco, CA 94111
                                              T: (818) 340-5400
                                              F: (818) 340-5401
                                              E: mccormick@boucher.la
                                              E: walbrun@boucher.la
                                              *Attorneys for Plaintiff*