**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | |
|---|---|
| J.R., an individual, | |
| Plaintiff, | Case No.: 3:23-cv-00063-HES-JBT |
| vs. | FIRST AMENDED COMPLAINT |
| EXTENDED STAY AMERICA, INC.; ESA P PORTFOLIO OPERATING LESSEE LLC; ESA MANAGEMENT, LLC; | DEMAND FOR JURY TRIAL |
| WYNDHAM HOTELS & RESORTS, INC.; | |
| RED LION HOTELS CORPORATION; and | |
| JAI SHREE LAXMI, LLC, | |
| Defendants. | |

**FIRST AMENDED COMPLAINT**

Plaintiff J.R., by and through the undersigned counsel, respectfully submits her first amended complaint for damages and makes the following averments.[1]

**I.  INTRODUCTION**

1.      Human sex trafficking is a pervasive evil that has left an indelible stain on the fabric of society.  This modern-day slavery exists illegally throughout the United States and is furthered by public lodging establishments, including Defendants' hotels.

---

[1] This amended complaint is made pursuant to the Court's November 8, 2023 Order.

1

Trafficking is undoubtedly one of the most wicked and immoral forms of behavior to plague civilized societies.

2.      As sex trafficking has grown to epidemic proportions, it has become widely recognized that our laws must look beyond the individual trafficker and sex buyer to end sex trafficking.  Congress therefore enacted the William Wilberforce Trafficking Victims Protection Reauthorization Act ("TVPRA") of 2008 to expand civil liabilities against anyone who knowingly benefits from the negligent participation in a venture that engages in trafficking crimes.[2]

3.      This case is about Plaintiff, J.R., a survivor of sex trafficking and the unfortunate victim of a scheme that began with criminal traffickers, and was assisted, supported, and facilitated by Defendants—hotel owners and operators. Defendants profit from sex trafficking by allowing criminals to brazenly operate in and out of their hotels throughout this country and have done so for years. Defendants permit criminals to parade their misconduct openly on their hotel premises, as Defendants reap huge profits at the expense of human life, human rights, and human dignity.[3]

---

[2] *See generally*, Human Trafficking - Key Legislation, U.S. DEPARTMENT OF JUSTICE (Sep. 28, 2022), https://www.justice.gov/humantrafficking/key-legislation.

[3] Plaintiff has attempted to address the Court's finding of a shotgun pleading by specifically identifying individual Defendants and their respective hotels where applicable throughout this amended complaint.  Plaintiff also further distinguished Defendants' conduct in separate sections.  Plaintiff thereby ensured this amended complaint "give[s] the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1323 (11th Cir. 2015).  To the extent any of Plaintiff's remaining allegations group Defendants together, such allegations do not create an impermissible shotgun pleading.  See *id.*, at 1321-23 (defining shotgun pleading types); *S.Y. v. Wyndham Hotels & Resorts, Inc.*, 521 F.Supp.3d 1173, 1182 (M.D. Fla. 2021).  Rather, in such rare instances, "[t]he complaint can be fairly read to aver that all defendants are responsible for the alleged conduct." *S.Y.*, 521 F.Supp.3d, at 1182 (quoting *Kyle K. v. Chapman*, 208 F.3d 940, 944 (11th Cir. 2000)).  In *S.Y.*, the plaintiff also alleged many of the same

4.      Hotels exist to make profits, and sex trafficking increases revenues for any hotel business willing to tolerate this depraved behavior.  Traffickers know that some hotels, like Defendants' hotels, rarely, if ever, intervene, even in the face of openly illegal behavior.

5.      Rather, Defendants routinely choose profits over people in their hotel operating business ventures to welcome sex trafficking at their properties through strategic business decisions that promote ease of access for buyers, allow the ability to pay in cash for non-traceability, offer free Wi-Fi, and other mechanisms that maintain anonymity, privacy, and discretion for criminals.  Despite mining and monetizing customer data for marketing and other purposes, Defendants further refuse to expend the necessary resources to educate their staff or implement and enforce anti-trafficking measures and reporting.

6.      Defendants have known for more than a decade that sex trafficking runs rampant at their hotels.  Instead of taking timely and effective measures to thwart this reality, Defendants choose to profit off the exploitation of Plaintiff and others like her.  Intent on benefitting from the profit created by rooms rented for this explicit and apparent purpose and acquiring valuable customer data by providing free internet

---

facts against all defendants and this Court found "[a] fair reading of the Complaint is that each of these defendants was involved in the identified conduct attributed to the '[hotel] Defendants.'" 521 F. Supp. 3d at 1182.  Similarly, here, Plaintiff's allegations against all Defendants simply reflect the systemic nature of sex trafficking within the hospitality industry and underscore that all Defendants are responsible for many of the same acts with similar hotel operating business ventures.

services which attracts traffickers, Defendants repeatedly ignore the open and obvious presence of commercial sex on their properties.

7.    Throughout 2013, Plaintiff was trafficked for commercial sex in each of Defendants' Jacksonville, Florida hotels.  Plaintiff endured coercion, psychological torment, and verbal abuse coupled with physical and sexual violence as her trafficker sold her at Defendants' properties.

8.    These repeated crimes took place with the actual and/or constructive knowledge of Defendants, which systematically created ways to use trafficking victims as a means to increase their profits, including renting rooms and providing internet for traffickers to advertise commercial sex with J.R. at their hotels.  Defendants implemented permissive policies, procedures, and brand standards rather than taking concrete and effective steps to prevent, spot, or report trafficking at their hotels.

9.    Plaintiff is a survivor of sex trafficking at Defendants' hotels. She brings this action for damages under the federal TVPRA civil remedy, 18 U.S.C. § 1595, seeking compensation for the harms and losses she sustained as a result of Defendants' support of these commercial sex transactions at their hotels.  Defendants own, operate, and manage the hotels wherein Plaintiff suffered.  She alleges Defendants recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, and/or solicited J.R. knowing, or in reckless disregard of the fact, that means of force, threats of force, fraud, and/or coercion were used to cause J.R. to engage in commercial sex acts.  Plaintiff further alleges Defendants knowingly benefited, attempted to benefit, and conspired to benefit from participation in hotel

operating business ventures Defendants knew, or should have known, were engaging in this unlawful sex trafficking, sexual exploitation, and brutal victimization of J.R., and others, in violation of 18 U.S.C. § 1591.

10.    Specifically, Plaintiff alleges each Defendant violated federal law by participating in a venture to operate hotels and knowingly benefited from this hotel venture through profits, including room rental profits, and the value of the "goodwill" of the hotel brand.  The hotel operating business venture violated 18 U.S.C. § 1591 as it: (1) recruited, enticed, patronized, and solicited J.R.'s traffickers and buyers to each Defendant's hotel; (2) harbored, provided, obtained, and maintained J.R. in each Defendant's rented hotel rooms; and (3) provided the internet services J.R.'s traffickers used to advertise J.R. and solicit buyers for commercial sex acts at each hotel.

11.    Defendants and traffickers had, and have, a mutually beneficial relationship, fueled by the sexual exploitation of victims like J.R.

12.    As a direct and proximate result of Defendants' consistent participation and refusal to identify, stop, and prevent commercial sex trafficking at their properties, Plaintiff was trafficked for the purpose of commercial sex, sexually exploited, and victimized repeatedly at Defendants' hotels.

13.    Thwarting the expansive growth of human trafficking requires the hospitality industry and its component members to be held accountable for their role in profiting from participation in ventures that a reasonable person or entity knows or should know engages in sexual slavery through both harboring and advertising

5

victims.  Civil lawsuits are thus an essential component of a viable plan for combatting sex trafficking in America.

## II.  PARTIES

14.    Plaintiff J.R. is an adult, natural person, and citizen of the United States. She resides in Jacksonville, Florida.  J.R. is a "victim" of sex trafficking within the meaning of 22 U.S.C. § 7102(17) and 18 U.S.C. §§ 1591(a), 1595(a), and a survivor of a "severe form of trafficking" within the meaning of 22 U.S.C. § 7102(16).[4]

### A.    EXTENDED STAY AMERICA

15.    Defendant Extended Stay America, Inc. ("ESA Inc.") is a Delaware corporation with its principal place of business in Charlotte, North Carolina.  ESA Inc. is a leading nationwide hospitality company.  In 2013, at the time of the J.R.'s trafficking, ESA Inc. directly owned, operated, and offered all public lodging services at its Extended Stay America® branded hotels.  ESA Inc. can be served by its registered agent, Intertrust Corporate Services Delaware Ltd., at 200 Bellevue Parkway, Suite 210, Wilmington, Delaware 19809.

16.    Defendant ESA P Portfolio Operating Lessee, LLC ("ESA Operating"), is a Delaware limited liability company and can be served at its registered agent, NRAI Services, Inc., 1200 South Pine Island Road, Plantation, Florida 33324.  ESA

---

[4] Due to the sensitive and private nature of Plaintiff's claims, the parties have stipulated to Plaintiff proceeding under pseudonym throughout all pre-trial public proceedings.  Plaintiff has a pending unopposed motion respectfully requesting this Court allow her identity to remain confidential.  *See* Pl.'s Unopposed Mot. Leave Proceed Pseudonym (Apr. 18, 2023), ECF No. 40.  The parties have also been engaged in negotiating the terms of a protective order, so Plaintiff's name will be disclosed without prejudice to Defendants.

Operating is and was a wholly owned subsidiary of ESA Inc. at all relevant times.[5] ESA Operating operates the Florida Extended Stay America® hotels at issue here.

17.     Defendant ESA Management, LLC ("ESA Management") is a Delaware limited liability company and can be served at its registered agent, NRAI Services, Inc., 1200 South Pine Island Road, Plantation, Florida 33324.   ESA Management is and was a wholly owned subsidiary of ESA Inc. at all relevant times.[6] ESA Management managed the Florida Extended Stay America® hotels at issue here.

18.     Defendants ESA Inc., ESA Operating, and ESA Management will collectively be referred to as "ESA."[7]

19.     Plaintiff was trafficked at the following four ESA brand hotels:

     a.     Extended Stay America® Jacksonville –Southside St. Johns Town Center located at 10020 Skinner Lake Drive, Jacksonville, Florida 32246 ("ESA® Southside");

---

[5] ESA Operating is the successor in liability to, and continuation of formerly known subsidiary "ESA P Portfolio Operating Lessee Inc."  Whenever reference is made in this Complaint to any act, deed, or conduct of "ESA Operating," the allegation applies equally to ESA P Portfolio Operating Lessee Inc and ESA P Portfolio Operating Lessee, LLC.

[6] ESA Management is the successor in liability to, and continuation of formerly known subsidiary "HVM L.L.C."  Whenever reference is made in this Complaint to any act, deed, or conduct of "ESA Management," the allegation applies equally to ESA Management, LLC and HVM L.L.C.

[7] ESA Operating and ESA Management are properly added defendants in this case.  Not only has ESA Inc. sought to substitute in ESA Management as a party, *see* Joint Stipulation at 1 (Mar. 6, 2023), ECF No. 21; ESA Mot. Dismiss at 1, n.1 (Mar. 21, 2023), ECF No. 27, but also because in a substantially similar trafficking case filed in this Middle District of Florida Court, the same ESA Operating and ESA Management defendants answered the trafficking survivor Plaintiff's complaint against them regarding the exact same ESA® Lenoir and ESA® Salisbury hotels.  *See* Compl., *K.H. v. ESA P Portfolio Operating Lessee LLC et al.*, No. 3:22-cv-01050 (M.D. Fla. Sept. 26, 2022), ECF No. 1; Defs.' ESA P Portfolio Lessee LLC, HVM, LLC, and ESA Management, LLC, Answer, *K.H.*, No. 3:22-cv-01050, ECF No. 15; Defs.' Initial Disclosures, *K.H.*, No. 3:22-cv-01050, ECF No. 25.

b.   Extended Stay America® Jacksonville – Deerwood Park located at 8801 Perimeter Park Boulevard, Jacksonville, Florida 32216 ("ESA® Deerwood");

c.   Extended Stay America® Jacksonville – Lenoir Avenue South located at 4699 South Lenoir Avenue, Jacksonville, Florida 32216 ("ESA® Lenoir"); and

d.   Extended Stay America® Jacksonville – Salisbury Road Southpoint located at 4693 Salisbury Road, Jacksonville, Florida 32256 ("ESA® Salisbury") (collectively, the "ESA® Hotels").

20.   Whenever reference is made in this Complaint to any act, deed, or conduct of ESA, the allegation is that ESA engaged in the act, deed, or conduct by or through one or more of its officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of ESA.

**B.   WYNDHAM**

21.   Defendant Wyndham Hotels & Resorts, Inc. ("Wyndham") is a Delaware corporation with its principal place of business in Parsippany, New Jersey. Wyndham is one of the largest hospitality companies in the world.  Wyndham owns, operates, manages, and/or franchises all public lodging services at its branded hotels. Wyndham can be served by its registered agent, Corporate Creations Network, Inc., at 801 U.S. Highway 1, North Palm Beach, Florida 33408.

8

22.     Wyndham Worldwide Corporation ("Wyndham Worldwide") acquired the Knights Inn® brand in 1995 through Knights Franchise Systems, Inc. ("KFSI").

23.     Defendant Red Lion now owns KFSI and the Knights Inn® brand.

24.     In 2013, Plaintiff was trafficked for commercial sex at Wyndham Worldwide's and KFSI's branded hotel, the Knights Inn® Jacksonville, located at 460 Lane Avenue South, Jacksonville, Florida 32254.

25.     Wyndham Worldwide, including KFSI, owned and operated the Knights Inn® brand during Plaintiff's trafficking at the Knights Inn® Jacksonville.  Wyndham Worldwide, including KFSI, owned, operated, managed, and/or supervised the Knights Inn® Jacksonville when Plaintiff was trafficked.

26.     Defendant Wyndham is the successor entity to Wyndham Worldwide. Defendant Wyndham retains successor liability for the wrongful acts of its predecessor, Wyndham Worldwide Corporation, including the acts of KFSI.[8]

27.     Whenever reference is made in this Complaint to any act, deed, or conduct of Wyndham, the allegation is that Wyndham engaged in the act, deed, or conduct by or through one or more of its officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Wyndham.

---

[8] Wyndham is the successor in liability to, and continuation of the formerly known "Wyndham Worldwide Corporation" which fully owned and operated KFSI.  Thus, whenever reference is made in this Complaint to any act, deed, or conduct of "Wyndham," the allegation applies equally to Wyndham, Wyndham Worldwide, and KFSI.

## C.    RED LION

28.    Defendant Red Lion Hotels Corporation ("Red Lion") is a Maryland corporation with its principal place of business at 1550 Market Street #350, Denver, Colorado 80202.  Red Lion is one of the largest hospitality companies in the world, operating eight brands in hotels across North America.[9]  Red Lion can be served by its registered agent, CSC-Lawyers Incorporating Service Company, 7 St. Paul Street, Suite 820, Baltimore, Maryland 21202.

29.    In 2018, Red Lion[10] acquired the Knights Inn® brand, including KFSI and management of the Knights Inn® Jacksonville, from Wyndham.

30.    Red Lion, doing business as KFSI, is the successor entity to Wyndham's and KFSI's wrongful conduct.  Red Lion retains successor liability for the wrongful acts of its predecessors, Wyndham and KFSI.

31.    Whenever reference is made in this Complaint to any act, deed, or conduct of Red Lion, the allegation is that Red Lion engaged in the act, deed, or conduct by or through one or more of its officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Red Lion.

---

[9] *Our Brands*, RLH BRANDS, https://www.redlion.com/our-brands (last visited Dec. 16, 2022).
[10] Through its wholly owned subsidiary, Red Lion Hotels Franchising, Inc.

**D.   JAI SHREE LAXMI**

32.   Defendant Jai Shree Laxmi, LLC ("JSL") is a limited liability company doing business as the Emerson Inn.  JSL can be served by its registered agent, Prem Patel, at 3558 Philips Highway, Jacksonville, Florida 32207.

33.   Now, and in 2013 at the time of J.R.'s trafficking, JSL directly owned, operated, and offered all public lodging services at the Emerson Inn located at 3558 Philips Highway, Jacksonville, Florida 32207 where Plaintiff was trafficked.

34.   Whenever reference is made in this Complaint to any act, deed, or conduct of JSL, the allegation is that JSL engaged in the act, deed, or conduct by or through one or more of its officers, directors, agents, employees, or representatives who was actively engaged in the  management,  direction, control, or transaction of the ordinary business and affairs of JSL.

## III.  JURISDICTION AND VENUE

**A.   PERSONAL JURISDICTION OVER DEFENDANTS**

35.   This Honorable Court may properly exercise personal jurisdiction over all Defendants.

36.   ESA Inc., ESA Operating, and ESA Management regularly conduct business in the State of Florida, derive substantial revenue from services rendered in Florida (including through the operation of numerous ESA branded hotels in Florida), and have caused indivisible injuries to Plaintiff in Florida as alleged herein.

37.   ESA Operating operates and controls the local Florida ESA® Hotels and Extended Stay America® brand where Plaintiff was trafficked.

38.    ESA Management manages the Florida ESA® Hotels and Extended Stay America® brand where Plaintiff was trafficked.  Defendant ESA Management is a successor in liability to the prior brand manager, HVM L.LC.  HVM L.L.C. conducted and operated businesses throughout the state of Florida and made critical management and business decisions for Extended Stay America® brand hotels.

39.    ESA Operating and ESA Management currently conduct and operate businesses throughout the state of Florida and make critical management and business decisions for the Extended Stay America® brand.

40.    Wyndham is subject to the jurisdiction of this Court because it regularly conducts business in the State of Florida, derives substantial revenue from services rendered in Florida (including through the operation of numerous branded hotels), and has caused indivisible injuries to Plaintiff in Florida as alleged herein.

41.    In 2013, Wyndham owned KFSI and the Knights Inn® brand and operated and managed the Knights Inn® Jacksonville where Plaintiff was trafficked.

42.    Red Lion is subject to the jurisdiction of this Court because it regularly conducts business in the State of Florida, derives substantial revenue from services rendered in Florida (including through the operation of numerous branded hotels), and has caused indivisible injuries to Plaintiff in Florida as alleged herein.

43.    Red Lion purchased KFSI and currently owns and manages the Knights Inn® brand.

44.    JSL is subject to the jurisdiction of this Court because it regularly conducts business in the State of Florida, derives substantial revenue from services

rendered in Florida (including through the operation of the Emerson Inn), and has caused indivisible injuries to Plaintiff in Florida as alleged herein.

**B.    SUBJECT MATTER JURISDICTION**

45.    This Honorable Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 1343(a) because this action arises under the TVPRA and its authorization amendments under 18 U.S.C., Chapter 77, and specifically section 1595. This Court also has supplemental jurisdiction over Plaintiff's claims that do not arise under federal law because each claim is "so related to claims in the action within [this Court's] original jurisdiction that they form part of the same controversy under Article III of the United States Constitution."  28 U.S.C. § 1367(a).

**C.    VENUE**

46.    Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District, and because one or more Defendants reside in this District and Division.

**IV.  SEX TRAFFICKING UNDER THE TVPRA**

47.    Under federal law, severe sex trafficking of an adult is defined by the use of force, fraud, or coercion to compel commercial sex acts.  22 U.S.C. § 7102(11)(A).

48.    Sex trafficking is a serious public health problem that negatively affects the well-being of individuals, families, and communities.[11]

---

[11] *Sex Trafficking*, CENTERS FOR DISEASE CONTROL AND PREVENTION (Feb. 4, 2022), https://www.cdc.gov/violenceprevention/sexualviolence/trafficking.html.

49.    It is a global crime with enormous profits.[12]   Of all trafficking, forced sexual exploitation specifically generates an estimated $99 billion per year.[13]

50.    Indeed, while sex trafficking makes up only 22% of the world's total trafficking, it is "six times more profitable than all other forms of forced labor, and five times more profitable than forced labor exploitation outside domestic work.[14]

51.    Recent statistics show that traffickers in developed nations like the United States can earn on average $80,000 per sex trafficking victim annually.[15]

52.    However, sex trafficking is preventable.  Crucial efforts to stop and deter sex trafficking include training awareness to recognize the signs of trafficking and measures to "end business profits from trafficking-related transactions."[16]

53.    Traffickers could not succeed in this hugely profitable industry alone. Experts agree that trafficking is less underground, and traffickers routinely interact and utilize commercial businesses for their criminal endeavors.[17]

54.    This intersection between human trafficking and the private industry is well-recognized.  Criminal traffickers must depend on legitimate mainstream business partners to be successful.  The private sector's involvement in the sex trafficking trade

---

[12] *Human Trafficking is the World's Fastest Growing Crime*, THE ADVISORY BOARD (May 22, 2017, 9:30 AM), https://www.advisory.com/daily-briefing/2017/05/22/human-trafficking.

[13] INT'L LAB. ORG., PROFITS AND POVERTY: THE ECONOMICS OF FORCED LABOR 13 (2014).

[14] *Id.* at 7, 15.

[15] *Id.* at 27.

[16] *Id.* at 13.

[17] *See, e.g.*, Carmen Niethammer, *Cracking The $150 Billion Business of Human Trafficking*, FORBES (Feb. 2, 2020), https://www.forbes.com/sites/carmenniethammer/2020/02/02/cracking-the-150-billion-business-of-human-trafficking.

is undeniable, and companies have long had a responsibility to address their known role in it with active and effective measures.[18]

## V.  SEX TRAFFICKING IN THE HOSPITALITY INDUSTRY

55.     Hotels are the central piece of infrastructure necessary to the survival of the sex trafficking trade.  News outlets, nonprofits, and other interested stakeholders have confirmed the "obvious nexus" between human trafficking and hotels' crucial role as the venue for selling commercial sex.[19]  The National Human Trafficking Hotline statistics also confirm hotels as the top-reported venue where sex trafficking occurs, surpassing even commercial brothels.[20]

56.     "Contrary to popular misconception, trafficking does not only take place in cheap hotels or motels with sub-par accommodations."[21]  The problem is industry wide.  In the United States, as much as 63% of all trafficking incidents occur at hotels ranging from luxury to economy.[22]

---

[18] *Id*. (quoting Bradley Myles, chief executive officer of Polaris: "Human trafficking is a $150 billion a year global industry and can't be fully addressed without businesses taking active and effective measures to reduce the potential for exploitation within their own systems.").

[19] Brittany Anthony, *On-Ramps, Intersections, and Exit Routes: A Roadmap for Systems and Industries to Prevent and Disrupt Human Trafficking*, Hotels and Motels, POLARIS 16-23 (Jul. 2018) https://polarisproject.org/wp-content/uploads/2018/08/A-Roadmap-for-Systems-and-Industries-to-Prevent-and-Disrupt-Human-Trafficking-Hotels-and-Motels.pdf; *see also Hotels & Motels Recommendations*, POLARIS, https://polarisproject.org/hotels-motels-recommendations (last visited Dec. 21, 2022); Giovanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

[20] *National Human Trafficking Hotline Statistics*, THE POLARIS PROJECT (2016), https://polarisproject.org/resources/2016-hotline statistics.

[21] Anthony, *supra* note 19, at 18.

[22] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hospitality Industry*, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015).

57.    Traffickers use hotels as the hub of their operations based on a variety of factors, including "convenient locations, buyer comfort, price, a hotel's policies, procedures,…infrastructure," and "whether the hotel is prone to law enforcement monitoring…[or is] perceived by traffickers to have distracted and busy staff."[23]

58.    ESA, Wyndham, and JSL have known this data for decades.  Their complacency in the face of the sex trafficking epidemic makes their hotels, and others like them, *the* venue of choice for sex trafficking.  Traffickers and buyers alike rely on ESA's, Wyndham's, and JSL's refusal to adopt and enforce company-wide anti-trafficking policies, refusal to train staff on what to look for and how to respond, and refusal to establish safe and secure reporting mechanisms for their staff at the point of sale.  Knowing their criminality will be permitted at ESA's, Wyndham's, and JSL's hotels, ESA, Wyndham, and JSL thus attract traffickers and buyers and increase the prevalence of sex trafficking at their hotels.[24]

59.    Put simply, ESA, Wyndham, and JSL's hotels are a "crucial piece of the infrastructure necessary to facilitate human trafficking" because "hotel chain franchises…offer a good balance of quality and price while giving buyers a sense of anonymity and safety."[25]

60.    ESA, Wyndham, and JSL have both the power and responsibility to make sex trafficking difficult for criminals.  Yet, ESA, Wyndham, and JSL repeatedly

---

[23] Anthony, *supra* note 19, at 18.
[24] Hotels Initiative, THE POLARIS PROJECT, https://polarisproject.org/initiatives/hotels (last visited Dec. 28, 2022); *see also* Cavagnaro, *supra* note 16, at 1.
[25] Anthony, *supra* note 19, at 18.

fail to heed the call, enact anti-trafficking measures, or enforce their own policies. Instead, ESA, Wyndham, and JSL continue to facilitate these crimes at their hotels, content to direct their efforts solely to profit and their own bottom line.

61.     Due to ESA's, Wyndham's, and JSL's commitment to profiting from, rather than preventing, sex trafficking, they refuse to embrace anti-trafficking policies, practices, and training that would have prevented J.R., and other vulnerable persons like her, from being sold, and continuing to be sold, for sex in their hotels throughout the nation and worldwide.

## VII.  THE SEX TRAFFICKING OF J.R. AT DEFENDANTS' HOTELS

62.     In or around January of 2013, J.R. was struggling to find stable housing. She was living out of her car and met a man who approached her at a gas station.  He offered her a helping hand, but instead, drugged her, stole her identification, cellphone, and car, advertised her, and sold her for commercial sex at Defendants' hotels.

63.     Throughout 2013, J.R. was subjected to repeated instances of rape, physical abuse, verbal abuse, exploitation, psychological torment, kidnaping, and imprisonment at the ESA® Southside, ESA® Deerwood, ESA® Lenoir, ESA® Salisbury, Knights Inn® Jacksonville, and Emerson Inn.

64.     The trafficker commonly used threats and intimidation to coerce J.R. and her co-victims into performing non-consensual sexual acts.  The trafficker remained in control over her person, whereabouts, and belongings.  He also used drugs, alcohol, the incurrence of debt, threats to her person and family, and other physical and

psychological methods to enforce compliance, such as hitting, slapping, choking, beating, humiliation, exhaustion, and isolation.

65. In addition, the trafficker worked with other gang members to remain in control over their sex trafficking victims, including J.R. These traffickers had firearms and other weapons and made threatening gestures toward J.R. The trafficker told J.R. to do what she was told, or she would be harmed. J.R. was routinely hit, chased, and held at gun point. J.R. also witnessed her co-victims being beaten on numerous occasions; and in one instance, watched the trafficker shave her co-victim's head.

66. The trafficker moved J.R. and her co-victims from one Defendant's hotel to another, staying for days or a week at a time. J.R. was sold for commercial sex numerous times per night with each "sale" to a different buyer.

67. Buyers entering the ESA® Hotels, Knights Inn® Jacksonville, and Emerson Inn were non-paying guests and left shortly after they arrived and procured the sexual services they had purchased from J.R.'s trafficker.

68. The foot traffic to and from the rented hotel rooms where J.R. and her co-victims were harbored was constant and obvious to both hotel staff and guests, including guests who complained to hotel staff. During a sale, the trafficker would wait directly outside the hotel room door or in the lobby, or visibly pace around the hotel hallway or parking lot.

69. The trafficker used the ESA's, Wyndham's, and JSL's Wi-Fi to post advertisements on Backpage and other internet sites for commercial sex with J.R. at

the ESA® Hotels, Knights Inn® Jacksonville, and Emerson Inn, to communicate with potential buyers, and to watch and record J.R.'s sexual acts.

70.     The trafficker also had personal relationships with hotel staff at the ESA® Hotels, Knights Inn® Jacksonville, and Emerson Inn, including front desk management and housekeeping personnel.  Despite J.R. encountering the same hotel staff and exhibiting obvious red flag signs of her trafficking, ESA's, Wyndham's, and JSL's staff repeatedly failed to report J.R.'s abuse to law enforcement or attempt to avert her suffering.  Rather, the hotels' staff consistently aided the trafficker in continuing to sell J.R. for commercial sex at Defendants' hotels, profiting therefrom.

71.     The trafficker followed a repetitive process at each of Defendants' hotels which, alongside several other red flags and direct employee interactions, alerted, or should have alerted, ESA, Wyndham, and JSL to J.R.'s trafficking, including but not limited to:

> a.    Paying for rooms in cash or with prepaid vanilla cards with these transactions being conducted with the assistance of ESA's, Wyndham's, and JSL's hotel personnel;
>
> b.    Paying for extended stays on a day-to-day basis with these transactions being conducted with the assistance of ESA's, Wyndham's, and JSL's hotel personnel;
>
> c.    Renting rooms which had fewer beds than patrons and an excessive number of people staying in the room with these

19

transactions being conducted with the assistance of ESA's, Wyndham's, and JSL's hotel personnel;

d. Requesting special rooms or features, including late check out, rooms in more secluded areas, or rooms by exits, with these transactions being conducted with the assistance of ESA's, Wyndham's, and JSL's hotel personnel;

e. Patrons in the trafficker(s)' party were not forthcoming about their full names, addresses, or vehicle information when registering at check-in, with this conduct taking place in the presence of ESA's, Wyndham's, and JSL's hotel personnel;

f. The trafficker(s) had control over J.R.'s and her co-victims' identification, money, and belongings while in the presence of ESA's, Wyndham's, and JSL's hotel personnel;

g. J.R. and her co-victims showed signs of physical abuse, restraint, and confinement, including bruising, drugging, cigarette burns, unkempt hair, and attire inappropriate for the weather or their age, all evident to ESA's, Wyndham's, and JSL's hotel personnel;

h. J.R. and her co-victims showed signs of fear, anxiety, tension, submission, and/or nervousness with this distress taking place in the presence of ESA's, Wyndham's, and JSL's hotel personnel;

i. J.R.'s and her co-victims' physical appearance showed signs of malnourishment, poor hygiene, fatigue, sleep deprivation, and

untreated illness or injuries, all evident to ESA's, Wyndham's, and JSL's hotel personnel;

j.  J.R. and her co-victims dressed in provocative clothing and shoes, observed by ESA's, Wyndham's, and JSL's hotel personnel;

k.  J.R. and her co-victims lacked freedom of movement or were constantly monitored by the traffickers while in the presence of ESA's, Wyndham's, and JSL's hotel personnel;

l.  J.R. and her co-victims had few or no personal possessions despite renting rooms for an extended stay, with these transactions being conducted with the assistance of ESA's, Wyndham's, and JSL's hotel personnel;

m.  J.R. and her co-victims were traveling with men (the traffickers) who appeared to be significantly with this conduct taking place in the presence of ESA's, Wyndham's, and JSL's hotel personnel;

n.  The rooms in which J.R. and her co-victims were held had numerous weapons and firearms displayed and visible from the public hallways and entrances of ESA's, Wyndham's, and JSL's hotels and to ESA's, Wyndham's, and JSL's hotel personnel;

o.  The rooms in which J.R. and her co-victims were held had indicia of commercial sex within the room, including excessive sex paraphernalia, an inordinate number of used condoms, empty bottles of lubrication, lingerie, sex toys, and bodily fluids on the

21

sheets and towels, all visible from the public hallways and entrances of the ESA® Hotels, Knights Inn® Jacksonville, and Emerson Inn and to ESA's, Wyndham's, and JSL's hotel personnel;

p.    The rooms in which J.R. and her co-victims were held smelled of bodily fluids and musk, which was notable from the public hallways and entrances of the ESA® Hotels, Knights Inn® Jacksonville, and Emerson Inn and to ESA's, Wyndham's, and JSL's hotel personnel;

q.    The rooms in which J.R. and her co-victims were held had excessive amounts of cash visible from the public hallways and entrances of the ESA® Hotels, Knights Inn® Jacksonville, and Emerson Inn and to ESA's, Wyndham's, and JSL's hotel personnel;

r.    The rooms in which J.R. and her co-victims were held contained multiple computers, cell phones, pagers, credit card swipers, or other technology, which was visible from the public hallways and entrances of the ESA® Hotels, Knights Inn® Jacksonville, and Emerson Inn and to ESA's, Wyndham's, and JSL's hotel personnel;

s.    The rooms in which J.R. and her co-victims were held had excessive amounts of drugs and alcohol which were visible from

the public hallways and entrances of the ESA® Hotels, Knights Inn® Jacksonville, and Emerson Inn and to ESA's, Wyndham's, and JSL's hotel personnel;

t. J.R. and her co-victims displayed apparent signs of illegal drug use both inside and outside of the ESA® Hotels, Knights Inn® Jacksonville, and Emerson Inn hotel rooms, with this conduct taking place in the presence or view of ESA's, Wyndham's, and JSL's hotel personnel;

u. J.R., her co-victims, and the trafficker(s) made excessive housekeeping requests to ESA's, Wyndham's, and JSL's hotel personnel for extra linens, toiletries, and cleaning supplies in the ESA® Hotels, Knights Inn® Jacksonville, and Emerson Inn hotel rooms where J.R. and her co-victims were held;

v. The "Do Not Disturb" sign was constantly displayed on the ESA® Hotels, Knights Inn® Jacksonville, and Emerson Inn hotel rooms where J.R. and her co-victims were held with trash left outside, in full presence and view of ESA's, Wyndham's, and JSL's hotel personnel;

w. Individuals loitered in the hallways and appeared to monitor the area in the vicinity of the ESA® Hotels, Knights Inn® Jacksonville, and Emerson Inn hotel rooms in which J.R. and her co-victims

were held, with this conduct taking place in the presence and view of ESA's, Wyndham's, and JSL's hotel personnel;

x. Active and apparent solicitation of buyers by the trafficker(s), J.R., and her co-victims took place in and around the ESA® Hotels, Knights Inn® Jacksonville, and Emerson Inn, including the lobby and parking lot, with this conduct taking place in the presence and view of ESA's, Wyndham's, and JSL's hotel personnel;

y. The continuous procession of unregistered buyers at odd hours entering and exiting the ESA® Hotels, Knights Inn® Jacksonville, and Emerson Inn hotel rooms where J.R. and her co-victims were held, with this conduct taking place in the presence and view of ESA's, Wyndham's, and JSL's hotel personnel;

z. Individuals entering and exiting through the side or rear entrances of the ESA® Hotels, Knights Inn® Jacksonville, and Emerson Inn, with this conduct taking place in the presence and view of ESA's, Wyndham's, and JSL's hotel personnel;

aa. Vehicles in the ESA® Hotels, Knights Inn® Jacksonville, and Emerson Inn parking lots regularly parked backwards so the license plates were not visible, with this conduct in the presence and view of ESA's, Wyndham's, and JSL's hotel personnel;

bb. Extraordinary violence and loud disturbances in and around the ESA® Hotels, Knights Inn® Jacksonville, and Emerson Inn public

hotel areas, as well as from inside the hotel rooms where J.R. and her co-victims were held, with this conduct in the presence and view of ESA's, Wyndham's, and JSL's hotel personnel;

cc.  Audible pleas to ESA's, Wyndham's, and JSL's hotel personnel and hotel guests for help from J.R. and her co-victims;

dd.  Hotel guest complaints about J.R., her co-victims, and the traffickers to ESA's, Wyndham's, and JSL's hotel personnel;

ee.  Direct employee encounters and witness accounts of J.R.'s and her co-victim's trafficking by ESA's, Wyndham's, and JSL's hotel personnel in the ESA® Hotels, Knights Inn® Jacksonville, and Emerson Inn hotel rooms and on the hotel premises;

ff.  Use of ESA's, Wyndham's, and JSL's hotel Wi-Fi to post advertisements for commercial sex with J.R. and her co-victims at the ESA® Hotels, Knights Inn® Jacksonville, and Emerson Inn;

gg.  Online reviews indicating the prevalence of sex trafficking and criminal activity at the ESA® Hotels, Knights Inn® Jacksonville, and Emerson Inn; and

hh.  J.R. and her co-victims being repeatedly taken and returned to the ESA® Hotels, Knights Inn® Jacksonville, and Emerson Inn over a period of time, with this conduct taking place in the presence of the same ESA's, Wyndham's, and JSL's hotel personnel.

72.    In addition to these abundant red flags that alerted, or should have alerted, ESA, Wyndham, and JSL to J.R.'s trafficking at the ESA® Hotels, Knights Inn® Jacksonville, and Emerson Inn in 2013, the following specific accounts of J.R.'s trafficking occurred at each of Defendants' hotels:

**A.    THE SEX TRAFFICKING OF PLAINTIFF AT THE ESA® HOTELS**

73.    J.R. was trafficked for commercial sex on numerous occasions throughout 2013 at ESA's hotels in Jacksonville, Florida, including the ESA® Southside, ESA® Deerwood, ESA® Lenoir, and ESA® Salisbury.

74.    J.R.'s trafficker had personal relationships with ESA staff who allowed him to rent specially requested rooms for trafficking and turned a blind eye to the trafficker's repeated and open abuses of J.R. during her trafficking.

75.    For instance, at the ESA® Southside, numerous guests complained to ESA staff about the noise caused by the trafficker and buyers in selling J.R. for commercial sex.  To J.R.'s dismay, when ESA® Southside staff came to the hotel room door, they provided a mere "warning with a wink."  ESA's hotel staff alerted the trafficker to the other guests' complaints, indicated they knew J.R. and her co-victims were being sold for commercial sex within the room, and then left without rendering aid or inquiring as to J.R.'s or her co-victims' well-being.  ESA's hotel staff allowed the trafficker to continue with the criminal endeavor within the ESA® Southside room, knowing that ESA and the ESA® Southside hotel would continue profiting from the trafficker's use of the room as a result.

76.     A violent altercation later broke out at the ESA® Southside wherein the trafficker and another man viciously beat J.R. to the ground.  The two men punched and kicked J.R.'s face and head while her co-victims screamed within the ESA room.

77.     J.R. pleaded with the ESA® Southside hotel staff for help until one finally agreed to call 911.  J.R. was then transported to a nearby hospital and treated for her injuries.

78.     Despite recognizing J.R. and the trafficker from this previous altercation, the staff at ESA® Southside continued to rent rooms to the trafficker when he later returned again to the ESA® Southside throughout 2013 with J.R.

79.     In addition, J.R.'s trafficker had personal relationships with ESA housekeeping staff who not only provided him with excessive linens and toiletries, but also at times allowed him to circumvent the check-in process entirely, supplying access to ESA hotel rooms in which to traffic J.R.

80.     For example, at the ESA® Deerwood hotel, J.R. witnessed the trafficker bypass the front desk staff and check-in process.  Instead, the trafficker walked specifically toward a known ESA housekeeper within the hotel.  The trafficker spoke with the ESA housekeeper, and the ESA housekeeper then opened and furnished the trafficker with an ESA® Deerwood hotel room in which to sell J.R. for sex.

81.     J.R. also encountered several ESA security guards at the ESA Hotels when being trafficked.  These security guards repeatedly acknowledged J.R., the trafficker, and numerous buyers coming to and from the ESA Hotel rooms where J.R. was held.  These ESA security guards witnessed the trafficker's violence toward J.R.

27

and her co-victims, the physical deterioration of J.R.'s appearance, J.R.'s provocative dress, and other obvious red flags of sex trafficking yet chose not to inquire, intervene, or call law enforcement.

**B.    THE SEX TRAFFICKING OF PLAINTIFF AT WYNDHAM'S AND RED LIONS' KNIGHTS INN® JACKSONVILLE**

82.    J.R. was trafficked for commercial sex at Wyndham's and Red Lion's Knights Inn® Jacksonville throughout 2013.  The trafficker held J.R. there for several nights in a row and returned week after week.

83.    J.R.'s trafficker had personal relationships with the Knights Inn® Jacksonville staff who allowed him to rent specially requested rooms for trafficking and turned a blind eye to the trafficker's repeated and open abuses of J.R.

84.    In full view of the Knights Inn® Jacksonville office and lobby, the trafficker forced J.R. to solicit buyers from inside and around the hotel.  The Knights Inn® Jacksonville staff witnessed J.R. walking throughout the hotel property, constantly coming and going with different buyers at all hours of the day and night.

85.    On one occasion, J.R.'s trafficking caused a huge scene with another guest at the Knights Inn® Jacksonville.  <u>Wyndham's Knights Inn® Jacksonville staff appeared and explicitly declared they knew J.R. was being sold for commercial sex</u>. Nevertheless, Wyndham's Knights Inn® Jacksonville staff did not inquire as to J.R.'s well-being or call law enforcement.  Instead, the hotel staff allowed the trafficker to continue renting rooms at the Knights Inn® Jacksonville to traffic J.R. throughout 2013, knowing Wyndham and the Knights Inn® Jacksonville would reap the profits.

## C.   THE SEX TRAFFICKING OF PLAINTIFF AT JSL'S EMERSON INN

86.   J.R. was trafficked for commercial sex on numerous occasions throughout 2013 at JSL's Emerson Inn.

87.   J.R.'s trafficker had personal relationships with JSL staff who allowed him to rent specially requested rooms for trafficking and turned a blind eye to the trafficker's repeated and open abuses of J.R. during her trafficking.

88.   The Emerson Inn is located in a known hotspot for crime and commercial sex trafficking within Jacksonville, Florida.

89.   J.R. was forced to solicit buyers in and around JSL's Emerson Inn, including from cars in the parking lot in full view of the hotel office.

90.   In addition, J.R.'s trafficker was brazenly and unapologetically violent with J.R. and her co-victims at JSL's Emerson Inn.

91.   J.R. also suffered numerous physical assaults from buyers at JSL's Emerson Inn.

92.   In one of the first instances J.R.'s trafficker harbored her at the Emerson Inn for commercial sex, a buyer was spooked during the transaction and took back the money he had paid. The trafficker was so angry that he threw J.R. out of the Emerson Inn room and chased her around the parking lot screaming about how he would harm her, and demanding she make up for the lost sex act. The trafficker caused such a commotion that JSL's Emerson Inn staff came outside of the Emerson Inn hotel office and watched the disturbing scene. However, they did not offer assistance to J.R. nor

29

did they call the authorities. Rather, the staff allowed the trafficker to continue renting rooms at the Emerson Inn, knowing the hotel would reap the profits.

93. On another occasion, the trafficker lifted J.R. by her throat as she gasped for air on the outside grounds of Emerson Inn. Again, JSL staff witnessed the trafficker choking J.R. but chose not to offer aid or alert the authorities. They continued renting rooms to the trafficker for the explicit and apparent purpose of sex trafficking J.R.

94. J.R. endured several similar assaults in and around the Emerson Inn wherein her trafficker or buyers would violently attack her, scream at her, and make clear to any nearby patron or staff that she was being forcibly sold for commercial sex.

## VIII.  COMBATTING HOTEL SEX TRAFFICKING

95. Defendants have long known of their role and responsibilities to combat sex trafficking within their hospitality businesses.

96. Global campaigns took initiative against the human trafficking epidemic and the lack of internal policies concerning human trafficking in the hotel industry as early as 1997 with the United Nations' Blue Heart Campaign and domestically in 2010 with the Department of Homeland Security's Blue Campaign.[26]

97. Abundant resources have been available to members of the hospitality industry that wish to implement anti-trafficking measures and provide effective

---

[26] *See* UNITED NATIONS OFFICE ON DRUGS AND CRIME, *https://www.unodc.org/ unodc/en/blueheart/ index.html* (last visited Dec. 20, 2022); *Blue Heart Campaign*, WIKIPEDIA, https://en.wikipedia.org/ wiki/Blue_Heart_Campaign (last visited Dec. 20, 2022); *DHS Blue Campaign Five Year Milestone*, DEPARTMENT OF HOMELAND SECURITY (Jul. 22, 2015), https://www.dhs.gov/blog/2015/07/22/ dhs-blue-campaign-five-year-milestone.

trafficking recognition and response training. Each of the following organizations offer guidance and recommendations for viable programs to address this issue:

a.      Polaris Project, including the National Human Trafficking Hotline and Resource Center;

b.      ECPAT-USA;

c.      BEST Alliance – Businesses Ending Slavery & Trafficking;

d.      U.S. Department of Homeland Security: Blue Campaign;

e.      U.S. Department of Health & Human Services: Office on Trafficking in Persons, including the Look Beneath the Surface Campaign;

f.      National Center for Missing & Exploited Children;

g.      United Nations Office on Drugs & Crime: Blue Heart Campaign;

h.      United Nations Human Rights Office of the High Commissioner, including the Guiding Principles on Business and Human Rights; and

i.      United Nations Global Compact.

98.    For example, to assist hospitality companies in combatting sex trafficking within their businesses, ECPAT developed and launched The Code of Conduct for the Protection of Children from Sexual Exploitation in Travel and Tourism ("The Code") in 1996 and ECPAT-USA in the United States in 2004.[27]

---

[27] *What is the Code?*, THE CODE, https://thecode.org/about/ (last visited Dec. 20, 2022).

31

99.    The Code identifies the following six steps companies should take to prevent child sex trafficking: (1) establish corporate policy and procedures against sexual exploitation of children; (2) train employees in children's rights, the prevention of sexual exploitation and how to report suspected cases; (3) include a clause in further partner contracts stating a common repudiation and zero tolerance policy of sexual exploitation of children; (4) provide information to travelers on children's rights, the prevention of sexual exploitation of children and how to report suspected cases; (5) support, collaborate and engage stakeholders in the prevention of sexual exploitation of children; and (6) report annually on the company's implementation of Code-related activities.[28]

100.    ECPAT-USA also identified hotel-specific best practices for preventing sex trafficking within the hospitality industry, including but not limited to:

a.    Develop a formal policy against trafficking;

b.    Develop a protocol for response;

c.    Conduct periodic staff training on recognizing and responding to trafficking indicators;

d.    Do not rent by the hour;

e.    Do not permit cash payments;

f.    Block "internet access to popular websites for online sex ads;

---

[28] THE CODE, *supra* note 27.

32

g.    Monitor "online sex ads such as Craigslist and Backpage for your hotel name and pictures of your rooms and guests;"

h.    Change Wi-Fi passwords in rooms and cafes regularly;

i.    Require all visitors to be logged, including guest name, visitor name, arrival time, departure time, and room number;

j.    Actively greet and speak with all visitors arriving at night;

k.    Watch for a trend of visitors to the same room; and

l.    Be aware of rooms with excess condoms, lubricants, and towels and report these indicators to management.[29]

101.    Numerous well-researched toolkits and trainings have also long since identified red flag signs of trafficking that hotel staff should notice, such as:

a.    Patrons show signs of fear, anxiety, tension, submission, nervousness, and/or appear distressed or injured;

b.    Patrons show signs of physical abuse, restraint, and/or confinement;

c.    Patrons exhibit evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way;

---

[29] *ECPAT-USA Anti-Trafficking Hotel Checklist*, ECPAT-USA, https://static1.squarespace.com/static/594970e91b631b3571be12e2/t/5cd329e8a4222f20baf5378b/1557342696892/ECPAT-USA_Anti TraffickingHotelChecklist.pdf (last visited Dec. 28, 2022).

d.  Patrons show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

e.  Patrons lack freedom of movement or are constantly monitored;

f.  Patrons avoid eye contact and interaction with others;

g.  Patrons have either no, or no control over, their money or identification;

h.  Patrons in provocative clothing and shoes, dress inappropriately for their age, or have lower quality clothing compared to others in their party;

i.  Patrons have few or no personal items—such as no luggage or other bags;

j.  Patrons are not forthcoming about full names or contact details;

k.  Minor patrons take on adult roles (e.g., pay bills, request services);

l.  A group of girls appears to be traveling with an older female or male;

m.  A group of males or females with identical tattoos in similar locations, which may indicate "branding" by a trafficker;

n.  Room is paid for with cash or pre-loaded credit card;

o.  Room rented has fewer beds than expected patrons;

p.  The same person reserves multiple rooms;

q.  Patrons enter/exit through side or rear doors instead of the lobby;

r.    Constant flow of men into a room at all hours;

s.    Patrons leave room infrequently, not at all, or at odd hours;

t.    Patrons loiter in hallways or appear to monitor the area;

u.    Cars are regularly parked backward hiding the license plate;

v.    Excessive use of hotel computers for sexually explicit websites;

w.    Pornography entertainment rented in rooms with minors;

x.    Patrons request information or access to adult services or sex industry;

y.    Patrons solicit male guests; or

z.    Patrons ask staff or guests for food or money.[30]

102.    In particular, "hotel housekeeping, maintenance, and room service staff typically have the most access to guest rooms where signs of human trafficking may be apparent," and should therefore be trained on additional red flags, including:

a.    "Do Not Disturb" sign used constantly;

b.    Requested room or housekeeping services (e.g., additional towels, new linens, etc.), but denying staff entry into room;

c.    Refusal of cleaning services for multiple days;

d.    Excessive amounts of cash in a room;

---

[30] DEP'T OF HOMELAND SECURITY, *Blue Campaign Hospitality Toolkit*, https://www.dhs.gov/sites/default/files/ publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf (last visited Dec. 21, 2022), previously attached as "Exhibit A" to Compl., ECF No. 2-2. *see also* U.S. DEP'T HEALTH & HUM. SERVS. OFFICE ON TRAFFICKING IN PERSONS, Fact Sheet: Identifying Victims of Human Trafficking, https://www.acf. hhs.gov/archive/otip/fact-sheet/fact-sheet-identifying-victims-human-trafficking (last visited Dec. 20, 2022).

e. Smell of bodily fluids and musk;

f. Presence of multiple computers, cell phones, pagers, credit card swipes, or other technology;

g. Excessive amounts of alcohol or illegal drugs in rooms;

h. Evidence of pornography;

i. Excessive amounts of sex paraphernalia in rooms (condoms, lubricant, lotion, etc.); or

j. Rooms stocked with merchandise, luggage, mail packages, and purses/wallets with different names.[31]

103. Because "hotel and motel employees are often in the best position to see potential signs of human trafficking,"[32] training hospitality staff to recognize these signs of trafficking and be prepared to act when they observe red flags is a critical component to combatting trafficking within hotels.[33]

104. Every day, thousands of hotel employees witness manifestations of sex trafficking. The hospitality industry thus has the greatest reach to prevent, identify, and thwart commercial sexual exploitation where it is most likely to occur.

---

[31] DEP'T OF HOMELAND SECURITY, *supra* note 30, "Exhibit A," Compl. ECF No. 2-2.

[32] *Id.*

[33] *Training for Hotel Associates*, ECPAT-USA, https://www.ecpatusa.org/hotel-training (last visited Dec. 20, 2022); *see also* MICHELLE GUELBART & JULIA WEJCHERT, ECPAT-USA, NO VACANCY FOR CHILD SEX TRAFFICKERS IMPACT REPORT: THE EFFICACY OF ECPAT-USA'S WORK TO PREVENT AND DISRUPT THE COMMERCIAL SEXUAL EXPLOITATION OF CHILDREN IN HOTELS (2017).

105.    In one recent study, 75% of survivors reported coming into contact with hotels during their exploitation.  "Unfortunately, 94% also disclosed that they never received any assistance, concern, or identification from hotel staff."[34]

106.    As described in the Office on Trafficking in Persons' Fact Sheet – Identifying Victims of Human Trafficking: "It is important to be vigilant and to 'look beneath the surface' in situations that don't seem quite right. One chance encounter could be a victim's best hope for rescue."[35]

107.    It is widely recognized that effective staff training has a substantial, positive impact on decreasing the prevalence and scope of trafficking within hotels.[36]

108.    Training hotel staff to identify the signs of trafficking and sexual exploitation is a crucial legal obligation for the hospitality industry.  The presence of trafficking and sexual exploitation in a hotel is frequently an obvious occurrence and, although unutilized, underutilized, or ineffectively utilized, many well-researched red flag trainings and toolkits were published to the hotel industry long before 2013 to help businesses, like Defendants, train their staff and create procedures to address the issue.

109.    Furthermore, aside from their unique position in this epidemic, hospitality businesses have the highest obligation to protect their guests from dangers

---

[34]    *Hotels & Motels Recommendations*, POLARIS, https://polarisproject.org/hotels-motels-recommendations (last visited Dec. 21, 2022).

[35] U.S. DEP'T. HEALTH & HUM. SERVS., *supra* note 30.

[36] *See* DEP'T OF HOMELAND SECURITY, *supra* note 30, "Exhibit A," Compl. ECF No. 2-2; Emily Roman, Evaluating the Impact of Training Employees to Identify Victims of Human Trafficking (2019) (M.A. thesis, Abilene Christian University) (Digital Commons @ ACU); *Free Online Training*, AMERICAN HOTEL & LODGING ASSOCIATION, https://www.ahla.com/issues/human-trafficking (last visited Dec. 21, 2022); *Training for Hotel Associates*, *supra* note 33.

that are known, or should be known, including trafficking and sexual exploitation, and should be held accountable when they fail to comply.

110. As aptly stated in a publication by the Cornell University School of Hospitality, "the hospitality industry is undoubtedly involved in the sex trafficking industry…and therefore has an inherent responsibility to deter the crime and can be liable for failing to do so."[37]

111. Upon information and belief, between at least 2008 and 2013, ESA, Wyndham, Red Lion, and JSL held meetings among their executives, directors, and managers discussing sex trafficking at their hotels.

112. Upon information and belief, between at least 2008 and 2013, ESA, Wyndham, and Red Lion also participated in meetings through their trade organizations, such as the American Hotel Lodging Association (AHLA) and communicated with organizations like ECPAT and Polaris, regarding trafficking prevention in the hotel industry and at their hotels.

113. Upon information and belief, between at least 2008 and 2013, ESA, Wyndham, and Red Lion further exchanged emails by employees related to sex trafficking at their hotels.

114. Upon information and belief, between at least 2008 and 2013, ESA, Wyndham, Red Lion, and JSL received and reviewed publicly available information regarding trafficking in hotels.

---

[37] Sarkisian, *supra* note 22, at 3-10.

115. Upon information and belief, between at least 2008 and 2013, ESA, Wyndham, Red Lion, and JSL were aware of the domestic and international campaigns and associated resources to combat trafficking in hotels.

116. Despite the existence and availability of resources, ESA, Wyndham, Red Lion, and JSL have refused to implement and enforce the recommended anti-trafficking measures and staff training at their hotels or to commit to doing so.

117. Even Wyndham and Red Lion who are signatories to ECPAT's CODE only pay lip service to its goals, while failing to implement its most effective guidance. Their membership is nothing more than a fig leaf, and their commitments are demonstrably false.

118. Despite publicly committing to employee training, ESA, Wyndham, and Red Lion have consistently failed to act, and training has never occurred in earnest or *en masse*. According to ECPAT's reports, the actual number of employees trained by hotel industry leaders like Wyndham, Red Lion, and ESA is abysmal.[38]

119. For years, ESA, Wyndham, Red Lion, and JSL have flagrantly contravened the spirit of ECPAT by failing to seriously implement its most effective guidance and rejecting universal recommendations on effective anti-trafficking hotel measures and staff training.

120. ESA, Wyndham, Red Lion, and JSL maintain a commitment to profiting from the exploitation of J.R. and others like her. They choose to preserve their profits

---

[38] GUELBART & WEJCHERT, *supra* note 33.

made by renting rooms to traffickers and acquiring customer data through free Wi-Fi used to advertise sex trafficking victims. ESA, Wyndham, Red Lion, and JSL further cut costs by not implementing responsible and effective anti-trafficking measures or staff training.

121. In addition, ESA, Wyndham, and Red Lion have long engaged in a coordinated campaign to avoid bad publicity while preserving the profits they derive from lodging traffickers, victims, and buyers, which ensures ESA, Wyndham, and Red Lion remain as complacent as their peers in facilitating trafficking at their hotels.

122. ESA, Wyndham, and Red Lion hired media professionals to make public claims to their investors and customers addressing the longstanding problem of human trafficking at hotels with no intention of acting on it or changing their permissive business practices.[39]

123. To curry favor and a positive public image, ESA, Wyndham, and Red Lion also used their trade association memberships to advertise policies, practices, and procedures that indicate a unified commitment to fighting human trafficking.[40] Through these trade associations such as AHLA, ESA, Wyndham, and Red Lion disseminated very specific talking points to provide to the government, law

---

[39] For instance, in 2011, the hotel industry trade and lobbying group American Hotel & Lodging Association (AHLA) issued an industry statement condemning human trafficking. AHLA stated trafficking is state and federal crime which "appl[ies] to all businesses and persons…including lodging establishments. Moreover, lodging establishments are often subject to licensing requirements which prohibit the knowing use of their premises for illegal or immoral purposes. All employees are expected to comply and are encouraged to alert the authorities if there is suspected trafficking in their hotel."

[40] *See, e.g.*, NICHOLS, ANDREA J., SEX TRAFFICKING IN THE UNITED STATES: THEORY, RESEARCH, POLICY, AND PRACTICE (Columbia Univ. Press 2016) (citing American Hotel and Lodging Association 2012 "Industry Principles to Combat Human Trafficking").

enforcement, the public, and the media.  These talking points amounted to nothing but spin whereby ESA, Wyndham, and Red Lion tote themselves as heroes for taking a stand but implementing no genuine anti-trafficking efforts within their hotel organizations.

124.  Yet these were more than just advertising campaigns.  They were part of a concerted effort to divert the attention of anti-trafficking stakeholders and lawmakers away from ESA, Wyndham, and Red Lion and make assurances that the hotel industry, and ESA, Wyndham, and Red Lion, specifically, were meaningfully addressing the industry-wide problem of human trafficking—without the true intention to do so.  By representing to the public and to legislators "the industry's ongoing commitment and work to end human trafficking" ESA, Wyndham, and Red Lion acknowledged and assumed their responsibility to meaningfully address human trafficking at their hotels.[41]

## IX.  DEFENDANTS ARE DIRECTLY LIABLE FOR PERMITTING AND FACILITATING J.R.'S SEX TRAFFICKING AT THEIR HOTELS

125.  Congress enacted the Victims of Trafficking and Violence Protection Act ("TVPA") in 2000 to combat sex trafficking, prevent violence against women and children, and offer justice for survivors of modern-day slavery.[42]

---

[41] *See No Room for Trafficking*, AMERICAN HOTEL & LODGING ASSOC., https://www.ahla.com/issues/human-trafficking (last visited Dec. 27, 2022).

[42] TVPA Pub. L. 106–386, October 28, 2000, 114 Stat. 1464 (2000) (codified as amended in Title 22, Chapter 78, and Title 18, Chapter 77, of the U.S. Code); *see also* Markup of H.R. 2620 before House Int'l Affairs Comm., 108th Cong., 1st Sess., at 298 (July 23, 2003) (statement of Rep. Christopher Smith).

126.   In each reauthorization since its enactment, Congress has maintained a strong intent to provide adequate protection and recovery for victim survivors of trafficking against "the enormous profitability of this industry."[43]

127.   Specifically, in 2003, over the objection of the Department of Justice, Congress chose to add a civil remedy under section 1595 and broadly define the class of defendants who could be sued in this private right of action.  Then again, when Congress passed the William Wilberforce TVPRA in 2008 it amended section 1595 to increase the capacity of survivors to recover against anyone who "knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter."[44]  Congress has thus consistently expanded the TVPRA in an effort to deter sex trafficking worldwide and provide a broad remedy for survivors against actors like Defendants.[45]

128.   Defendants have been on notice of repeated incidences of sex trafficking occurring at the hotels they own, operate, supervise, and brand for decades. Defendants have further known that the hotel industry is the epicenter of the sex

---

[43] *Trafficking In Persons: The Federal Government's Approach to Eradicate This Worldwide Problem: Hearing on H.R. 2620 Before the Subcomm. On Human Rights and Wellness of the H Comm. on Gov't Reform*, 108th Cong. (2004) (statement of Rep. Dan Burton).

[44] William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457, 122 Stat. 5044.

[45] *See Roe v. Howard*, 917 F.3d 229, 242 (4th Cir. 2019) ("Viewed as a whole, the TVPA represents a far-reaching congressional effort to combat transnational human trafficking on numerous fronts, including by expanding the civil claims and remedies available to its victims.").

42

trafficking trade.   Yet each Defendant failed, and persists in failing, to fulfill its statutory responsibility to combat such criminality, or to refuse its benefits.

**Defendants ESA Inc., ESA Operating, and ESA Management and the ESA® Hotels**

129.   ESA Inc., ESA Operating, and ESA Management participated in commercial hotel operating business ventures at their directly owned, operated, and branded hotels, including the ESA® Southside, ESA® Deerwood, ESA® Lenoir, and ESA® Salisbury. Knight's Inn® Jacksonville, and Emerson Inn where J.R. was trafficked.   There was an ongoing business relationship between Defendants, their hotels, and their staff which was aligned with Defendants' common hotel operating enterprises.

130.   In 2013, the ESA® Southside, ESA® Deerwood, ESA® Lenoir, and ESA® Salisbury were alter egos, representatives, agents, or co-conspirators of Defendants ESA, Inc., ESA Operating, and ESA Management, their owner, parent corporation, and subsidiaries.   ESA had the right to exercise control over all business operations, management, supervision, administration, and procedures at the subject ESA® Hotels.

131.   In 2013, ESA was a single and joint employer with a high degree of interrelated, intermingled, and unified operations at the ESA® Hotels.   ESA shared common policies, practices, and procedures—or lack thereof—with the ESA® Hotels. As an integrated enterprise and/or joint employer, ESA and the ESA® Hotels are separately and jointly responsible for compliance with all applicable laws, and jointly and severally liable for any damages caused by employees.

43

## Defendant JSL and the Emerson Inn

132.   JSL participated in a commercial hotel operating business venture at its directly owned and operated hotel the Emerson Inn where J.R. was trafficked. There was an ongoing business relationship between JSL, the Emerson Inn, and its hotel staff which was aligned with JSL's common hotel operating enterprise at the Emerson Inn.

133.   In 2013, the Emerson Inn was an alter ego, representative, agent, or co-conspirator of its owner and operator, Defendant JSL. JSL had the right to exercise control over all business operations, management, supervision, administration, and procedures at the Emerson Inn.

134.   In 2013, JSL was a single and joint employer with a high degree of interrelated, intermingled, and unified operations at the Emerson Inn. JSL shared common policies, practices, and procedures—or lack thereof—with the Emerson Inn. As an integrated enterprise and/or joint employer, JSL and the Emerson Inn are separately and jointly responsible for compliance with all applicable laws, and jointly and severally liable for any damages caused by employees.

## Defendants Wyndham and Red Lion, and the Knights Inn® Jacksonville

135.   In 2013, Wyndham participated in a commercial hotel operating business venture with and through KFSI at the Knights Inn® Jacksonville where J.R. was trafficked. There was an ongoing business relationship between Wyndham, KFSI, the Knights Inn® Jacksonville, and Knights Inn® Jacksonville hotel staff which was aligned with Wyndham's common hotel operating enterprise at the Knights Inn® Jacksonville.

44

136.   In 2013, the Knights Inn® Jacksonville was an alter ego, representative, agent, or co-conspirator of Wyndham, including KFSI, its owner and operator. Wyndham had the right to exercise control over all business operations, management, supervision, administration, and procedures at the Knights Inn® Jacksonville.

137.   In 2013, Wyndham was a single and joint employer with a high degree of interrelated, intermingled, and unified operations at the Knights Inn® Jacksonville. Wyndham shared common policies, practices, and procedures—or lack thereof—with the Knights Inn® Jacksonville.  As an integrated enterprise and/or joint employer, Wyndham and the Knights Inn® Jacksonville are separately and jointly responsible for compliance with all applicable laws, and jointly and severally liable for any damages caused by employees.

138.   Red Lion is the current owner and operator of KFSI and the Knights Inn® brand.

139.   Red Lion retains successor liabilities for Wyndham, KFSI, and the Knights Inn® Jacksonville.

## A.   ESA, WYNDHAM, AND JSL PARTICIPATED IN HOTEL OPERATING BUSINESS VENTURES

### ESA's Hotel Operating Business Ventures at the Subject ESA® Hotels

140.   ESA Inc. is a leading hospitality company with over 760 hotels nationwide.[46]  In 2013, at the time of the J.R.'s trafficking, ESA Inc. directly owned,

---

[46] *Our Locations*, EXTENDED STAY AMERICA, https://www.extendedstayamerica.com/hotels/ (last visited Dec. 14, 2022).

operated, and offered all public lodging services at its Extended Stay America® brand hotels,[47] including the ESA® Hotels where Plaintiff was trafficked.

141. In 2013, ESA Inc. directly owned and operated the ESA® Southside, ESA® Deerwood, ESA® Lenoir, and ESA® Salisbury where Plaintiff was trafficked.

142. ESA Inc. is the ultimate parent company of the various subsidiaries that own and operate the Extended Stay America® brand hotels. These subsidiaries include: (1) businesses that operate the brand hotels ("Operating Lessees" such as Defendant ESA Operating), (2) a business that manages the brand hotels (Defendant ESA Management), (3) businesses that own and control the intellectual property of the Extended Stay America® brand, and (4) ESH Hospitality, Inc. d/b/a ESH REIT and its subsidiaries, which own the Extended Stay America® hotel properties.

143. ESA Operating is an Operating Lessee subsidiary that operates the subject Extended Stay America® brand hotels in Florida where Plaintiff was trafficked.

144. ESA Management is the managing subsidiary which managed the subject Extended Stay America® branded hotels in Florida where Plaintiff was trafficked.

145. ESA, Inc., ESA Operating, and ESA Management participated in hotel operating business ventures at each of the subject ESA® Hotels.

---

[47] ESA Inc. did not begin franchising its hotels until 2017. *See* Tatiana Rokou, *Extended Stay America launches franchise development program*, TRAVEL DAILY NEWS (Jun. 7, 2017, 10:05 AM), https://www.traveldailynews.com/post/extended-stay-america-launches-franchise-development-program; Elliott Mest, *Extended Stay America reveals franchising component*, HOTEL MANAGEMENT (Jun. 5, 2017, 8:22 PM), https://www.hotelmanagement.net/franchising/extended-stay-america-reveals-franchising-component.

146.   The ESA defendants participated in a hotel operating business venture at the ESA® Southside, the ESA® Deerwood, the ESA® Lenoir, and the ESA® Salisbury.

147.   Each ESA hotel operating business venture was a distinct hotel enterprise which also included hotel staff at the four subject ESA® Hotels where Plaintiff was trafficked, including, but not limited to, the maintenance workers, housekeeping staff or janitorial staff, front-desk staff, booking or reservation staff, kitchen and room service staff, hotel managers and assistant managers, bookkeepers and accountants, bell-hops, and valets.

148.   Together, ESA, Inc., ESA Operating, ESA Management, and the hotel staff employed by ESA at the ESA® Southside owned, supervised, operated, and managed the ESA® Southside.  The ESA defendants participated in a hotel operating business venture and created an ESA® Southside enterprise where J.R. was trafficked.

149.   Together, ESA, Inc., ESA Operating, ESA Management, and the hotel staff employed by ESA at the ESA® Deerwood owned, supervised, operated, and managed the ESA® Deerwood.  The ESA defendants participated in a hotel operating business venture and created an ESA® Deerwood enterprise where J.R. was trafficked.

150.   Together, ESA, Inc., ESA Operating, ESA Management, and the hotel staff employed by ESA at the ESA® Lenoir owned, supervised, operated, and managed the ESA® Lenoir.  The ESA defendants participated in a hotel operating business venture and created an ESA® Lenoir enterprise where J.R. was trafficked.

151.   Together, ESA, Inc., ESA Operating, ESA Management, and the hotel staff employed by ESA at the ESA® Salisbury owned, supervised, operated, and

47

managed the ESA® Salisbury. The ESA defendants participated in a hotel operating business venture and created an ESA® Salisbury enterprise where J.R. was trafficked.

152.   The ESA defendants are both directly liable for their violations under TVPRA Section 1595 and vicariously liable for the acts and/or omissions of their ESA staff at the ESA® Southside, ESA® Deerwood, ESA® Lenoir, and ESA® Salisbury.

**Wyndham's Hotel Operating Business Venture at the Knights Inn® Jacksonville**

153.   Wyndham is one of the largest hospitality companies in the world with nearly 9,000 branded hotels across 95 countries.[48]   Wyndham owns, operates, manages, and/or franchises all public lodging services at its branded hotels.

154.   In 2013, Wyndham participated with KFSI in a hotel operating business venture at the Knights Inn® Jacksonville.

155.   The Wyndham hotel operating business venture with KFSI also included hotel staff and employees at the Knights Inn® Jacksonville where Plaintiff was trafficked, including, but not limited to, the maintenance workers, housekeeping staff or janitorial staff, front-desk staff, booking or reservation staff, kitchen and room service staff, hotel managers and assistant managers, bookkeepers and accountants, bell-hops, and valets.

156.   Together, the above Wyndham venture participants owned, supervised, operated, and/or managed the Knights Inn® Jacksonville where J.R. was trafficked.

---

[48] *Locations – Discover Wyndham Hotels & Resorts*, WYNDHAM HOTELS & RESORTS, https:// www.wyndhamhotels.com/locations (last visited Dec. 14, 2022).

157. In 2013, Wyndham, including KFSI, controlled and dictated the day-to-day actions and inactions of the Knights Inn® Jacksonville through highly specific and demanding brand standards, policies, and procedures.

158. Wyndham, including KFSI, employed front desk and housekeeping staff and controlled all aspects of day-to-day operations, including but not limited to, staff training, uniforms, reservation and marketing systems, credit processing systems, Wi-Fi qualifications, internet service provider contracts, policies, terms, and conditions on internet landing pages, safety and cybersecurity measures, monitoring systems for customer reviews, hotel amenities such as furniture and food and beverage, and other management systems related to the daily operations at the Knights Inn® Jacksonville when Plaintiff was trafficked at that brand location.

159. In 2013, Wyndham, including KFSI, was the principal in an agency relationship with nearly exclusive control over every element of the daily operations at the Knights Inn® Jacksonville. Wyndham is both directly liable for its violations under TVPRA Section 1595 and vicariously liable for the acts and/or omissions of its staff at the Knights Inn® Jacksonville.

160. When Plaintiff was trafficked, the Knights Inn® Jacksonville had apparent agency for Wyndham, including KFSI, so as to establish vicarious liability under Florida law, in addition to its actual agency relationships.

161. Wyndham, including KFSI, ratified the actions and inactions of the Knights Inn® Jacksonville.

### JSL's Hotel Operating Business Venture at the Emerson Inn

162. JSL is a hospitality company which directly owns, operates, and offered all public lodging services at the Emerson Inn in Jacksonville, Florida where Plaintiff was trafficked.

163. Now, as in 2013, JSL participates in a hotel operating business venture at the Emerson Inn.

164. The JSL hotel operating business venture also included hotel staff and employees at the Emerson Inn where Plaintiff was trafficked, including, but not limited to, the maintenance workers, housekeeping staff or janitorial staff, front-desk staff, booking or reservation staff, kitchen and room service staff, hotel managers and assistant managers, bookkeepers and accountants, bell-hops, and valets.

165. Together, the above JSL venture participants owned, supervised, operated, and/or managed the Emerson Inn where J.R. was trafficked.

**B.    ESA, WYNDHAM, AND JSL KNOWINGLY BENEFITED FROM PARTICIPATION IN THEIR HOTEL OPERATING BUSINESS VENTURES**

166. ESA, Wyndham, and JSL knowingly benefited from their hotel operating business ventures through economic and non-economic means, including but not limited to, the profits reaped through room rentals, data collection, and maintenance of their public image.

167. ESA knowingly benefited financially, both directly and through the acquisition and use of customer data, through its participation in its hotel operating business ventures at the ESA® Southside, ESA® Deerwood, ESA® Lenoir, and ESA®

50

Salisbury which: (1) recruited, enticed, patronized, and solicited J.R.'s traffickers and buyers to the subject ESA® Hotels; (2) rented rooms at the subject ESA® Hotels where Plaintiff was harbored, provided, obtained, maintained and forced to engage in commercial sex, and (3) provided the Wi-Fi Plaintiff's trafficker(s) used to advertise and solicit buyers to purchase commercial sex delivered by Plaintiff at the subject ESA® Hotels.  ESA further benefited through maintaining its reputation and public image from the general public, and its loyalty from the traffickers and buyers.

168.  Wyndham, including KFSI, knowingly benefited financially, both directly and through the acquisition and use of customer data, through its participation in its business venture at the Knights Inn® Jacksonville which (1) recruited, enticed, patronized, and solicited J.R.'s traffickers and buyers to the Knights Inn® Jacksonville; (2) rented rooms at the Knights Inn® Jacksonville where Plaintiff was harbored, provided, obtained, maintained and forced to engage in commercial sex, and (3) provided the Wi-Fi Plaintiff's trafficker(s) used to advertise and solicit buyers to purchase commercial sex delivered by Plaintiff at the Knights Inn® Jacksonville. Wyndham Worldwide further benefited through maintaining its reputation and public image from the general public, and its loyalty from the traffickers and buyers.

169.  JSL knowingly benefited financially, both directly and through the acquisition and use of customer data, through its participation in its business venture at the Emerson Inn which (1) recruited, enticed, patronized, and solicited J.R.'s traffickers and buyers to the Emerson Inn; (2) rented rooms at the Emerson Inn where Plaintiff was harbored, provided, obtained, maintained and forced to engage in

51

commercial sex, and (3) provided the Wi-Fi Plaintiff's trafficker(s) used to advertise and solicit buyers to purchase commercial sex delivered by Plaintiff at the Emerson Inn. JSL further benefited through maintaining its reputation and public image from the general public, and its loyalty from the traffickers and buyers.

170. ESA, Wyndham, and JSL knowingly benefited from the steady stream of income earned by renting their hotel rooms to J.R.'s trafficker and buyers.

171. ESA, Wyndham, and JSL were the primary facilitators in the hotel operating business ventures of renting rooms at the ESA® Hotels, the Knights Inn® Jacksonville, and the Emerson Inn. ESA, Wyndham, and JSL engaged in marketing to attract participants, including J.R.'s trafficker and buyers, to their ventures. ESA, Wyndham, and JSL controlled and fixed the price of room rentals at their hotels. ESA, Wyndham, and JSL controlled room booking and payment processing for renting at their hotels. ESA, Wyndham, and JSL required their hotels to use software operated and controlled by ESA, Wyndham, and JSL for room booking and reservations, credit processing for payments for room rentals, and property management. ESA, Wyndham, and JSL also took primary responsibility for customer retention and rewards programs at their hotels. Thus, every time J.R.'s trafficker rented a room at the ESA® Hotels, the Knights Inn® Jacksonville, and the Emerson Inn, ESA, Wyndham, and JSL knowingly benefited from their participation in the reservation, payment information, and guest reservation data that was processed, collected, and retained through ESA's, Wyndham's, and JSL's software and management platforms.

52

172.    ESA, Wyndham, and JSL also knowingly benefited from acquiring valuable customer data when they provided free Wi-Fi to patrons at the ESA® Hotels, the Knights Inn® Jacksonville, and the Emerson Inn, including J.R.'s trafficker and buyers.  ESA, Wyndham, and JSL profited from data collected each and every time J.R.'s trafficker and buyers used ESA's, Wyndham's, and JSL's Wi-Fi to advertise and solicit J.R. for commercial sex at the ESA® Hotels, the Knights Inn® Jacksonville, and the Emerson Inn.

173.    ESA, Wyndham, and JSL controlled policies and procedures relating to Wi-Fi, information technology, and the collection of guest web browsing data at the ESA® Hotels, the Knights Inn® Jacksonville, and the Emerson Inn.  ESA, Wyndham, and JSL required their hotels to use specific Wi-Fi service providers and to store their guest data on ESA's, Wyndham's, and JSL's  centralized data platforms.  ESA, Wyndham, and JSL had direct access to guest data through their centralized data management platforms.  ESA, Wyndham, and JSL then used this valuable guest data for marketing purposes and also retained data to sell to third parties.

174.    ESA, Wyndham, and JSL knowingly benefited from allowing the ongoing use of its Wi-Fi to access websites like Backpage, and other notorious pages used for the advertisement of commercial sex, knowing that if they cut-off access to such pages, they would lose traffickers' and buyers' regular and profitable patronage.

175.    In addition, ESA, Wyndham, and JSL knowingly benefited from their ongoing reputation for privacy, discretion, and lack of policies and training hindering

commercial sex at the ESA® Hotels, the Knights Inn® Jacksonville, and the Emerson Inn which continues to attract traffickers and buyers.

176.    ESA, Wyndham, and JSL further knowingly benefited from maintaining and enhancing their hotel brand goodwill by denying to the general public any problem of sex trafficking at their hotels while pretending to take unified efforts to combat it.

177.    ESA, Wyndham, and JSL knowingly benefited through strategic cost-saving measures, including refusing to mandate or monitor employee training on sex trafficking, declining to analyze or address data they received regarding criminal activity, safety, and other indicia of trafficking issues occurring at the ESA® Hotels, the Knights Inn® Jacksonville, and the Emerson Inn (while using the same data to enhance marketing and other profit driven purposes), and choosing not to implement adequate security measures or employ qualified staff.

178.    ESA was a direct participant in the hotel operating business ventures at the ESA® Hotels.  ESA and the ESA® Hotels were aligned in a common enterprise involving risk and potential profit.  There was a continuous business relationship between ESA and the ESA® Hotels.

179.    Wyndham was a direct participant in the hotel operating business ventures at the Knights Inn® Jacksonville.  Wyndham and the Knights Inn® Jacksonville were aligned in a common enterprise involving risk and potential profit. There was a continuous business relationship between Wyndham and the Knights Inn® Jacksonville.

180.    JSL was a direct participant in the hotel operating business ventures at the Emerson Inn.  JSL and the Emerson Inn were aligned in a common enterprise involving risk and potential profit.  There was a continuous business relationship between JSL and the Emerson Inn.

**C.    ESA'S, WYNDHAM'S, AND JSL'S HOTEL OPERATING BUSINESS VENTURES VIOLATED THE TVPRA BY SOLICITING, HARBORING, AND ADVERTISING SEX TRAFFICKING AT THEIR HOTELS**

181.    Through their hotel operating business ventures, ESA, Wyndham, and JSL (1) recruited, enticed, patronized, and solicited J.R.'s traffickers and buyers to each Defendant's hotel; (2) harbored, provided, obtained, and maintained J.R., J.R.'s trafficker, and J.R.'s buyers in each Defendant's rented hotel rooms; and (3) provided the internet services J.R.'s traffickers used to advertise J.R. and solicit buyers for commercial sex acts at each of Defendants' hotels.

182.    ESA's hotel operating business ventures at the ESA® Hotels rented and provided rooms to J.R.'s trafficker in which J.R. was harbored and forced to engage in commercial sex acts to numerous buyers entering the ESA® Hotels for this explicit and apparent purpose.

183.    Wyndham's hotel operating business venture at the Knights Inn® Jacksonville rented and provided rooms to J.R.'s trafficker in which J.R. was harbored and forced to engage in commercial sex acts to numerous buyers entering Wyndham's Knights Inn® Jacksonville for this explicit and apparent purpose.

184.    JSL's hotel operating business venture at the Emerson Inn rented and provided rooms to J.R.'s trafficker in which J.R. was harbored and forced to engage

in commercial sex acts to numerous buyers entering JSL's Emerson Inn for this explicit and apparent purpose.

185.  ESA's hotel operating business ventures at the ESA® Hotels also advertised J.R. for commercial sex at the ESA® Hotels using the Wi-Fi services provided by ESA.

186.  Wyndham's hotel operating business venture at the Knights Inn® Jacksonville also advertised J.R. for commercial sex at the Knights Inn® Jacksonville using the Wi-Fi services provided by Wyndham.

187.  JSL's hotel operating business venture at the Emerson Inn also advertised J.R. for commercial sex at the Emerson Inn using the Wi-Fi services provided by JSL.

188.  ESA, Wyndham, and JSL had the opportunity to inhibit J.R.'s trafficker and buyers, but instead chose to continue implementing permissive business practices which failed to take reasonable measures to stop sex trafficking from occurring at the ESA® Hotels, the Knights Inn® Jacksonville, and the Emerson Inn.

189.  ESA, Wyndham, and JSL failed to take any steps to stop harboring or advertising J.R. at the ESA® Hotels, the Knights Inn® Jacksonville, and the Emerson Inn, including alerting authorities, implementing reasonable security measures, training their staff to improve awareness of sex trafficking red flags, monitoring internet usage over their networks, or declining to provide free Wi-Fi or access to websites like Backpage that are tied to the trafficking industry.

190.  These failures were deliberate choices made by ESA, Wyndham, and JSL to conduct hotel operating business ventures that facilitated, rather than prevented, sex

56

trafficking in their hotels and in contradiction to all available anti-trafficking guidance for businesses.

**D.   ESA, WYNDHAM, AND JSL HAD ACTUAL OR CONSTRUCTIVE KNOWLEDGE OF SEX TRAFFICKING AT THEIR HOTELS THROUGH REPORTS, REVIEWS, NEWS, AND DATA SYSTEMS**

191.   ESA, Wyndham, and JSL not only have access to public police and news reports, but also internal reports generated by guests and employees regarding sex trafficking at their individual hotel locations.

192.   Upon information and belief, ESA, Wyndham, and JSL regularly review and monitor complaints, criminal activity, police reports, news articles, suspicious disturbances, and online hotel reviews which provide indicators of human trafficking at their hotels, including at the ESA® Hotels, the Knights Inn® Jacksonville, and the Emerson Inn.

193.   Prior to, during, and following the incidents described herein, ESA, Wyndham, and JSL had actual and/or constructive knowledge of the rampant criminal activity occurring at their hotels, including the sex trafficking of J.R. and others like her, drug dealing, and general safety concerns observable by staff, guests, via hotel video surveillance, through oral and written complaints, news, reporting, and centralized management, internet, and data systems. Nevertheless, ESA, Wyndham, and JSL chose to prioritize profits over people, and elected not to take any reasonable measures to curtail the continued exploitation at their hotels.

**ESA's Knowledge of Sex Trafficking at their Extended Stay America® Brand Hotels, Including the ESA® Southside, ESA® Deerwood, ESA® Lenoir, and ESA® Salisbury**

194.   ESA knew or should have known that sex trafficking and prostitution are associated, that both carry a high risk of physical and sexual violence, substance abuse, and other illegal dangerous conduct, and that the pimp/trafficker-prostitute/sex trafficking victim relationship involves the use of force, fraud, and coercion.

195.   ESA knew or should have known that this violent and criminal activity was occurring at Extended Stay America® brand hotels and therefore knew or should have known that sex trafficking was occurring at the subject ESA® Hotels.  ESA has long received, and continues to receive, evidence and reports that human trafficking and prostitution run rampant at its Extended Stay America® brand hotels, including at the ESA® Southside, ESA® Deerwood, ESA® Lenoir, and ESA® Salisbury where J.R. was trafficked.

196.   ESA had actual or constructive knowledge of sex trafficking occurring at its Extended Stay America® brand hotels through internal reports generated by hotel guests and employees regarding sex trafficking at the ESA® Southside, ESA® Deerwood, ESA® Lenoir, and ESA® Salisbury hotels as well as other ESA® brand hotels.

197.   ESA also had actual or constructive knowledge of sex trafficking occurring at its Extended Stay America® brand hotels through news reports regarding violent and criminal activity occurring at Extended Stay America® brand hotels after J.R. was trafficked evidencing that Extended Stay America® brand hotels have been,

and continue to be, laden with crime generally, and human trafficking and prostitution specifically.  For instance:

    a.    In 2023, the Town of Fishkill Police Department announced news of a joint operation targeting prostitution and other illegal activity at an ESA brand hotel. The operation yielded multiple arrests for prostitution, as well as numerous felony drug charges for possession of controlled substances.[49]

    b.    In 2022, a joint prostitution operation resulted in the arrest of five individuals at an ESA brand hotel.[50]

    c.    In 2015, a narcotics complaint led to a drug bust at an ESA brand hotel.[51]

    d.    In 2014, a man was arrested after threatening an eighteen year-old girl at an ESA brand hotel because "she wasn't working."[52]

---

[49] Val, *Rt. 9 Fishkill Hotel Busted Twice in 18 Months for Prostitution*, WRRV (Sept. 23, 2023), https://wrrv.com/extended-stay-fishkill-prostitution-2023/.

[50] Bobby Welber, *New York State Police Charge 5 with Prostitution in Hudson Valley*, HUDSON VALLEY POST (May 2, 2022), https://hudsonvalleypost.com/new-york-state-police-charge-5-with-prostitution-in-hudson-valley/.

[51] *Call to extended stay hotel prompts drug bust*, Dayton Daily News (Dec. 15, 2015), https://www.daytondailynews.com/news/crime--law/call-extended-stay-hotel-prompts-drug-bust/4XmHw4NPWekaGjtlVUkLIP/.

[52] Neal Simpson, *Local motels, hotels are hotbeds for sex trafficking*, THE PATRIOT LEDGER (Feb. 12, 2016), https://www.patriotledger.com/story/news/crime/2016/01/30/local-motels-hotels-are-hotbeds/32534523007/.

e.   In 2014, three people were arrested in the parking lot of an ESA brand hotel for conspiracy and loitering with intent to commit prostitution.[53]

f.   In 2014, a man was arrested after police discovered he had trafficked a young woman out of an ESA brand hotel in Columbia, Howard County, Maryland.[54]

g.   In 2014, police arrested a man on human trafficking charges after an investigation at an ESA brand hotel in Orlando, Florida.[55]

198.   ESA also had actual or constructive knowledge of sex trafficking occurring at its Extended Stay America® brand hotels through news reports regarding violent and criminal activity occurring at Extended Stay America® brand hotels before and during the time J.R. was trafficked at the subject ESA® Hotels.  For instance:

a.   In 2013, a man was indicted by a federal grand jury on charges of child sex trafficking after federal investigators discovered he had been conducting a sex trafficking operation out of the ESA brand hotel in Memphis, Tennessee, involving a fourteen year-old girl.[56]

---

[53] Lisa Paredes, *Three Arrested On Prostitution Charges Near Extended Stay*, MY BURBANK (Apr. 21, 2014), https://myburbank.com/three-arrested-on-prostitution-charges-near-extended-stay/.

[54] Fatimah Waseem, *Tougher laws, more services for human trafficking victims sought in Howard County*, THE BALTIMORE SUN (May 22, 2017), https://www.baltimoresun.com/maryland/howard/columbia/ph-ho-cf-human-trafficking-0406-20170522-story.html.

[55] Amy Pavuk, *Suspected pimps, prostitutes arrested in human-trafficking case*, ORLANDO SENTINEL (May 9, 2014), https://www.orlandosentinel.com/news/os-xpm-2014-05-09-os-sex-trafficking-arrests-20140509-story.html.

[56] Janice Broach, *'Mr. Money' accused of sex trafficking*, WMC-TV (Apr. 25, 2013, updated Apr. 26, 2013), https://www.actionnews5.com/story/22083442/mid-south-man-called-mr-money-accused-

b.      In August 2013, a man and woman were arrested for sex trafficking after police investigated an ESA brand hotel in Plantation, Florida, and discovered drug paraphernalia and evidence that the couple had been luring women at a bus station with the promise of jobs but instead had been forcing them into prostitution.[57]

c.      In December 2013, police arrested six men in a prostitution sting operation at the ESA brand hotel located in the BWI Hotel District in Linthicum, Maryland, an area known for being a hotspot for sex trafficking.[58]

d.      In 2012, a man who sex trafficked a woman out of various hotels on or before June 2010, including an ESA brand hotel, was arrested on federal charges of Interstate Trafficking of Prostitutes and sentenced.[59]

---

of-sex-trafficking/; Louis Goggans, *Aspiring Rapper Sentenced to 10 Years for Sex Trafficking*, MEMPHIS FLYER (Jan. 21, 2015), https://www.memphisflyer.com/aspiring-rapper-sentenced-to-10-years-for-sex-trafficking; U.S. Attorney's Office, Western District of Tennessee, News (Apr. 25, 2013), https://www.justice.gov/usao-wdtn/pr/osbie-antonio-sea-indicted-sex-trafficking-14-year-old-girl-and-two-others.

[57] Erika Pensantes, *Human trafficking suspects accused of prostitution women in Plantation*, SUN SENTINEL (Aug. 20, 2013), https://www.sun-sentinel.com/news/fl-xpm-2013-08-20-fl-human-trafficking-plantation-20130820-story.html.

[58] Kate Yoon, *Human trafficking around BWI airport is a 'transient crime'*, CAPITAL GAZETTE (Jan. 4, 2014), https://www.capitalgazette.com/entertainment/cg2-arc-140104gn-trafficking-20140104-story.html.

[59] *Giglo Beach Homicide Investigation – Victim Megan Waterman*, SUFFOLK CTY. GOV'T (2022), https://www.gilgonews.com/vics/MeganWaterman.

e.      In 2012, a couple was arrested for prostitution and pandering after holding a woman against her will at an ESA brand hotel.[60]

f.      In 2012, a nineteen year-old woman was arrested on suspicion of prostitution. After allegedly seeing a post online advertising her services, investigators found the woman with a client at an ESA brand hotel.[61]

g.      In 2009, a man was charged with promoting prostitution for using Craigslist.com to advertise commercial sex occurring an ESA brand hotel in Cherry Hill, Camden County, New Jersey.[62]

199.    ESA also had actual or constructive knowledge of sex trafficking occurring at its Extended Stay America® brand hotels through news reports regarding violent and criminal activity occurring at the subject ESA® Hotels where J.R. was trafficked. For instance:

a.      At the ESA® Southside, in 2018 Jacksonville police responded to a shooting.[63]

---

[60] Sabrina Wu, *UPDATE: Prostitution Repeat Offendres' Bond Set*, PATCH (May 8, 2023, updated May 9, 2023), https://patch.com/illinois/burridge/update-prostitution-repeat-offenders-being-held-on-bond-video.

[61] *Arizona woman arrested at Burbank hotel on suspicion of prostitution*, BURBANK LEADER (Dec. 4, 2012), https://www.latimes.com/socal/burbank-leader/the818now/tn-818-1204-arizona-woman-arrested-at-burbank-hotel-on-suspicion-of-prostitution-story.html.

[62] Andy McNeail, *Man charged with sex trafficking in Cherry Hill sting*, COURIER-POST (March 14, 2014, 12:15 am), https://www.courierpostonline.com/story/news/crime/2014/03/14/man-charged-with-trafficking-in-cherry-hill-sex-sting/6395105/.

[63] Rich Jones, *Jacksonville Sheriff's Office investigation murder at extended stay near St. Johns Town Center*, 104.5 WOKV (Aug. 17, 2018) https://www.wokv.com/news/local/jacksonville-sheriff-office-investigate-shooting-death-extended-stay-near-johns-town-center/HwUbugXgboHihssRCr8qaI/.

b.   At the ESA® Deerwood, in 2020, an individual was arrested after a reported shooting at the hotel stemming from a domestic dispute.[64]

200.   ESA also had actual or constructive knowledge of sex trafficking occurring at its Extended Stay America® brand hotels through public reviews left by guests on online website forums, such as TripAdvisor.com, Yelp.com, and Google.com, wherein guests frequently complain about the obvious prevalence of the commercial sex trade, physical violence by trafficker pimps, drug use, and other signs of human trafficking at Extended Stay America® brand hotels, including the subject ESA® Hotels where J.R. was trafficked.

201.   For instance, the below reviews appear online about the ESA® Southside:

a.   "The first night, I was approached by two prostitutes in the parking lot after I returned back from the store.  Unsavory-types of people wander around the property all weekend long…I specifically inquired before booking the room if it was a corporate facility, or a franchise one. I was assured it was corporate…I will be following up with their corporate office (ESA Management LLC of Charlotte, NC) to get out of my 30 day stay ASAP."

---

[64] *1 suspect in custody after shooting at Extended Stay America in Jacksonville's Southside*, FIRST COAST NEWS (Apr. 22, 2020), https://www.firstcoastnews.com/article/news/crime/shooting-reported-on-jacksonvilles-southside/77-8186d464-e207-44f6-b4c5-e9164bc0bfd1.

b.  "Would recommend a different hotel…I was approached several times by women offering me there [sic] companionships ship for a fee…The staff is untrained and not knowledgeable with company policies."

c.  "This place would be fine but it's filled with drug dealers and hookers.  The smell of pot is constant."

d.  "There is [sic] prostitutes out here i heard screams at 3am, i looked out the window it was a woman and some guys and they were arguing about something sounded like a shoot out ready to happen."

e.  "They need to shut this rat hole down. Wanna witness a drug bust? Drug deal? Or drugged up prostitute get slapped up in the dark desolate parking lot before then hearing bangs, as well as her screaming from being gang banged in the room next to you? Come here. You wanna be scared to go out to your car because goons are out there? Come here. …Probably laying in the bed of a murder victim or battered prostitute. I would even get tested for hiv after leaving here …Suspicious men, druggies, sleezy women."

f.  "there's a lot of drugs trafficking going on in that place of business is not safe Horrible"

g.  "I travel throughout the United States and travel to other countries…This Extended Stay is by far the worst place that I

64

stayed.  First let me say I do not like to complain but this place deserves it…When [] the sheets came loose I saw blood in different areas all over the mattress cover, a lot of body sweat and sex stains."

h.    "Shady people standing around on stair wells and area…"

i.    "This place was terrible and not safe. I didn't get a good night of sleep either of the nights I was there. There were a bunch of shady characters walking around and talking loud all night long."

j.    "First off, when we drove on the property in was like going into a drug zone!"

k.    "Whoever was in my room also left their drug paraphernalia right on the dresser!!! I told the hotel manager on site about the situation and she tried to cover it up!  I let her take the stuff they left on the dresser and she stalled until I called the corporate office."

l.    "Drug addict party place. NEVER STAY HERE!!!!!"

m.    "I just watched a drug deal go down in the parking lot."

n.    Never stay here. Worst nightmare of my life.…Drug dealers on site."

202.    For instance, the below reviews appear online about the ESA®Deerwood:

a.    "Horrible staff…Swat busted a prostitute smoking crack and tried selling sex to an undercover…"

65

b.    "The room was dirty there was drug deals at all hours the door was constantly slamming.  Horrible place."

c.    "Turns out it was a key to a random drug dealers room....because when I opened the door...there were drugs everywhere....and people..."

d.    "They need to do better with the towels and tracking there [sic] extending stay drug users…"

203.    For instance, the below reviews appear online about the ESA® Lenoir:

a.    "Definitely drug dealing going on here there's no way the hotel's not aware of it strange people loitering outside day and night."

b.    "THE wors[t] Hotel. Dirty, blood on the shades, dirty beds. drug trades in front of the hotel..."

c.    "There was blood on the back of the bathroom door, the entire hotel smells like weed and there's drug deals happening outside the hotel."

d.    "Place was gross. Found condom wrappers in the bed."

e.    "NIGHTMARE HOTEL. Full of dope boys and drugs… This hotel and management are a joke. Half of the night shift is outback with the dope boys. That hotel is super shady. BEWARE BEWARE BEWARE..."

f.    "I'm writing this as I wait for the police to arrive to tell the people in the parking lot to shutup! The night shift attendent, after 3

phone calls from me since 1200 (it's now 5a) complaining about these inconsiderate folks inside on my floor, and outside, said she can not do anything and cannot go outside! Guess they can't call the police either!"

g.    "I would not suggest going to this place ever unless you're a cop looking to make an arrest […]."

h.    "[T]here were 'undesirable people' hanging out in the corridor, staring at us as we walked to our room. Females looking like prostitutes, guys and women looking drugged out […]."

i.    "This place allow[s] crackheads and prostitutes to stay here […]."

j.    "[W]elcomed by the prostitutes in the back of the hotel [in] half dress."

k.    "Dope dealers and prostitution all around!!!!!"

204.    For instance, the below reviews appear online about the ESA® Salisbury:

a.    "Used CRACK PIPE, Used CONDOM and PUBIC hairs … Need I say more?!? Absolutely disgusting …. These rooms were nasty … I would never tay [sic] here again!!!!! […] DO they even clean the rooms or check them???"

b.    "[L]ight on staff. The room smelled. […] [N]o one at the front desk most of the time."

c.    "[D]id not feel safe at all …."

67

d.  "Worst hotel stay by far!!!! I have stayed in some bad/sketchy places, but um this one…oh boy…laundry list of problems."

e.  "Way too many escorts staying here.  Seriously they need to clean them out.  Too many hotels around jax let them stay and then drug dealers come.  Clean up are [sic] hotels Jacksonville plz."

f.  "high prostitution area"

g.  "DIRTY…SMELLS BAD AND I THINK I FOUND BLOOD STAINS ON THE MATTRESS… I have never been in a pay [b]y the hour hotel but i would imangine [sic] what that would look like would be our room...I will be calling corperate [sic] asap…"

h.  "…hands-down the worst hotel I have ever stayed at in my life…very shady characters walking around let alone inside the hotel.  There was only ONE staff member there at a time which they each claimed they were the manager as well as did nothing whatsoever about any complaint…"

i.  "Lots of creepy characters around outside and the lobby. As a female traveling alone, I did not feel safe here at all. […] [T]he place smells like a dog pound where the dogs all smoke marijuana. Do not stay here. DO NOT. […] Not only does this hotel not give a damn about guests, corporate doesn't seem interested either."

68

      j.      "First room offered had white stains on the carpet! Second room had blood on ceiling from drug users. Absolutely filthy. […] Used by working ladies."

205. ESA also had actual or constructive knowledge of sex trafficking occurring at its Extended Stay America® brand hotels because upon information and belief, ESA requires all employees to report suspicious activity at its ESA brand hotels to its ESA corporate executives and upper-level management. Had ESA trained its staff on the red flag signs of trafficking, its staff would have reported the obvious indications of sex trafficking the staff and hotel guests witnessed at its ESA brand hotels, including the ESA® Southside, ESA® Deerwood, ESA® Lenoir, and ESA® Salisbury.

206. Moreover, ESA knew or should have known of sex trafficking at its Extended Stay America® brand hotels through their centralized control over their hotel operating systems, including reservations, internet, reports, and reviews concerning their hotels which alerted or should have alerted ESA to the ongoing criminal activity at ESA brand hotels.

207. Similarly, ESA knew or should have known of sex trafficking at its Extended Stay America® brand hotels because ESA offers free internet at its hotels through specific providers which is available to guests in rooms as well as throughout publicly accessible networks in its hotel lobbies and common areas. ESA collects data on internet usage through these services, including:

69

a. The IP address and other identifying information for all devices that access the internet on its wireless networks;

b. The identity of websites accessed by those devices through the IP addresses of the servers that host those websites; and

c. Information about the user accessing the internet through its wireless networks, including the user's room number, a user-provided name, and other identifying information.

208. For instance, through such data collection, ESA knew or should have known of the prevalent use of websites like Backpage.com by traffickers to post advertisements for commercial sex at its ESA brand hotels.

209. Despite the fact ESA is sufficiently sophisticated to monitor, provide cybersecurity, and prevent illegal activity from occurring at its hotels over wireless networks, ESA made no effort to flag or block the use of such website advertisements, or failed to otherwise address or monitor internet usage at its ESA brand hotels that indicated the sexual exploitation of J.R. and others like her within its hotels' walls.

**Wyndham's and Red Lion's Knowledge of Sex Trafficking at Knights Inn® Brand Hotels, Including the Knights Inn® Jacksonville**

210. Wyndham and Red Lion knew or should have known that sex trafficking and prostitution are associated, that both carry a high risk of physical and sexual violence, substance abuse, and other illegal dangerous conduct, and that the pimp/trafficker-prostitute/sex trafficking victim relationship involves the use of force, fraud, and coercion.

70

211. Wyndham and Red Lion knew or should have known that this violent and criminal activity was occurring at Knights Inn® brand hotels and therefore knew or should have known that sex trafficking was occurring at the Knights Inn® Jacksonville. Wyndham and Red Lion have long received, and continue to receive, evidence and reports that human trafficking and prostitution run rampant at Knights Inn® brand hotels, including at the Knights Inn® Jacksonville where J.R. was trafficked.

212. Wyndham and Red Lion had actual or constructive knowledge of sex trafficking occurring at Knights Inn® brand hotels through internal reports generated by hotel guests and employees regarding sex trafficking at the Knights Inn® Jacksonville as well as other Knights Inn® brand hotels.

213. Wyndham and Red Lion also had actual or constructive knowledge of sex trafficking occurring at Knights Inn® brand hotels through news reports regarding nuisance actions and hotel closures pertaining to Knights Inn® brand hotels and evidencing that Knights Inn® brand hotels have been, and continue to be, laden with crime generally, and human trafficking and prostitution specifically. For instance:

a.   In 2023, the Knights Inn® motel in Franklin, Ohio was temporarily closed for substantial criminal activity.[65] This closure came after the fifth death at the hotel in five years.[66]

b.   In 2022, the Knights Inn® motel in Napoleon, Ohio was closed for 60 days after the City of Napoleon declared it a public nuisance.[67]

c.   In 2022, in Roanoke, Virginia, local, state, and federal authorities held a press conference at a Knights Inn® motel to announce the results of law enforcement action taken against the business and its owner. Authorities stated the investigation found drugs and sex trafficking and that "despite telling the owner their concerns, he did little to prevent it." Authorities seized and forfeited the property.[68]

d.   In 2019, the City of Cayce, South Carolina suspended a Knights Inn® motel's business license. The Cayce Department of Public Safety believed that criminal activity, complaints, and arrests

---

[65] Anna Azallion, *'Serious, hazardous public nuisance': Knights Inn motel temporarily closed for 'substantial criminal activity'*, WCPO (Jan. 25, 2023), https://www.wcpo.com/news/local-news/warren-county/franklin/serious-hazardous-public-nuisance-knights-inn-motel-temporarily-closed-for-substantial-criminal-activity.

[66] Callie Cassick, *Franklin Knight's Inn shut down after fifth body found*, WDTN (Jan. 25, 2023), https://www.wdtn.com/news/crime/franklin-knights-inn-shut-down-after-fifth-body-found/.

[67] *Henry County court orders hotel closure*, THE CRESCENT NEWS (Feb. 15, 2022, updated Mar. 22, 2023), https://www.crescent-news.com/news/local_news/henry-county-court-orders-hotel-closure/article_4a84b9aa-8dce-11ec-afb6-2be97466f344.html.

[68] Alli Graham & Alyssa Rae, *Authorities: Sex trafficking, drugs among findings of investigation into Roanoke hotel*, WSLS (Sept. 27, 2022), https://www.wsls.com/news/local/2022/09/27/authorities-disclose-findings-of-investigation-into-roanoke-hotel/.

plagued the property and placed a strain on the City's public safety services as well as the safety of its citizens. According to Cayce DPS, in 90 days, Cayce officers responded to 169 calls for service at the hotel. In 97 of these responses, criminal complaints were filed, including arrests for trafficking methamphetamine, strong armed robbery, and attempted murder. During that same 90-day period, the owner of the hotel was charged and convicted of operating a nuisance business.[69]

e. In 2014, in Columbus, Ohio, a Knights Inn® motel was declared a public nuisance and shut down. In granting the temporary restraining order, the Environmental Court Judge Daniel R. Hawkins cited numerous instances of crime, including murders, undercover purchases of heroin, crack cocaine, and marijuana, shootings, and prostitution at the Knights Inn® property dating back as far as 2009. In one instance, Hon. Hawkins wrote, a detective told the front desk clerk she didn''t have any identification when attempting to rent a room at the motel. The

---

[69] *Cayce suspends license for Knights Inn Hotel*, WLTX (Oct. 2, 2019), https://www.wltx.com/article/news/crime/city-cayce-suspend-business-license-knights-inn/101-9a94dadc-b2e0-4e24-a3ac-273e0e43db72.

clerk allegedly offered to let her have the room in exchange for $35 and sexual intercourse.[70]

214.   Wyndham and Red Lion also had actual or constructive knowledge of sex trafficking occurring at Knights Inn® brand hotels through news reports regarding violent and criminal activity occurring at Knights Inn® brand hotels after J.R. was trafficked evidencing that crime generally, and human trafficking, sex trafficking, and prostitution specifically, persists at Knights Inn® brand hotels.  For instance:

a.   In 2020, the discovery of a naked woman screaming for help at a Knights Inn® motel on Dix Ellis Trail in Jacksonville led to the arrest of a man on charges of home invasion, robbery, false imprisonment, and battery.[71]

b.   In 2019, police arrested a man who was selling crack cocaine, heroin, and methamphetamine out of a room at a Knights Inn® motel.[72]

---

[70] Kevin Parks, *Knights Inn ordered closed, called public nuisance*, THE COLUMBUS DISPATCH (Nov. 20, 2014, updated Nov. 24, 2014), https://www.dispatch.com/story/news/local/northland/2014/11/21/knights-inn-ordered-closed-called/22706067007/.

[71] Dan Scanlan, *Jacksonville man arrested after naked woman pleads for help during attack at motel*, JACKSONVILLE (Jan. 9, 2020), https://www.jacksonville.com/story/news/local/2020/01/09/jacksonville-man-arrested-after-naked-woman-pleads-for-help-during-attack-at-motel/112137448/.

[72] Talia Naquin, *Elyria police arrest man accused of selling drugs out of Knights Inn Motel*, FOX 8 (Feb. 27, 2019), https://fox8.com/news/elyria-police-arrest-man-accused-of-selling-drugs-out-of-knights-inn-motel/.

c.  In 2017, a woman's body was discovered at a Knights Inn® motel.[73] "While there are five hotels and motels in Claremont, at the core of the residents' complaints are three establishments — the Knights Inn, The Claremont Lodge and Motel 6 — where crime and nuisance activities, including prostitution, have been a problem for at least a decade, according to officials. The problems have worsened in recent years, officials say."[74]

d.  In 2015, police arrested three people after discovering an active meth lab inside a room at a Knights Inn® motel on East Morton Avenue in Jacksonville.[75]

e.  In 2015, a man was charged with killing his girlfriend at a Knights Inn® motel.[76]

f.  In 2014, a gunman robbed a "prostitute" after having sex with her at a Knights Inn® motel.[77]

---

[73] Jacob Rodriguez, *Suspect named in homicide at Knights Inn Motel*, ABC 10 (Jul. 4, 2017), https://www.abc10.com/article/news/crime/suspect-named-in-homicide-at-knights-inn-motel/73-453735197.

[74] Javier Rojas, *Claremont tackling crime and prostitution at 10 Freeway-adjacent motels*, Daily BULLETIN (Dec. 17, 2022), https://www.dailybulletin.com/2022/12/17/claremont-TACKLING-crime-and-prostitution-at-10-freeway-adjacent-motels/.

[75] *Police find meth lab in motel room*, MY JOURNAL COURIER (Aug. 5, 2015), https://www.myjournalcourier.com/news/article/Police-find-meth-lab-in-motel-room-12565153.php.

[76] Justine McDaniel, *Banselam motels remain hot spot for crime*, THE PHILA. INQUIRER (May 23, 2016), https://www.inquirer.com/philly/news/20160523_Bensalem_motels_remain_hot_spot_for_crime.html.

[77] *Police Seek Gunman Who Shot At, Robbed Prostitute After Sex*, CBS DET. (Feb. 26, 2014), https://www.cbsnews.com/detroit/news/police-seek-gunman-who-shot-at-robbed-prostitute-after-sex/.

215. Wyndham and Red Lion also had actual or constructive knowledge of sex trafficking occurring at Knights Inn® brand hotels through a news report regarding violent and criminal activity occurring at Knights Inn® brand hotels during the same year that J.R. was trafficked. For instance:

a. In 2013, a man was fatally shot at a Knights Inn® motel.[78]

216. Wyndham and Red Lion also had actual or constructive knowledge of sex trafficking occurring at Knights Inn® brand hotels through a news report regarding violent and criminal activity occurring at the specific Knights Inn® Jacksonville where J.R. was trafficked:

a. In 2017, officers were dispatched to the Knights Inn® Jacksonville motel on South Lane Avenue and found a shooting victim in the parking lot of the motel.[79]

217. Wyndham and Red Lion also had actual or constructive knowledge of sex trafficking occurring at the specific Knights Inn® Jacksonville where J.R. was trafficked through calls to the Jacksonville Sheriff's Office for service. For instance:

a. In 2013, there were approximately 92 calls for service to the Knights Inn® Jacksonville where J.R. was trafficked for, including, but not limited to, the following occurrences: dispute; missing

---

[78] Jose D. Enriquez III, *Second man wanted in Knights Inn killing*, BEAUMONT ENTER. (Aug. 27, 2013), https://www.beaumontenterprise.com/news/article/Second-man-wanted-in-Knights-Inn-killing-4765450.php.
[79] *Man shot at the Knights Inn hotel parking lot*, NEWS 4 JAX (Jul. 25, 2017), https://www.news4jax.com/news/2017/07/25/man-shot-at-the-knights-inn-hotel-parking-lot/.

person; domestic disturbance; suspicious person; drug investigation; robbery; suicide; prostitution; assault; and armed dispute.

b.    In 2012, there were approximately 73 calls for service to the Knights Inn® Jacksonville where J.R. was trafficked for, including, but not limited to, the following occurrences: suspicious person; dispute; drug investigation; theft; prostitution; domestic disturbance; and assault.

218.    Wyndham and Red Lion also had actual or constructive knowledge of sex trafficking occurring at Knights Inn® brand hotels through public reviews left by guests on online website forums, such as TripAdvisor.com, Yelp.com, and Google.com, wherein guests frequently complain about the obvious prevalence of the commercial sex trade, physical violence by trafficker pimps, drug use, and other signs of human trafficking at Knights Inn® brand hotels, including the Knights Inn® Jacksonville where J.R. was trafficked.

219.    For instance, the below reviews appear online about the Knights Inn® Jacksonville:

a.    "Horrible prostitutes in and out of hotel"

b.    "Do not stay at this hotel. I called to inform the front desk that black guys were trying to pimp out a prostitute at the hotel. The woman at the front desk started threatening me and stated that the hotel was a known drug and hooker hotel and for me to stay the

hell away from there. She was irate with me and started accusing me of doing drugs and hookers. These people will rob you. Not a safe place. Will call corporate office to inform them tomorrow."

c.    "Trashy place.  The girl by the pool was tweaking so bad, we didnt need a fan…The people next room to me smoked so much weed and kept traffic coming thru all nite. The front desk lady in daytime is Clearly just here for a check. Offers excuse of 'well it is the west side.  She didnt care…hookers walk around here…"

d.    "Just passing through looking for Pokemon and giving someone a ride.  About the same amount of hookers as there are Pokemon around."

e.    "They had 2 overdoses…Hookers roam and dopeboys hustle.  Do not stay here. I will never go back. Door didnt lock proper. Lady at night looked like a closet doper. Scared me. [thumbs down emoticon] horrid horrid horrid."

f.    "…No one at the hotel was ever helpful and 'working girls' always around asking for a party…."

g.    "The owner[s] have drug dealer payin them to let them know when the police r coming…I think it should be close[d] down"

h.    "…I'm not too happy with Knights Inn they need more security an[d] more lighting…they have a lot of…young women walking around there at night and usually I think you need to take a good

78

look at that they need to beware of what comes and goes out of [their] motels…"

i.    "Locals stay here. Not exactly safe…Pretty sure you can rent by the hour."

j.    "To[o] much bad traffic if you know what I mean. You can tell illegal stuff is going on"

k.    "Atmosphere was a lot of criminal activity around the premises all hours of the night…it was hard to sleep because of the smell and the activity that was very busy from 3 in the morning to 5 in the morning..."

l.    "Saw a pregnant woman get attacked…"

m.    "Drug abuse is openly prevalent and a quiet night is unheard of"

220.    Wyndham also had actual or constructive knowledge of sex trafficking occurring at its Knights Inn® brand hotels because upon information and belief, Wyndham requires all employees to report suspicious activity at its Knights Inn® brand hotels to its Wyndham corporate executives and upper-level management. Had Wyndham trained its staff on the red flag signs of trafficking, its staff would have reported the obvious indications of sex trafficking the staff and hotel guests witnessed at its Knights Inn® brand hotels, including the Knights Inn® Jacksonville.

221.    Moreover, Wyndham knew or should have known of sex trafficking at its Knights Inn® brand hotels through its centralized control over its hotel operating systems, including reservations, internet, reports, and reviews concerning its hotels

79

which alerted or should have alerted Wyndham to the ongoing criminal activity at Knights Inn® brand hotels.

222.   Similarly, Wyndham knew or should have known of sex trafficking at its Knights Inn® brand hotels because Wyndham offers free internet at its hotels through specific providers which is available to guests in rooms as well as throughout publicly accessible networks in its hotel lobbies and common areas.   Wyndham collects data on internet usage through these services, including:

    a.    The IP address and other identifying information for all devices that access the internet on its wireless networks;

    b.    The identity of websites accessed by those devices through the IP addresses of the servers that host those websites; and

    c.    Information about the user accessing the internet through its wireless networks, including the user's room number, a user-provided name, and other identifying information.

223.   For instance, through such data collection, Wyndham knew or should have known of the prevalent use of websites like Backpage.com by traffickers to post advertisements for commercial sex at its Knights Inn® brand hotels.

224.   Despite the fact Wyndham is sufficiently sophisticated to monitor, provide cybersecurity, and prevent illegal activity from occurring at its hotels over wireless networks, Wyndham made no effort to flag or block the use of such website advertisements, or failed to otherwise address or monitor internet usage at its Knights

Inn® brand hotels that indicated the sexual exploitation of J.R. and others like her within its hotel's walls.

**JSL's Knowledge of Sex Trafficking at the Emerson Inn**

225.   JSL knew or should have known that sex trafficking and prostitution are associated, that both carry a high risk of physical and sexual violence, substance abuse, and other illegal dangerous conduct, and that the pimp/trafficker-prostitute/sex trafficking victim relationship involves the use of force, fraud, and coercion.

226.   JSL knew or should have known that this violent and criminal activity was occurring at the Emerson Inn.  JSL has long received, and continues to receive, evidence and reports that human trafficking and prostitution run rampant at the Emerson Inn where J.R. was trafficked.

227.   JSL had actual or constructive knowledge of sex trafficking occurring at the Emerson Inn through internal reports generated by hotel guests and employees regarding sex trafficking at the Emerson Inn.

228.   JSL had actual or constructive knowledge of sex trafficking occurring at the Emerson Inn through news reports regarding the area along Philips Highway in Jacksonville, Florida (along which the Emerson Inn is located) evidencing that the Emerson Inn has been and continues to be laden with crime generally, and human trafficking and prostitution specifically.  For instance:

     a.     In 2016, six women were arrested in a city-wide prostitution crackdown, three of whom were arrested near Philips Highway, "which has been a problem spot for prostitution in Jacksonville."

81

In fact, the owner of the Emerson Inn, JSL's Patel, said "prostitutes" can be seen in the area almost every evening.[80]

b.     In 2009, eighteen men and a woman were arrested on charges of soliciting prostitution and two men were arrested on additional charges of drug possession during an undercover police sting on Philips Highway in blocks ranging from 3500 to 4100,[81] which includes the Emerson Inn's location.

229.   JSL had actual or constructive knowledge of sex trafficking occurring at the Emerson Inn through news reports regarding violent and criminal activity occurring at the Emerson Inn even before J.R. was trafficked there.  For instance:

a.     In 2012, a gunman was shot by police at the Emerson Inn.[82]

b.     In 2012, police responded to the Emerson Inn in reference to a dead body.[83]

---

[80] Ben Becker, *Expert: Prostitution crackdowns in Jacksonville important, but ineffective*, ACTION NEWS JAX (Oct. 18, 2016), https://www.actionnewsjax.com/news/local/expert-prostitution-crackdowns-in-jacksonville-important-but-ineffective/458167873/.

[81] Sandy Strickland, *SOUTHSIDE COPS: Nineteen arrested in prostitution sting on Philips Highways*, FLA. TIMES-UNION (Sept. 11, 2009), https://www.jacksonville.com/story/news/2009/09/11/southside-cops-nineteen-arrested-in-prostitution-sting-o/15973867007/.

[82] *Law & Disorder: Armed man shot by police at motel*, FLA. TIMES-UNION (Mar. 20, 2012), https://www.jacksonville.com/story/news/crime/2012/03/20/law-disorder-armed-man-shot-police-motel/15872240007/.

[83] Rich Jones, *Foul play suspected in discovery of body near Emerson Inn*, 104.5 WOKV (Jun. 11, 2012), https://www.wokv.com/news/local/foul-play-suspected-discovery-body-near-emerson-inn/KZkMleYikjOHa9tn5ySKKO/.

82

230.    JSL had actual or constructive knowledge of sex trafficking occurring at the Emerson Inn through calls to the Jacksonville Sheriff's Office for service at the Emerson Inn where J.R. was trafficked.  For instance:

a.    In 2013, there were 157 calls for service to the Emerson Inn where J.R. was trafficked for, including, but not limited to, the following occurrences: dispute; assault with injury; assault; theft; suspicious person; prostitution; robbery; drug investigation; burglary; domestic disturbance with violence; discharging firearm; suicide; armed dispute; and armed robbery.

b.    In 2012, there were 208 calls for service to the Emerson Inn where J.R. was trafficked for, including, but not limited to, the following occurrences: theft; suspicious person; drug investigation; domestic disturbance; domestic disturbance involving alcohol; prostitution; fight; armed dispute; discharging firearm; dispute; officer involved homicide investigation; discharging firearm at a person; missing person; assault; and armed assault.

231.    JSL also had actual or constructive knowledge of sex trafficking occurring at the Emerson Inn through public reviews left by guests on online website forums, such as TripAdvisor.com, Yelp.com, and Google.com, wherein guests frequently complain about the obvious prevalence of the commercial sex trade, physical violence by trafficker pimps, drug use, and other signs of human trafficking at the Emerson Inn where J.R. was trafficked.

232.    For instance, the below reviews appear online about the Emerson Inn:

    a.    "Had a prostitution ring and drugs going on there."

    b.    "Prostitutes in parking lot that live in the rooms."

    c.    "I wouldn't even give this place 1 star nasty room and full of pimps and prostitutes"

    d.    "It's ok for the price, if they were to get rid of some of the prostitutes and pimps I would rate it 5 stars."

    e.    "Deep screaming from the tenants at night and slot [sic] [o]f cursing could be heard outside my door. In fact I heard a man say 'I will kill you' the hotel [was] full of pimps and prostitute busy all night…."

    f.    "very little hygiene, a lot of crime I do not recommend it.  it's very dangerous"

233.    JSL also had actual or constructive knowledge of sex trafficking occurring at the Emerson Inn because upon information and belief, JSL requires all employees to report suspicious activity at the Emerson Inn to its JSL hotel owners and operators.  In addition, upon information and belief, JSL's owners and operators are themselves often working at the Emerson Inn and directly observed the suspicious, criminal, and sex trafficking activity at the Emerson Inn.  Had JSL trained its staff on the red flag signs of trafficking, its staff would have reported the obvious indications of sex trafficking the staff and hotel guests witnessed at the Emerson Inn.

234.    Moreover, JSL knew or should have known of sex trafficking at the Emerson Inn through JSL's centralized control over its hotel operating systems, including reservations, internet, reports, and reviews concerning its hotels which alerted or should have alerted JSL to the ongoing criminal activity at the Emerson Inn.

235.    Similarly, JSL knew or should have known of sex trafficking at the Emerson Inn because JSL offers free internet at its hotels through specific providers which is available to guests in rooms as well as throughout publicly accessible networks in JSL's Emerson Inn lobby and common areas.  JSL collects data on internet usage through these services, including:

    a.    The IP address and other identifying information for all devices that access the internet on its wireless networks;

    b.    The identity of websites accessed by those devices through the IP addresses of the servers that host those websites; and

    c.    Information about the user accessing the internet through its wireless networks, including the user's room number, a user-provided name, and other identifying information.

236.    For instance, through such data collection, JSL knew or should have known of the prevalent use of websites like Backpage.com by traffickers to post advertisements for commercial sex at the Emerson Inn.

237.    Despite the fact JSL is sufficiently sophisticated to monitor, provide cybersecurity, and prevent illegal activity from occurring at the Emerson Inn over wireless networks, JSL made no effort to flag or block the use of such website

advertisements, or failed to otherwise address or monitor internet usage at the Emerson Inn that indicated the sexual exploitation of J.R. and others like her within its hotel's walls.

**E.  ESA, WYNDHAM, AND JSL KNEW OR SHOULD HAVE KNOWN OF J.R.'S TRAFFICKING AT THE ESA® HOTELS, THE KNIGHTS INN® JACKSONVILLE, AND THE EMERSON INN**

238.  ESA, Wyndham, and JSL had actual or constructive knowledge of J.R.'s trafficking at the ESA® Hotels, the Knights Inn® Jacksonville, and the Emerson Inn.

239.  A reasonably diligent company, armed with the knowledge and data available to ESA, Wyndham, and JSL, would have recognized the issue of sex trafficking at their hotels and adhered to the law by implementing policies, procedures, and training that, if followed, would have identified J.R.'s trafficking at their hotels.

## ESA Knew or Should Have Known of J.R.'s Sex Trafficking at the ESA® Southside, ESA® Deerwood, ESA® Lenoir, and ESA® Salisbury

240.  ESA knew or should have known that its hotel operating business ventures at the ESA® Southside, ESA® Deerwood, ESA® Lenoir, and ESA® Salisbury necessarily permit and facilitate sex trafficking, and that J.R. was harmed, by design, from those strategic business decisions.

241.  ESA knew or should have known of J.R.'s trafficking at the subject ESA® Hotels because ESA has been on notice of the pervasive issue and centrality of ESA brand hotels as sex trafficking havens for decades and failed to implement anti-trafficking measures.

242. ESA knew or should have known of J.R.'s trafficking at the subject ESA® Hotels through the numerous national and international efforts to combat sex trafficking within the hospitality industry, including the proliferation of well-researched and widespread anti-trafficking toolkits and trainings, as outlined in Section VIII, paragraphs 95-124.

243. ESA knew or should have known of J.R.'s trafficking at the subject ESA® Hotels because ESA knew sex trafficking and prostitution are associated, that both carry a high risk of physical and sexual violence, substance abuse, and other illegal and dangerous conduct, and that pimps and traffickers use force, fraud, and coercion to compel commercial sex acts.

244. ESA knew or should have known of J.R.'s trafficking at the subject ESA® Hotels because ESA knew that ESA brand hotels, including the ESA® Hotels were in areas known for crime and the sex trade, and that ESA brand hotels, including the ESA® Hotels were therefore susceptible to sex trafficking.  ESA also knew or should having known of J.R.'s trafficking at the subject ESA® Hotels from the numerous reports, news and other police activity ESA monitored, received, and reviewed concerning these issues at the subject ESA® Hotels as outlined in Section IX.D, paragraphs 197-199.

245. ESA knew or should have known of J.R.'s trafficking because ESA hotel employees at ESA brand hotels observed the obvious red flags of trafficking, including at the subject ESA® Hotels.  ESA® Southside staff observed the signs of J.R.'s trafficked as outlined in Section II.A, paragraphs 75-78.  ESA® Deerwood staff observed the

signs of J.R.'s trafficked as outlined in Section II.A, paragraph 80.  ESA® Lenoir staff observed the signs of J.R.'s trafficked as outlined in Section II.A, paragraphs 74, 79, and 81.  ESA® Salisbury staff observed the signs of J.R.'s trafficked as outlined in Section VII.A, paragraphs 74, 79, and 81.

246.    These sex trafficking signs were so open and obvious that numerous hotel guests complained to ESA and publicly warned others in online reviews about the dangers of ESA brand hotels, including the dangers of the subject ESA® Hotels as outlined in Section IX.D, paragraphs 201-204.

247.    ESA knowingly enabled the trafficking of J.R. and other victims at ESA brand hotels by refusing to train ESA employees to identify, address, and or report obvious signs of sex trafficking, and by refusing to implement a brand-wide zero tolerance policy for sex trafficking on their properties, including at the subject ESA® Hotels.  ESA knew or should have known of J.R.'s trafficking had ESA done so.

248.    ESA also had actual or constructive knowledge of J.R.'s sex trafficking occurring at the subject ESA® Hotels because, upon information and belief, ESA requires all employees to report suspicious activity at its ESA brand hotels to its ESA corporate executives and upper-level management.  Had ESA trained its staff on the red flag signs of trafficking, its staff would have reported the obvious indications of

J.R.'s sex trafficking that both ESA staff and hotel guests witnessed at the ESA®
Southside, ESA® Deerwood, ESA® Lenoir, and ESA® Salisbury.[84]

249.   Moreover, ESA had actual or constructive knowledge of J.R.'s sex
trafficking occurring at its Extended Stay America® brand hotels because ESA requires
its hotels to use centralized data systems that are owned and operated by ESA at the
corporate level, for reservations and booking, credit processing, property management,
Wi-Fi and information technology, and incident reporting.  Through these means and
centralized management platforms, ESA repeatedly collected data on J.R., her
trafficker, and her buyers and had direct access to data such as: room reservation
patterns; identification and payment information; data from websites visited on hotel
Wi-Fi; guest complaints and disturbances during stays; extra requests for towels and
linens; room cleaning requests; and other data associated with J.R. and her trafficker.
These mechanisms alerted or should have alerted ESA to J.R.'s traffickers' and buyers'
ongoing criminal activity at the subject ESA® Hotels.

250.   In addition, each time J.R.'s trafficker or buyers connected to ESA's free
Wi-Fi to post or view advertisements of commercial sex with J.R., ESA knowingly
collected and retained the user's web browsing and personal data on ESA's data
management platform which alerted or should have alerted ESA to J.R.'s trafficking
at the subject ESA® Hotels.

---

[84] Alternatively, despite ESA's failures to train its employees or implement and enforce anti-trafficking
policies and procedures, ESA staff that witnessed signs of J.R.'s trafficking may still have reported the
criminal conduct to higher ESA corporate management such that ESA had actual knowledge, as well
as constructive knowledge, of J.R.'s trafficking at the ESA® Hotels.

251.    ESA knew or should have known of J.R.'s trafficking at the subject ESA® Hotels through ESA's centralized control over, and monitoring of, their ESA brand hotels, the decades of research and resources provided to ESA to combat this known problem, and ESA's purported anti-trafficking measures which ESA brand hotels would have used to report J.R.'s trafficking to ESA had any such measures actually been effectively trained, implemented, or enforced.

252.    ESA could and should have implemented and enforced anti-trafficking policies, procedures, and training to address the known sex trafficking at their brand hotels which would have protected J.R., and others like her, from being repeatedly exploited, including by:

    a.    Mandating employee training addressing trafficking within hotels;

    b.    Distributing material to assist employees in identifying trafficking;

    c.    Developing a process for escalating suspected trafficking within the organization;

    d.    Providing checklists, protocols, and information on trafficking;

    e.    Mandating new hire orientation on human rights and corporate responsibility;

    f.    Mandating periodic continued employee education on hotel trafficking through webinars, seminars, conferences, and online portals; and

    g.    Tracking performance indicators and key metrics on trafficking prevention at their hotels; and

h.    Closing hotels which continue to allow rampant sex trafficking and refuse to enforce the corporate anti-trafficking policies and procedures.

253.    Despite having actual and/or constructive knowledge of the extensive commercial sex trafficking occurring at the brand hotels ESA owned and operated daily, ESA maintained its deficiencies, repeatedly choosing to not stop or to inadequately address J.R.'s trafficking at the ESA® Southside, ESA® Deerwood, ESA® Lenoir, and ESA® Salisbury.

254.    Had ESA not harbored known and suspected human traffickers, buyers, and victims in exchange for financial gain, J.R.'s trafficker could not have successfully arranged for her to be continually sold for sex at the subject ESA® Hotels.

255.    Had ESA not allowed J.R. to be advertised across ESA's networks in exchange for financial gain, J.R.'s trafficker could not have successfully arranged for her to be continually sold for sex at the subject ESA® Hotels.

256.    Had ESA not had business models which permitted, facilitated, and encouraged ongoing human trafficking at ESA brand hotels, J.R. would not have been trafficked at the subject ESA® Hotels throughout 2013.  The open and obvious signs of J.R.'s sex trafficking would and should have resulted in J.R.'s trafficking being reported, prevention of further room rentals to her trafficker, and an end to J.R.'s exploitation at the subject ESA® Hotels.

**Wyndham Knew or Should Have Known of J.R.'s Sex Trafficking at the Knights Inn® Jacksonville**

257.    Wyndham knew or should have known that its hotel operating business ventures at the Knights Inn® Jacksonville necessarily permitted and facilitated sex trafficking, and that J.R. was harmed, by design, from those strategic business decisions.

258.    Wyndham knew or should have known of J.R.'s trafficking at the Knights Inn® Jacksonville because Wyndham has been on notice of the pervasive issue and centrality of Wyndham brand hotels as sex trafficking havens for decades and failed to implement anti-trafficking measures.

259.    Wyndham knew or should have known of J.R.'s trafficking at the Knights Inn® Jacksonville through the numerous national and international efforts to combat sex trafficking within the hospitality industry, including the proliferation of well-researched and widespread anti-trafficking toolkits and trainings as outlined in Section VIII, paragraphs 95-124.

260.    Wyndham knew or should have known of J.R.'s trafficking at the Knights Inn® Jacksonville because Wyndham knew sex trafficking and prostitution are associated, that both carry a high risk of physical and sexual violence, substance abuse, and other illegal and dangerous conduct, and that pimps and traffickers use force, fraud, and coercion to compel commercial sex acts.

261.    Wyndham knew or should have known of J.R.'s trafficking at the Knights Inn® Jacksonville because Wyndham knew that the Knights Inn® Jacksonville

92

was in an area known for crime and the sex trade, and that the Knights Inn® Jacksonville was therefore susceptible to sex trafficking. Wyndham also knew or should having known of J.R.'s trafficking at the Knights Inn® Jacksonville from the numerous reports, news and other police activity Wyndham monitored, received, and reviewed concerning these issues at the Knights Inn® Jacksonville as outlined in Section IX.D, paragraphs 213-217.

262. Wyndham knew or should have known of J.R.'s trafficking because Knights Inn® Jacksonville hotel employees observed the obvious red flags of sex trafficking at the hotel as outlined in Section VII.B, paragraphs 83-85. These sex trafficking signs were so open and obvious that numerous hotel guests complained to Wyndham and publicly warned others in online reviews about the dangers of Knights Inn® brand hotels, including the dangers of the Knights Inn® Jacksonville as outlined in Section IX.D, paragraph 219.

263. Wyndham knowingly enabled the trafficking of J.R. and other victims at Knights Inn® brand hotels by refusing to train Wyndham and KFSI employees to identify, address, and or report obvious signs of sex trafficking, and by refusing to implement a brand-wide zero tolerance policy for sex trafficking on their properties, including at the Knights Inn® Jacksonville. Wyndham knew or should have known of J.R.'s trafficking had Wyndham done so.

264. Wyndham also had actual or constructive knowledge of J.R.'s sex trafficking occurring at the Knights Inn® Jacksonville because, upon information and belief, Wyndham requires all employees to report suspicious activity at its Knights

93

Inn® brand hotels to its Wyndham corporate executives and upper-level management. Had Wyndham trained its staff on the red flag signs of trafficking, its staff would have reported the obvious indications of J.R.'s sex trafficking that both Knights Inn® Jacksonville staff and hotel guests witnessed at the Knights Inn® Jacksonville.[85]

265.   Moreover, Wyndham had actual or constructive knowledge of J.R.'s sex trafficking occurring at its Knights Inn® brand hotels because Wyndham requires its brand hotels to use centralized data systems that are owned and operated by Wyndham at the corporate level, for reservations and booking, credit processing, property management, Wi-Fi and information technology, and incident reporting. Through these means and centralized management platforms, Wyndham repeatedly collected data on J.R., her trafficker, and her buyers and had direct access to data such as: room reservation patterns; identification and payment information; data from websites visited on hotel Wi-Fi; guest complaints and disturbances during stays; extra requests for towels and linens; room cleaning requests; and other data associated with J.R. and her trafficker.  These mechanisms alerted or should have alerted Wyndham to J.R.'s traffickers' and buyers' ongoing criminal activity at the Knights Inn® Jacksonville.

---

[85] Alternatively, despite Wyndham's failures to train its employees or implement and enforce anti-trafficking policies and procedures, Knights Inn® Jacksonville staff that witnessed signs of J.R.'s trafficking may still have reported the criminal conduct to higher Wyndham corporate management such that Wyndham had actual knowledge, as well as constructive knowledge, of J.R.'s trafficking at the Knights Inn® Jacksonville.

266. In addition, each time J.R.'s trafficker or buyers connected to Wyndham's free Wi-Fi to post or view advertisements of commercial sex with J.R., Wyndham knowingly collected and retained the user's web browsing and personal data on Wyndham's data management platform which alerted or should have alerted Wyndham to J.R.'s trafficking at the Knights Inn® Jacksonville.

267. Wyndham knew or should have known of J.R.'s trafficking at the Knights Inn® Jacksonville through Wyndham's centralized control over, and monitoring of, its Knights Inn® brand hotels, the decades of research and resources provided to Wyndham to combat this known problem, and Wyndham's purported anti-trafficking measures which Knights Inn® brand hotels would have used to report J.R.'s trafficking to Wyndham had any such measures actually been effectively trained, implemented, or enforced.

268. Wyndham could and should have implemented and enforced anti-trafficking policies, procedures, and training to address the known sex trafficking at its Knights Inn® brand hotels which would have protected J.R., and others like her, from being repeatedly exploited, including by:

      a.    Mandating employee training addressing trafficking within hotels;

      b.    Distributing material to assist employees in identifying trafficking;

      c.    Developing a process for escalating suspected trafficking within the organization;

      d.    Providing checklists, protocols, and information on trafficking;

e. Mandating new hire orientation on human rights and corporate responsibility;

f. Mandating periodic continued employee education on hotel trafficking through webinars, seminars, conferences, and online portals; and

g. Tracking performance indicators and key metrics on trafficking prevention at their hotels; and

h. Closing hotels which continue to allow rampant sex trafficking and refuse to enforce the corporate anti-trafficking policies and procedures.

269. Despite having actual and/or constructive knowledge of the extensive commercial sex trafficking occurring at the Knights Inn® brand hotels Wyndham owned, operated, and/or managed daily, Wyndham maintained its deficiencies, repeatedly choosing to not stop or to inadequately address J.R.'s trafficking at the Knights Inn® Jacksonville.

270. Had Wyndham not harbored known and suspected human traffickers, buyers, and victims in exchange for financial gain, J.R.'s trafficker could not have successfully arranged for her to be continually sold for sex at the Knights Inn® Jacksonville.

271. Had Wyndham not allowed J.R. to be advertised across Wyndham's networks in exchange for financial gain, J.R.'s trafficker could not have successfully arranged for her to be continually sold for sex at the Knights Inn® Jacksonville.

272. Had Wyndham not had business models which permitted, facilitated, and encouraged ongoing human trafficking at Knights Inn® brand hotels, J.R. would not have been trafficked at the Knights Inn® Jacksonville throughout 2013. The open and obvious signs of J.R.'s sex trafficking would and should have resulted in J.R.'s trafficking being reported, prevention of further room rentals to her trafficker, and an end to J.R.'s exploitation at the Knights Inn® Jacksonville.

**JSL Knew or Should Have Known of J.R.'s Sex Trafficking at the Emerson Inn**

273. JSL knew or should have known that its hotel operating business ventures at the Emerson Inn necessarily permitted and facilitated sex trafficking, and that J.R. was harmed, by design, from those strategic business decisions.

274. JSL knew or should have known of J.R.'s trafficking at the Emerson Inn because JSL has been on notice of the pervasive issue and centrality of JSL brand hotels as sex trafficking havens for decades and failed to implement anti-trafficking measures.

275. JSL knew or should have known of J.R.'s trafficking at the Emerson Inn through the numerous national and international efforts to combat sex trafficking within the hospitality industry, including the proliferation of well-researched and widespread anti-trafficking toolkits and trainings as outlined in Section VIII, paragraphs 95-124.

276. JSL knew or should have known of J.R.'s trafficking at the Emerson Inn because JSL knew sex trafficking and prostitution are associated, that both carry a high risk of physical and sexual violence, substance abuse, and other illegal and dangerous

conduct, and that pimps and traffickers use force, fraud, and coercion to compel commercial sex acts.

277.   JSL knew or should have known of J.R.'s trafficking at the Emerson Inn because JSL knew that the Emerson Inn was in an area known for crime and the sex trade, and that the Emerson Inn was therefore susceptible to sex trafficking.  JSL also knew or should having known of J.R.'s trafficking at the Emerson Inn from the numerous reports, news and other police activity JSL monitored, received, and reviewed concerning these issues at the Emerson Inn as outlined in Section IX.D, paragraphs 228-230.

278.   JSL knew or should have known of J.R.'s trafficking because Emerson Inn hotel employees observed the obvious red flags of sex trafficking at the hotel as outlined in Section VII.C, paragraphs 87-94.  These sex trafficking signs were so open and obvious that numerous hotel guests complained to JSL and publicly warned others in online reviews about the dangers of the Emerson Inn as outlined in Section IX.D, paragraph 232.

279.   JSL knowingly enabled the trafficking of J.R. and other victims at the Emerson Inn by refusing to train JSL employees to identify, address, and or report obvious signs of sex trafficking, and by refusing to implement a brand-wide zero tolerance policy for sex trafficking at the Emerson Inn.  JSL knew or should have known of J.R.'s trafficking had JSL done so.

280.   JSL also had actual or constructive knowledge of J.R.'s sex trafficking occurring at the Emerson Inn because, upon information and belief, JSL requires all

98

employees to report suspicious activity at the Emerson Inn to its JSL corporate executives and upper-level management. Had JSL trained its staff on the red flag signs of trafficking, its staff would have reported the obvious indications of J.R.'s sex trafficking that both Emerson Inn staff and hotel guests witnessed at the Emerson Inn.[86] In addition, JSL owners and operators regularly worked at the Emerson Inn and, upon information and belief, themselves witnessed the obvious signs of J.R.'s trafficking.

281.  Moreover, JSL had actual or constructive knowledge of J.R.'s sex trafficking occurring at the Emerson Inn because JSL requires the Emerson Inn to use centralized data systems that are owned and operated by JSL at the corporate level, for reservations and booking, credit processing, property management, Wi-Fi and information technology, and incident reporting. Through these means and centralized management platforms, JSL repeatedly collected data on J.R., her trafficker, and her buyers and had direct access to data such as: room reservation patterns; identification and payment information; data from websites visited on hotel Wi-Fi; guest complaints and disturbances during stays; extra requests for towels and linens; room cleaning requests; and other data associated with J.R. and her trafficker. These mechanisms alerted or should have alerted JSL to J.R.'s traffickers' and buyers' ongoing criminal activity at the Emerson Inn.

---

[86] Alternatively, despite JSL's failures to train its employees or implement and enforce anti-trafficking policies and procedures, Emerson Inn staff that witnessed signs of J.R.'s trafficking may still have reported the criminal conduct to JSL owners and managers such that JSL had actual knowledge, as well as constructive knowledge, of J.R.'s trafficking at the Emerson Inn.

282.    In addition, each time J.R.'s trafficker or buyers connected to JSL's free Wi-Fi to post or view advertisements of commercial sex with J.R., JSL knowingly collected and retained the user's web browsing and personal data on JSL's data management platform which alerted or should have alerted JSL to J.R.'s trafficking at the Emerson Inn.

283.    JSL knew or should have known of J.R.'s trafficking at the Emerson Inn through JSL's centralized control over, and monitoring of, the Emerson Inn, the decades of research and resources provided to JSL to combat this known problem, and JSL's purported anti-trafficking measures which staff at the Emerson Inn would have used to report J.R.'s trafficking to JSL had any such measures actually been effectively trained, implemented, or enforced.

284.    JSL could and should have implemented and enforced anti-trafficking policies, procedures, and training to address the known sex trafficking at the Emerson Inn which would have protected J.R., and others like her, from being repeatedly exploited, including by:

   a.    Mandating employee training addressing trafficking within hotels;

   b.    Distributing material to assist employees in identifying trafficking;

   c.    Developing a process for escalating suspected trafficking within the organization;

   d.    Providing checklists, protocols, and information on trafficking;

   e.    Mandating new hire orientation on human rights and corporate responsibility;

f.  Mandating periodic continued employee education on hotel trafficking through webinars, seminars, conferences, and online portals; and

g.  Tracking performance indicators and key metrics on trafficking prevention at their hotels; and

h.  Closing hotels which continue to allow rampant sex trafficking and refuse to enforce the corporate anti-trafficking policies and procedures.

285.  Despite having actual and/or constructive knowledge of the extensive commercial sex trafficking occurring at the Emerson Inn JSL directly owned, operated, and managed daily, JSL maintained its deficiencies, repeatedly choosing to not stop or to inadequately address J.R.'s trafficking at the Emerson Inn.

286.  Had JSL not harbored known and suspected human traffickers, buyers, and victims in exchange for financial gain, J.R.'s trafficker could not have successfully arranged for her to be continually sold for sex at the Emerson Inn.

287.  Had JSL not allowed J.R. to be advertised across JSL's networks in exchange for financial gain, J.R.'s trafficker could not have successfully arranged for her to be continually sold for sex at the Emerson Inn.

288.  Had JSL not had a business model which permitted, facilitated, and encouraged ongoing human trafficking at the Emerson Inn, J.R. would not have been trafficked at the Emerson Inn throughout 2013.  The open and obvious signs of J.R.'s sex trafficking would and should have resulted in J.R.'s trafficking being reported,

prevention of further room rentals to her trafficker, and an end to J.R.'s exploitation at the Emerson Inn.

## X. IF THE KNIGHTS INN® JACKSONVILLE WAS FRANCHISED BY KFSI, WYNDHAM AND RED LION MAINTAIN VICARIOUSLY TVPRA LIABILITY FOR J.R.'S TRAFFICKING

289. Although neither Wyndham nor Red Lion have yet to offer evidence suggesting the Knights Inn® Jacksonville was a franchised property in 2013, this anticipated argument does not disrupt Wyndham's, and thus subsequently Red Lion's, liability under the TVPRA.

290. In addition to, and apart from, direct liability under the TVPRA, the TVPRA also provides for vicariously liable if the Knights Inn® Jacksonville was franchised by KFSI—owned and directed by Wyndham—through the actions and inactions of the Knights Inn® Jacksonville hotel staff that facilitated J.R.'s trafficking.[87]

291. In 2013, Wyndham Worldwide, which included KFSI, exercised systemic control over the Knights Inn® Jacksonville. The Knights Inn® Jacksonville was thus an agent of Wyndham Worldwide when J.R. was trafficked.

---

[87] The TVPRA provides for vicarious liability and numerous courts have found Wyndham vicariously liable under agency principles for alleged TVPRA violations of its franchised hotels. *See S. Y. v. Wyndham Hotels & Resorts, Inc.*, 521 F. Supp. 3d 1173, 1187 (M.D. Fla. 2021) (finding WHR vicariously liable under Section 1595); *A.D. v. Wyndham Hotels & Resorts, Inc.*, No. 4:19CV120, 2020 WL 9550005 (E.D. Va. Sept. 21, 2020) (conducting an extensive analysis on TVPRA section 1595 vicarious liability and finding Wyndham so liable); *B.M. v. Wyndham Hotels & Resorts, Inc.*, No. 20-CV-00656-BLF, 2020 WL 4368214, at *6 (N.D. Cal. July 30, 2020) ("Plaintiff has alleged sufficient facts to establish a plausible claim for an agency relationship between the franchisees and Wyndham…"); *see also S.Y. v. Naples Hotel Co.*, 476 F. Supp. 3d 1251, 1257-58 (M.D. Fla. 2020); *J.C. v. Choice Hotels Int'l*, Inc., No. 20-CV-00155-WHO, 2020 WL 6318707, at *10.

292. To any extent the Knights Inn® Jacksonville was franchised, rather than directly owned and operated, by Wyndham Worldwide and KFSI, Wyndham and Red Lion are still vicariously liable and retain successor liability for the actions and inactions of Wyndham Worldwide and the Knights Inn® Jacksonville.

293. Under a typical franchise agreement, the corporate Brand lends its name and likeness to third party owners, while the hotel building and operations are run by a franchisee or third-party management company under the Brand's exacting control. In return, the Brand exchanges the high risk that is inherent in owning an asset like a hotel for the low risk associated with owning a franchise contract, while still controlling the Brand's image, policies, and profits from putting heads in their beds.

294. The average consumer does not see this relationship. The Brand gives the franchisee property the Brand's identity. The Brand provides signage within and in front of the hotel property that assures customers that when checking into that branded hotel, they can expect that Brand's specific standards. This notion is reinforced throughout the branded hotel as the Brand is emblazoned on everything from the pens on the bedside tables to the staff uniforms at the front desk.

295. In addition to Brand recognition and controlling consumer expectations, the Brand provides a marketing organization as well as hotel listings in the Global Distribution System (GDS) and other online travel agency databases. The Brand also supplies the branded hotel with its Brand-wide central room reservation system, 1-800 phone number, payment and revenue management tools, world-class loyalty programs and customer support, corporate website, advertising, and media channels. In

addition, the Brand requires the use of specified vendors and suppliers of goods and services at the hotel, and mandates the branded hotel carry Wi-Fi internet service which allows the Brand to access, monitor, and harvest guest data.

296.   Furthermore, for the privilege of carrying the Brand's name and reputation, the Brand requires the branded hotel to abide by the Brand's corporate policies, procedures, reporting, and staff training requirements.  Rather than paying the cost to develop their own, the branded hotel receives predetermined operating standards from the Brand.  The Brand directs, communicates, and publishes these protocols through the Brand's property systems with back-end management by the Brand.

297.   The Brand is considered a joint employer of the employees at its branded hotels.  As a standard practice in the hospitality industry, the Brand exercises significant control over the employment decisions at its branded hotels.  The Brand promulgates policies, procedures, and standards governing the hiring, training, retention, and advancement of employees at its branded hotel and sets its rates of pay.

298.   The Brand thus exercises significant control over the branded hotel's day-to-day operations.  Marketing, room reservations, hotel operating management systems, vendors, protocols, and internet at the branded hotel are all mandated and controlled by the corporate Brand.[88]

---

[88] Ellen Meyer, *The Origins and Growth of Franchising in the Hotel Industry*, LODGING MAGAZINE (Apr. 10, 2018), https://lodgingmagazine.com/the-origins-and-growth-of-franchising-in-the-hotel-industry

299.    Through these mechanisms, the Brand sees reservation trends and gathers valuable customer data from guests at the branded hotel, including names, payment information, reservation history, browsing data, service inquiries, utilization of facilities, other details associated with the hotel stay for promotional, customer service, and guest safety reasons.[89]

300.    In return, the branded hotel typically pays around 10% of its total revenue back to the Brand and is required to maintain the hotel property in accordance with the Brand's standards as laid out in its franchise agreement.

301.    Per the contract, franchise agreement, or direct ownership, supervision, and operation by the Brand, the Brand may enforce these standards through periodic inspections.  The Brand may terminate the agreement if the branded hotel is found to be inadequate; however, the Brand rarely takes this action because it would lose the associated franchise fees.  The right of the Brand to enforce these standards is also their responsibility.

302.    To the extent Wyndham Worldwide served as a corporate Brand and franchised the Knights Inn® brand to the Knights Inn® Jacksonville in 2013, Wyndham Worldwide and the Knights Inn® Jacksonville exhibited a significant degree of interrelated, intermingled, and unified operation, which demonstrated an agency relationship between them.

---

[89] *See, e.g.*, *Privacy Policy*, SONESTA RED LION, https://franchise.sonesta.com/es/node/946.

303. This agency relationship was created through Wyndham Worldwide's Brand exercise of an ongoing and systemic right of control over the Knights Inn® Jacksonville's hotel operations beyond that which is necessary to maintain Brand standards, including the means and methods of how the Knights Inn® Jacksonville conducted daily business through the following actions:

a. hosting online bookings on the Brand's domain;

b. regulating the rates for room rentals;

c. fixing additional hotel prices, such as for fees, incidentals, and food;

d. sharing profits;

e. requiring the use of the Brand's property management systems;

f. requiring the use of the Brand's payment processing systems;

g. requiring the use of only specific and Brand approved hotel vendors;

h. requiring the use of the Brand's customer rewards program;

i. mandating free Wi-Fi access at the hotel;

j. requiring the use of the Brand's internet services and providers, including filtering, cybersecurity measures, and advertising, which allows the Brand to access, monitor, and harvest guest internet data;

k. requiring installation of the Brand's data transport systems which share data with the Brand;

l.  mandating insurance coverage and other property requirements;

m.  mandating other standardized or strict rules of hotel operation;

n.  controlling customer review and response platforms;

o.  requiring the branded hotel to gather and generate data reports, including reservation, payment, and occupancy information for the Brand;

p.  requiring the branded hotel to keep audit reports and other records of hotel operations to be delivered to the Brand;

q.  setting employee wages;

r.  making employment decisions, including hiring, firing, and promotions;

s.  providing standardized training methods, education, and orientation materials for branded hotel employees, including but not limited to, webinars, seminars, conferences, and online portals;

t.  advertising for the branded hotel, including new property openings and employment;

u.  providing standardized marketing services and requirements;

v.  providing the software, hardware, and platforms used by branded hotels in daily operations or to report suspicious activity;

w.  providing IT support for the Brand's required systems;

107

x.    dictating the building and maintenance of the branded hotel structure in the Brand's specified manner;

y.    requiring modifications and updates to the branded hotel structure upon the Brand's request;

z.    prohibiting substantial changes to the branded hotel without the Brand's express permission;

aa.    conducting regular inspections and auditing hotel operations for compliance with contract terms and the Brand's rules and regulations;

bb.    developing and requiring the use of uniform Brand operating policies, procedures, and standards, including policies relating to security and guest safety, human rights, ethics, corporate governance, legal compliance, and risk management issues; and

cc.    other actions that deprive the branded hotels of independence.

304.    Upon information and belief, Wyndham Worldwide tracked, managed, and controlled the data regarding guest information, including physical location of guests via internet enabled devices, internet activity, inventory information, and indicia of J.R.'s trafficking at the Knights Inn® Jacksonville, including check-in, hospitality requests, internet activity and advertising posts on Backpage.com and other adult pages which solicited commercial sex listing the address and her location at the Knights Inn® Jacksonville.

305. In addition, Wyndham Worldwide created an apparent agency relationship with the Knights Inn® Jacksonville by holding it out to the public as possessing authority to act on Wyndham Worldwide's behalf.[90]

306. J.R.'s traffickers and buyers relied on Wyndham Worldwide's Brand standards and failure to implement or enforce anti-trafficking measures when they chose to harbor and advertise J.R. for commercial sex at the Knights Inn® Jacksonville.

307. As alleged in Section VII.B, paragraphs 82-85, employees at the Knights Inn® Jacksonville observed obvious signs of J.R.'s trafficking and had either actual or constructive knowledge of her exploitation. Yet under Wyndham Worldwide's hotel operating policies, procedures, and Brand standards, these employees failed to address J.R.'s victimization due to a lack of training, enforcement, or effectiveness.

308. As the primary in an agency relationship with Knights Inn® Jacksonville, Wyndham Worldwide assumed and breached its duties in the following ways:

> a.    Failing (altogether or adequately) to mandate employee training addressing trafficking within hotels;
>
> b.    Failing (altogether or adequately) to distribute material to assist employees in identifying trafficking;
>
> c.    Failing (altogether or adequately) to develop a process for escalating suspected trafficking within the organization;

---

[90] *See, e.g.*, Section IX.D. ¶ 220.b (online review warning against staying at the Knights Inn® Jacksonville and indicating they would "call corporate office to inform them tomorrow"); *see also* Section IX.D. ¶ 202.a ("I will be following up with their corporate office…").

d.    Failing (altogether or adequately) to provide checklists, protocols, and information on trafficking;

e.    Failing (altogether or adequately) to mandate new hire orientation on human rights and corporate responsibility;

f.    Failing (altogether or adequately) to mandate periodic continued employee education on hotel trafficking through webinars, seminars, conferences, and online portals;

g.    Failing (altogether or adequately) to track performance indicators and key metrics on trafficking prevention at their branded hotels; and

h.    Failing (altogether or adequately) to enforce anti-trafficking policies and procedures or end brand franchise agreements with hotels which allowed sex trafficking on the property.

309. Defendants Wyndham and Red Lion are vicariously liable for the knowing benefits the Knights Inn® Jacksonville received in franchising the hotel to Wyndham Worldwide, including but not limited to, the Knights Inn® brand's name, likeness, operating standards, and centralized management systems, and similarly liable for Wyndham Worldwide's knowing benefit of significant franchise fees and continuous royalties on gross revenues generated at the Knights Inn® Jacksonville.

310. Defendants Wyndham and Red Lion are vicariously liable for the Knights Inn® Jacksonville's participation in a commercial hotel operating business venture with Wyndham Worldwide which repeatedly harbored J.R., her trafficker,

and buyers in their rented rooms for commercial sex and advertised J.R. using its internet services for the same explicit purpose.

311. Employees at the Knights Inn® Jacksonville knew or should have known of J.R.'s trafficking through the obvious interactions and red flag signs she, her co-victims, trafficker, and buyers repeatedly exhibited over numerous and extended stays.

312. Employees at the Knights Inn® Jacksonville knew or should have known J.R.'s trafficker's purpose for being present at the hotel was to force to J.R. into commercial sex acts yet rented him rooms and continued to permit their presence.

313. Employees at the Knights Inn® Jacksonville knew or should have known J.R.'s buyers were present at the hotel solely for commercial sex yet continued to permit their presence and repeated entry to the rooms where J.R. was held.

314. Employees at the Knights Inn® Jacksonville failed to report the crimes and shielded J.R.'s trafficker and buyers from interruption by law enforcement.

315. Employees at the Knights Inn® Jacksonville failed to help or in any way address the suffering of J.R. and her co-victims from repeated sex trafficking.

316. Employees at the Knights Inn® Jacksonville continued to supply the trafficker and buyers with hotel services, including additional housekeeping.

317. Had the Knights Inn® Jacksonville or Wyndham Wordwide enacted and enforced effective anti-trafficking measures at their hotel, J.R.'s continued trafficking would not have been possible. They would not have profited from her pain.

## XI.  CAUSES OF ACTION

### COUNT ONE

### Violation of TVPRA 18 U.S.C. § 1595

### (Against Defendants ESA Inc., ESA Operating, and ESA Management)

318.    J.R. incorporates each foregoing allegation as if fully set forth herein.

319.    J.R. is a survivor victim of sex trafficking within the meaning of 18 U.S.C. § 1591(a) and is therefore entitled to bring a civil action under 18 U.S.C. § 1595 against "whoever knowingly benefits, financially or by receiving anything of value from participating in a venture which that person knew or should have known was engaged in an act in violation of [the TVPRA] . . . ."

320.    As a sex trafficking victim, J.R. endured extreme violence, fraud, and coercion as outlined in Section VII., paragraphs 62-72.

321.    ESA participated in hotel operating business ventures at the subject ESA® Hotels as outlined in Section IX. A, paragraphs 140-152.  ESA took part in a common undertaking or hotel enterprise involving risk and potential profit.  As a commercial hotel business, ESA's venture necessarily involved the goal of making profit while balancing numerous risks, including market risk or insufficient customer demand, risk of insolvency or inability to access capital, risk of rising input or operating costs (e.g., labor, utilities, advertising, etc.), and regulatory risk.[91]

---

[91] Plaintiff alleges a distinct hotel operating business venture.  The venture is not defined by J.R.'s sex trafficking nor her trafficker's participation with the defendant.  Indeed, to satisfy the participation requirement the element "does not require that the defendant in question have participated in the sex trafficking act itself."  *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 730 (11th Cir. 2021) (Jordan, J., concurring).  Here, the venture is defined exclusively by ESA's hotel businesses at the ESA® Hotels.

322.   The hotel ventures included Defendant ESA, Inc., Defendant ESA Operating, and Defendant ESA Managing.  The hotel ventures further included ESH REIT and the hotel staff and employees at the four subject ESA® Hotels where Plaintiff was trafficked: ESA® Southside, ESA® Deerwood, ESA® Lenoir, and ESA® Salisbury.

323.   The ESA® Hotel staff and employees involved in the hotel ventures included, but are not limited to, the maintenance workers, housekeeping and janitorial staff, front-desk staff, booking or reservation staff, kitchen and room service staff, hotel managers and assistant managers, bookkeepers and accountants, bell-hops, and valets.

324.   ESA knowingly benefited, attempted to benefit, and conspired to benefit from participation in hotel operating business ventures at each of the subject ESA® Hotels as defined in Section IX.B, paragraphs 167, 170-178.  ESA knowingly benefited from participating in a business venture to operate the ESA® Southside hotel.  ESA knowingly benefited from participating in a business venture to operate the ESA® Deerwood hotel.  ESA knowingly benefited from participating in a business venture to operate the ESA® Lenoir hotel.  ESA knowingly benefited from participating in a business venture to operate the ESA® Salisbury hotel.

325.   ESA knew it was receiving value from participating in the hotel operating business ventures at the subject ESA® Hotels.

113

326. ESA financially benefited from participating in the hotel operating business ventures by receiving money from renting rooms at the subject ESA® Hotels. ESA knew it was receiving money from renting ESA hotels rooms.[92]

327. Moreover, ESA directly benefited from the trafficking of J.R. on each occasion it received payment for rooms rented at the ESA® hotels where J.R. was harbored.

328. ESA further gained financial value in its hotel ventures by keeping operating costs low and maintaining the loyalty of the segment of its customer base that sought to participate in the sex trade.

329. In addition, ESA knowingly benefited from providing free Wi-Fi in the operation of its hotel business at the ESA® Hotels which J.R.'s traffickers used to advertise J.R. and solicit buyers. ESA, in turn, acquired valuable customer data which it collected from any internet users at its hotels.

330. ESA's hotel operating business ventures at the ESA® Hotels violated the TVPRA by: (1) recruiting, enticing, patronizing, and soliciting J.R.'s traffickers and buyers to each of the subject ESA® Hotels; (2) harboring, providing, obtaining, and maintaining sex trafficking victims, traffickers, and buyers, including J.R., J.R.'s trafficker, and J.R.'s buyers in rented hotel rooms at the ESA® Southside, ESA® Deerwood, ESA® Lenoir, and ESA® Salisbury; and (3) providing the uninhibited internet services sex traffickers, including J.R.'s traffickers, used to advertise victims

---

[92] Collecting profits made by hotel room rentals is sufficient to allege the knowing benefit element. *See J.C. v. I Shri Khodiyar, LLC*, 624 F. Supp. 3d 1307, 1316 (N.D. Ga. 2022) (collecting cases).

114

like J.R. and solicit buyers for commercial sex acts at each of the subject ESA® Hotels as outlined in Section IX.C, paragraphs 181-182, 185, 188-190.

331.    ESA not only had actual or constructive knowledge of sex trafficking occurring at its ESA brand hotels, as outlined in Section IX.D, paragraphs 191-209, but ESA also knew or should have known of J.R.'s trafficking specifically through news and national and international efforts, through crime reports and calls for service, through publicly posted and direct internal reports of prostitution and sex trafficking at its hotels, through J.R.'s appearance and interactions with ESA hotel staff, through J.R.'s traffickers and buyers' appearance and conduct at the ESA® Hotels, through its internet service and centralized data systems, through the training of its hotel staff, and through the implementation and enforcement of other anti-trafficking policies, procedures, and training as outlined by Section VII.A, paragraphs 73-81, and Section IX.E, paragraphs 238-256.

332.    ESA, through ESA's hotel staff and each of the hotel operating business ventures at the ESA® Hotels, knew, were in reckless disregard of the fact, or should have known that means of force, threats of force, fraud, coercion, or any combination of such means were used to cause J.R. to engage in commercial sex acts.

333.    ESA should have known that its hotel operating business ventures at the ESA® Hotels were violating the TVPRA 18 U.S.C. § 1591. Nevertheless, ESA chose not to help J.R. when witnessing her assaults and chose not to implement or enforce anti-trafficking measures that would have helped her, and others like her. Instead, the ESA hotel businesses continued to solicit traffickers and buyers, rent rooms for

115

commercial sex, and advertise sex trafficking through ESA's internet. These actions, omissions, and/or commissions were the but-for and proximate cause of J.R.'s injuries and damages and a breach of ESA's statutory obligation not to benefit from a hotel venture that it knew, or should have known, to engage in violations of 18 U.S.C. § 1591(a).

334.   J.R. has suffered substantial physical and psychological injuries as the result of being trafficked at the ESA® Southside, ESA® Deerwood, ESA® Lenoir, and ESA® Salisbury.

## COUNT TWO
### Violation of TVPRA 18 U.S.C. § 1595
### (Against Defendants Wyndham and Red Lion)

335.   J.R. incorporates each foregoing allegation as if fully set forth herein.

336.   J.R. is a survivor victim of sex trafficking within the meaning of 18 U.S.C. § 1591(a) and is therefore entitled to bring a civil action under 18 U.S.C. § 1595 against "whoever knowingly benefits, financially or by receiving anything of value from participating in a venture which that person knew or should have known was engaged in an act in violation of [the TVPRA] . . . ."

337.   As a sex trafficking victim, J.R. endured extreme violence, fraud, and coercion as outlined in Section VII., paragraphs 62-72.

338.   Wyndham participated in a hotel operating business venture at the Knights Inn® Jacksonville as outlined in Section IX. A, paragraphs 153-161. Wyndham took part in a common undertaking or hotel enterprise involving risk and

116

potential profit.   As a commercial hotel business, Wyndham's venture necessarily involved the goal of making profit while balancing numerous risks, including market risk or insufficient customer demand, risk of insolvency or inability to access capital, risk of rising input or operating costs (e.g., labor, utilities, advertising, etc.), and regulatory risk.[93]

339.   Unlike ESA and JSL who were undoubtedly direct hotel owners and operators, if Wyndham was a franchisor of the Knights Inn$_®$ Jacksonville, Wyndham maintains TVPRA liability as outlined in Section X, paragraphs 289-317.   As a franchisor, Wyndham would have exchanged the high risk that is inherent in owning the Knights Inn$_®$ Jacksonville while still controlling the Knights Inn$_®$ brand image, policies, and profits from room rentals.

340.   The hotel venture included Defendant Wyndham (formerly Wyndham Worldwide), KFSI, and the hotel staff and employees at Knights Inn$_®$ Jacksonville.

341.   The Knights Inn$_®$ Jacksonville staff and employees involved in Wyndham's hotel venture included, but are not limited to, the maintenance workers, housekeeping and janitorial staff, front-desk staff, booking or reservation staff, kitchen and room service staff, hotel managers and assistant managers, bookkeepers and accountants, bell-hops, and valets.

---

[93] Plaintiff alleges a distinct hotel operating business venture.   The venture is <u>not</u> defined by J.R.'s sex trafficking nor her trafficker's participation with the defendant.   Indeed, to satisfy the participation requirement the element "does not require that the defendant in question have participated in the sex trafficking act itself."   *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 730 (11th Cir. 2021) (Jordan, J., concurring).   Here, the venture is defined exclusively by Wyndham's hotel business at the Knights Inn$_®$ Jacksonville.

342.    Wyndham knowingly benefited, attempted to benefit, and conspired to benefit from participation in the hotel operating business venture at the Knights Inn® Jacksonville as defined in Section IX.B, paragraphs 168, 170-177, 179.  Wyndham knowingly benefited from participating in a business venture to operate the Knights Inn® Jacksonville hotel.

343.    Wyndham knew it was receiving value from participating in the hotel operating business ventures at the Knights Inn® Jacksonville.

344.    Wyndham financially benefited from participating in the hotel operating business venture by receiving money from renting rooms at the Knights Inn® Jacksonville. Wyndham knew it was receiving money from renting Knights Inn® Jacksonville hotel rooms.[94]  As a franchisor, Wyndham would have further benefited through the receipt of significant franchise fees and royalties on gross room revenues generated at the Knights Inn® Jacksonville.

345.    Moreover, Wyndham directly benefited from the trafficking of J.R. on each occasion it received payment for rooms rented at the Knights Inn® Jacksonville where J.R. was harbored.

346.    Wyndham further gained financial value in its hotel ventures by keeping operating costs low and maintaining the loyalty of the segment of its customer base that sought to participate in the sex trade.

---

[94] Collecting profits made by hotel room rentals is sufficient to allege the knowing benefit element.  *See J.C. v. I Shri Khodiyar, LLC*, 624 F. Supp. 3d 1307, 1316 (N.D. Ga. 2022) (collecting cases).

347.   In addition, Wyndham knowingly benefited from providing free Wi-Fi in the operation of its hotel business at the Knights Inn® Jacksonville which J.R.'s traffickers used to advertise J.R. and solicit buyers.  Wyndham, in turn, acquired valuable customer data which it collected from any internet users at its hotels.

348.   Wyndham's hotel operating business venture at the Knights Inn® Jacksonville violated the TVPRA by: (1) recruiting, enticing, patronizing, and soliciting J.R.'s traffickers and buyers to each of the Knights Inn® Jacksonville; (2) harboring, providing, obtaining, and maintaining sex trafficking victims, traffickers, and buyers, including J.R., J.R.'s trafficker, and J.R.'s buyers in rented hotel rooms at the Knights Inn® Jacksonville; and (3) providing the uninhibited internet services sex traffickers, including J.R.'s traffickers, used to advertise victims like J.R. and solicit buyers for commercial sex acts at each of the Knights Inn® Jacksonville as outlined in Section IX.C, paragraphs 183, 186, 188-190.

349.   Wyndham not only had actual or constructive knowledge of sex trafficking occurring at its Knights Inn® brand hotels, including the Knights Inn® Jacksonville as outlined in Section IX.D, paragraphs 191-193, 210-224, but Wyndham also knew or should have known of J.R.'s trafficking specifically through news and national and international efforts, through crime reports and calls for service, through publicly posted and direct internal reports of prostitution and sex trafficking at its hotels, through J.R.'s appearance and interactions with ESA hotel staff, through J.R.'s traffickers and buyers' appearance and conduct at the Knights Inn® Jacksonville, through its internet service and centralized data systems, through the training of its

hotel staff, and through the implementation and enforcement of other anti-trafficking policies, procedures, and training as outlined by Section VII.B, paragraphs 82-85, and Section IX.E, paragraphs 238-239, 257-272.

350.    Wyndham, through Wyndham's Knights Inn® Jacksonville hotel staff and the hotel operating business venture at the Knights Inn® Jacksonville, knew, were in reckless disregard of the fact, or should have known that means of force, threats of force, fraud, coercion, or any combination of such means were used to cause J.R. to engage in commercial sex acts.

351.    Wyndham should have known that its hotel operating business venture at the Knights Inn® Jacksonville was violating the TVPRA 18 U.S.C. § 1591. Nevertheless, Wyndham chose not to help J.R. when witnessing her assaults and chose not to implement or enforce anti-trafficking measures that would have helped her, and others like her.  Instead, the Knights Inn® Jacksonville hotel business continued to solicit traffickers and buyers, rent rooms for commercial sex, and advertise sex trafficking through Wyndham's internet.  These actions, omissions, and/or commissions were the but-for and proximate cause of J.R.'s injuries and damages and a breach of Wyndham's statutory obligation not to benefit from a hotel venture that it knew, or should have known, to engage in violations of 18 U.S.C. § 1591(a).

352.    Red Lion acquired the Knights Inn® brand, including KFSI and management of the Knights Inn® Jacksonville, from Wyndham and is the successor

entity to Wyndham's and KFSI's wrongful conduct.  Red Lion therefore retains successor liability for the wrongful acts of its predecessors, Wyndham and KFSI.[95]

353.   J.R. has suffered substantial physical and psychological injuries as the result of being trafficked at Wyndham's and Red Lion's Knights Inn® Jacksonville.

## COUNT THREE
### Violation of TVPRA 18 U.S.C. § 1595
### (Against Defendant JSL)

354.   J.R. incorporates each foregoing allegation as if fully set forth herein.

355.   J.R. is a survivor victim of sex trafficking within the meaning of 18 U.S.C. § 1591(a) and is therefore entitled to bring a civil action under 18 U.S.C. § 1595 against "whoever knowingly benefits, financially or by receiving anything of value from participating in a venture which that person knew or should have known was engaged in an act in violation of [the TVPRA] . . . ."

356.   As a sex trafficking victim, J.R. endured extreme violence, fraud, and coercion as outlined in Section VII., paragraphs 62-72.

357.   JSL participated in a hotel operating business venture at the Emerson Inn as outlined in Section IX. A, paragraphs 162-165.  JSL took part in a common undertaking or hotel enterprise involving risk and potential profit.  As a commercial hotel business, JSL's venture necessarily involved the goal of making profit while balancing numerous risks, including market risk or insufficient customer demand, risk

---

[95] *See Bernard v. Kee Mfg. Co., Inc.*, 409 So.2d 1047, 1049 (1982); *Redman v. Cobb Int'l, Inc.*, 23 F. Supp. 2d 1372, 1375 (M.D. Fla. 1998), *aff'd sub nom. Redman v. Cobb Int'l Inc.*, 208 F.3d 1009 (11th Cir. 2000).

of insolvency or inability to access capital, risk of rising input or operating costs (e.g., labor, utilities, advertising, etc.), and regulatory risk.[96]

358.   The hotel venture included Defendant JSL and the hotel staff and employees at Emerson Inn.

359.   The Emerson Inn staff and employees involved in JSL's hotel venture included, but are not limited to, the maintenance workers, housekeeping and janitorial staff, front-desk staff, booking or reservation staff, kitchen and room service staff, hotel managers and assistant managers, bookkeepers and accountants, bell-hops, and valets.

360.   JSL knowingly benefited, attempted to benefit, and conspired to benefit from participation in the hotel operating business venture at the Emerson Inn as defined in Section IX.B, paragraphs 169, 170-177, 180. JSL knowingly benefited from participating in a business venture to operate the Emerson Inn hotel.

361.   JSL knew it was receiving value from participating in the hotel operating business ventures at the Emerson Inn.

362.   JSL financially benefited from participating in the hotel operating business venture by receiving money from renting rooms at the Emerson Inn. JSL knew it was receiving money from renting Emerson Inn hotel rooms.[97]

---

[96] Plaintiff alleges a distinct hotel operating business venture. The venture is not defined by J.R.'s sex trafficking nor her trafficker's participation with the defendant. Indeed, to satisfy the participation requirement the element "does not require that the defendant in question have participated in the sex trafficking act itself." *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 730 (11th Cir. 2021) (Jordan, J., concurring). Here, the venture is defined exclusively by JSL's hotel business at the Emerson Inn.
[97] Collecting profits made by hotel room rentals is sufficient to allege the knowing benefit element. *See J.C. v. I Shri Khodiyar, LLC*, 624 F. Supp. 3d 1307, 1316 (N.D. Ga. 2022) (collecting cases).

363.   Moreover, JSL directly benefited from the trafficking of J.R. on each occasion it received payment for rooms rented at the Emerson Inn where J.R. was harbored.

364.   JSL further gained financial value in its hotel ventures by keeping operating costs low and maintaining the loyalty of the segment of its customer base that sought to participate in the sex trade.

365.   In addition, JSL knowingly benefited from providing free Wi-Fi in the operation of its hotel business at the Emerson Inn which J.R.'s traffickers used to advertise J.R. and solicit buyers.  JSL, in turn, acquired valuable customer data which it collected from any internet users at its hotels.

366.   JSL's hotel operating business venture at the Emerson Inn violated the TVPRA by: (1) recruiting, enticing, patronizing, and soliciting J.R.'s traffickers and buyers to each of the Emerson Inn; (2) harboring, providing, obtaining, and maintaining sex trafficking victims, traffickers, and buyers, including J.R., J.R.'s trafficker, and J.R.'s buyers in rented hotel rooms at the Emerson Inn; and (3) providing the uninhibited internet services sex traffickers, including J.R.'s traffickers, used to advertise victims like J.R. and solicit buyers for commercial sex acts at each of the Emerson Inn as outlined in Section IX.C, paragraphs 184, 187, 188-190.

367.   JSL not only had actual or constructive knowledge of sex trafficking occurring at the Emerson Inn as outlined in Section IX.D, paragraphs 191-193, 225-237, but JSL also knew or should have known of J.R.'s trafficking specifically through news and national and international efforts, through crime reports and calls for service,

through publicly posted and direct internal reports of prostitution and sex trafficking at its hotels, through J.R.'s appearance and interactions with ESA hotel staff, through J.R.'s traffickers and buyers' appearance and conduct at the Emerson Inn, through its internet service and centralized data systems, through the training of its hotel staff, and through the implementation and enforcement of other anti-trafficking policies, procedures, and training as outlined by Section VII.C, paragraphs 86-94, and Section IX.E, paragraphs 238-239, 273-288.

368.   JSL, through JSL's Emerson Inn hotel staff and the hotel operating business venture at the Emerson Inn, knew, were in reckless disregard of the fact, or should have known that means of force, threats of force, fraud, coercion, or any combination of such means were used to cause J.R. to engage in commercial sex acts.

369.   JSL should have known that its hotel operating business venture at the Emerson Inn was violating the TVPRA 18 U.S.C. § 1591.  Nevertheless, JSL chose not to help J.R. when witnessing her assaults and chose not to implement or enforce anti-trafficking measures that would have helped her, and others like her.  Instead, the Emerson Inn hotel business continued to solicit traffickers and buyers, rent rooms for commercial sex, and advertise sex trafficking through JSL's internet.  These actions, omissions, and/or commissions were the but-for and proximate cause of J.R.'s injuries and damages and a breach of JSL's statutory obligation not to benefit from a hotel venture that it knew, or should have known, to engage in violations of 18 U.S.C. § 1591(a).

370.    J.R. has suffered substantial physical and psychological injuries as the result of being trafficked at JSL's Emerson Inn.

## **PRAYER FOR RELIEF**

WHEREFORE Plaintiff requests that the jury selected to hear this case render a verdict in her favor on all counts alleged, and against each and every named Defendant, separately and severally, and that it award damages to her in an amount which will adequately compensate her for the injuries and damages she sustained due to the Defendants' conduct outlined as follows:

a.    All available compensatory damages for the described losses with respect to each cause of action;

b.    Past and future medical expenses, as well as the costs associated with past and future life care;

c.    Past and future lost wages and loss of earning capacity;

d.    Past and future emotional distress;

e.    Consequential and/or special damages;

f.    All available noneconomic damages, including without limitation pain, suffering, and loss of enjoyment of life;

g.    Disgorgement of profits obtained through unjust enrichment;

h.    Restitution;

i.    Punitive damages with respect to each cause of action;

j.    Reasonable and recoverable attorneys' fees;

k.    Costs of this action; and

l.      Pre-judgment and all other interest recoverable.

On the foregoing basis, Plaintiff also requests a jury be selected to hear this case and render a verdict for Plaintiff, and against Defendants, and that it award damages to Plaintiff in an amount which adequately reflects the enormity of the Defendants' wrongs, and which will effectively prevent other similarly caused acts.  Further, Plaintiff requests the Court enter judgment consistent with the jury's verdict and prays for any other damages and equitable relief the Court or jury deems appropriate under the circumstances.

**THE PLAINTIFF DEMANDS A TRIAL BY JURY**

DATED: November 22, 2023          Respectfully submitted,

/s/ *Amanda J.G. Walbrun*

Amanda J.G. Walbrun (*pro hac vice*)
Meghan E. McCormick (Fla. Bar No.888745)
BOUCHER LLP
555 Montgomery St., Ste. 1205
San Francisco, CA 94111
T: (818) 340-5400
F: (818) 340-5401
E: mccormick@boucher.la
E: walbrun@boucher.la

Doug H. Clifton (Fla. Bar No. 49850)
EDWARDS & RAGATZ, PA
4401 Salisbury Rd., Ste. 200
Jacksonville, FL 32216
T: 904-399-1609
F: 904-399-1615
E: DHC@edwardsragatz.com

*Attorneys for Plaintiff*

126